UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| PEGGY YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. DKC 08 CV 2586. |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant, | ) | |

**PLAINTIFF'S MEMORANDUM
IN OPPOSITION TO
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

Sharon Fast Gustafson
4041 N. 21st Street
Arlington, Virginia  22207
(703) 527-0147 telephone
(703) 527-0582 telefacsimile
sf.gustafson@verizon.net
Federal Bar No. 16485

*Attorney for Plaintiff*

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Ms. Young's employment as a driver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    The lifting requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Medical impairments and DOT certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Circumstances in which UPS accommodates drivers . . . . . . . . . . . . . . . . . . . . . . . . 7
    UPS's vocabulary for alternate work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    "Light duty" for non-work-related injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Numerous non-lifting functions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    UPS's policy of not accommodating pregnant employees . . . . . . . . . . . . . . . . . . . . . 13
    CBA negotiation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Ms. Young's pregnancy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Ms. Young's attempt to return to work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    UPS's refusal to allow Ms. Young to work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    Ms. Young's "disability" status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Ms. Young's damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    I.      UPS violated the Pregnancy Discrimination Act . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        A.    Pregnancy discrimination is against the law . . . . . . . . . . . . . . . . . . . . . . . . 23
        B.    Direct evidence shows that UPS sent Peggy Young home
            because she was pregnant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

            1.    UPS told Peggy Young to go home until she was no longer pregnant
                 because she was "too much of a liability" . . . . . . . . . . . . . . . . . . . . . . 25
            2.    UPS required Ms. Young to bring in a doctor's note with
                 her "restrictions" and later told her to get a doctor's note
                 saying she could not work at all . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
            3.    UPS has an explicit, stated policy of denying accommodations to
                 employees with pregnancy-related limitations . . . . . . . . . . . . . . . . . . . 29
        C.    Other evidence shows that UPS committed pregnancy discrimination
            in four ways . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

            1.    UPS violated the PDA by refusing to permit Peggy Young
                 to perform her regular job because she was pregnant . . . . . . . . . . . . . . 30

a.  Because Ms. Young was pregnant, UPS did not let her
decide for herself whether she would work her regular job . . . . . 31

b.  Because Ms. Young was pregnant, UPS did not bother
to confirm that Ms. Young could work her regular job . . . . . . . 32

2.  UPS violated the PDA by implementing and enforcing a policy of not
accommodating employees with pregnancy-related conditions and by
following discriminatory procedures that abet that policy . . . . . . . . . . . 34

a.  UPS's policy of non-accommodation violates the PDA . . . . . . 34

b.  UPS's procedures for pregnant employees depart from
its usual procedures for employees who request or
need accommodations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

c.  Peggy Young was "similar in [her] ability or inability to work"
to other employees whom UPS accommodated . . . . . . . . . . . . . 39

d.  UPS's basis for denying Peggy Young an accommodation
was a pretext for its pregnancy discrimination  . . . . . . . . . . . . . 40

3.  UPS violated the PDA by failing to provide disability benefits
for medical conditions in early pregnancy and by requiring
that a pregnant employee have a doctor's note stating that she
cannot work at all in order to qualify for benefits  . . . . . . . . . . . . . . . . 44

4.  UPS's policy of providing accommodations only for employees
with on-the-job injuries or with other non-pregnancy-related medical
conditions has a disparate impact on pregnant women  . . . . . . . . . . . . . 45

II.  UPS violated the Americans with Disabilities Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

A.  UPS violated the ADA by requiring Peggy Young to obtain a medical
examination and a doctor's note with "restrictions."  . . . . . . . . . . . . . . . . . . . . . 46

B.  UPS violated the ADA by failing to accommodate Peggy Young
when it regarded her as having a disability  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

1.  UPS regarded Peggy Young as disabled  . . . . . . . . . . . . . . . . . . . . . . . . 48

a.  The Division Manager's statement that Ms. Young was "too much
of a liability" shows that UPS regarded her as disabled  . . . . . . 49

b.  The OHM's instruction to get a doctor's note that Ms. Young
could not work at all shows that UPS regarded her as disabled  . 52

c.  Coding Ms. Young 's status as "disability" shows that UPS
regarded her as disabled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

d.  UPS's other contentions are beside the point  . . . . . . . . . . . . . . 53

       2.     Peggy Young was qualified . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

       3.     UPS had a duty to accommodate Peggy Young once it
              regarded her as disabled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

III.    UPS's motion is moot insofar as it seeks judgment on Plaintiff's claim of race
      discrimination, since she has moved to dismiss that claim . . . . . . . . . . . . . . . . . . . . . . . 60

IV.    Ms. Young suffered damages as a result of UPS's unlawful discrimination . . . . . . . . . 60

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

APPENDICES (separately filed):

    PLAINTIFF'S ANNOTATION OF DEFENDANT UPS's
        "STATEMENT OF UNDISPUTED FACTS"

    UNPUBLISHED OPINION CITED:

       *Aksamit v. UPS*, No. 03-cv-0956 (D. Ariz. August 30, 2004)

    EVIDENCE CITED:

        Statement of Patricia Arline-Young ("Arline-Young Stmt.")
        Statement of Charles Cox ("Cox Stmt.")
        Statement of Tammy Gatton ("Gatton Stmt.")
        Statement of Sharon Fast Gustafson ("Gustafson Stmt.")
        Statement of Mia Johnson Lynch ("Lynch Stmt.")
        Statement of Faith Reyna ("Reyna Stmt.")
        Statement of Carolyn L. Robinson ("Robinson Stmt.")
        Statement of Lisa Scott ("Scott Stmt.")
        Statement of Cynthia Shawl ("Shawl Stmt."), with exhibits
        Statement of Anthony Smith ("Smith Stmt.")
        Statement of Carvette Welch ("Welch Stmt.")
        Statement of Tynette Williams ("Tynette Williams Stmt.")
        Statement of Peggy Young (¶¶ 1-64, June 3, 2009) and supplemental statement (¶¶ 65-73,
           September 15, 2010) (collectively, "Young Stmt."), with exhibits

        Deposition of Patricia Arline-Young ("Arline-Young Dep.")
        Deposition of Tammy Gatton ("Gatton Dep.")
        Deposition of Michael Wayne Hill ("Hill Dep.")
        Deposition of Carolyn Martin ("Martin Dep."), selected pages
        Deposition of Regina McNair ("McNair Dep.")

Deposition of UPS, Designee Mark Brien ("UPS Dep. (Brien)"), selected pages,
   with exhibits (filed in paper form and under seal)
Deposition of UPS, Designee Jerry Gordanier ("UPS Dep. (Gordanier)")
Deposition of UPS, Designee Frankie McDonnell ("UPS Dep. (McDonnell)")
Deposition of Tynette Williams ("Tynette Williams Dep.")
Deposition of Peggy Young ("Young Dep."), selected pages

Plaintiff's Exhibits ("PX") 1-22 (filed electronically):

| | |
|---|---|
| PX1 | "COBRA" notice |
| PX2 | Employee Record Attendance Report for Peggy Young |
| PX3 | Defendant UPS's response to Interrogatory No. 18 |
| PX4 | Defendant UPS's 6/11/2008 position statement to the EEOC |
| PX5 | Defendant UPS's 8/4/2008 response to amended charge |
| PX6 | Email of 2/23/2006 from Gina Norris |
| PX7 | Email of 8/7/2006 from Gina Norris |
| PX8 | Air Driver position description |
| PX9 | Collective Bargaining Agreement |
| PX10 | Operations Clerk position description |
| PX11 | Car Washer position description |
| PX12 | Loader/Unloader position description |
| PX13 | Smalls Sort - Sort Only position description |
| PX14 | Auto Painter position description |
| PX15 | Essential Job Function |
| PX16 | Smalls Sort - Sort Only position description |
| PX17 | UPS Policy Book |
| PX18 | Family and Medical Leave |
| PX19 | "Focus on Abilities" Management Guide |
| PX20 | UPS Impartial Employment and Promotion Guide |
| PX20.1 | Arbitration Opinion (Local 177) |
| PX20.3 | Arbitration Opinion (Local 28) |
| PX21 | UPS Essential Job Functions |
| PX22 | Absent/Non-work Pay Codes |

Plaintiff's Exhibits ("PX") 23-35 (filed in paper form and under seal):

| | |
|---|---|
| PX23 | TAW Register |
| PX24 | Injury Report |
| PX25 | Injury/Accident Review |
| PX26 | Record of Safe Work Methods |
| PX27 | Employee History Profile for Peggy Young |
| PX28 | UPS Diabetes Protocol |
| PX29 | UPS ADA Procedural Compliance Manual |

PX30   ADA Flowchart (partial)
PX31   UPS Vision Protocol
PX32   Documents re Employee "E442"
PX33   Documents re Employee "A3"
PX34   Documents re Employee "A4"
PX35   Documents re Employee "E441"
PX36   Documents re Employee "A2"
PX37   Documents re Employee "A3"
PX38   ADA Flowchart (complete)
PX39   Delivery Data Results, 12/31/08 - 01/02/09
PX40   Delivery record

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| PEGGY YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. DKC 08 CV 2586. |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant, | ) | |

### PLAINTIFF'S MEMORANDUM
### IN OPPOSITION TO
### DEFENDANT'S MOTION FOR
### SUMMARY JUDGMENT

UPS refused to let pregnant driver Peggy Young do her regular job because it insisted she could not lift packages over 20 pounds, but it refused to grant her any accommodation related to lifting. UPS then coded Ms. Young as being out on "disability", though it denied her any disability payments. UPS thereby cost Ms. Young her wages and benefits, and caused emotional pain and suffering. In so doing, UPS violated the pregnancy discrimination prohibitions in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e(k), commonly known as the Pregnancy Discrimination Act ("PDA"). UPS also violated the Americans with Disabilities Act ("ADA"), 42 U.S.C.12101 et seq., by discriminating against--and refusing to make accommodations for--someone it wrongly "regarded as having" a disability (§ 12101(2)(C)). As we will show, UPS's motion for summary judgment must fail, both legally and factually, as to Peggy Young's claims under the PDA and the ADA.

### SUMMARY OF ARGUMENT

UPS is not subtle. When pregnant driver Peggy Young--healthy and ready to work--reported for duty after an approved leave, UPS Division Manager Myron Williams bluntly told her that she needed to

stay home until she was no longer pregnant, because she was "too much of a liability".  UPS has an

equally un-subtle, admitted "policy" of not accommodating pregnant employees; but it argues that Peggy

Young was sent home not because she was pregnant *per se*, but because her midwife had imposed a

weight-lifting "restriction" (which UPS's policy would not accommodate).  This "restriction" is a

fabrication.  Ms. Young's midwife in fact released her "without limitations".

In violation of the ADA, UPS's Occupational Health Manager ("OHM") insisted that Ms. Young

must bring a doctor's note with her "restrictions"--a requirement not imposed on non-pregnant returning

employees--so that UPS would have an ostensible reason to keep Peggy Young out of the workplace for

the remainder of her pregnancy.  Ms. Young had no "restrictions" to report, so the midwife gave her the

closest thing she honestly could:  a weight-lifting "recommendation".   However, despite the absence of

any actual restriction, and despite Ms. Young's insistence that she could do her regular job, the OHM

disregarded the law and UPS's policies requiring individualized consideration and informed Ms. Young

that she could not perform her regular job and that UPS has a policy of no light duty for pregnancy.

When Peggy Young pleaded up the chain of command at UPS, she explicitly and repeatedly stated

her willingness to work either a light duty position or her regular position.  She did not need UPS to give

her an accommodation because she was willing to perform her regular job, or any job.  She just needed

to maintain her pay and--most important--her UPS health benefits.  Her final appeal to the UPS District

Manager yielded his command to stay away until she was no longer pregnant, because she was "too

much of a liability".   UPS's OHM then coded Ms. Young as being out due to "disability"--evidently

regarding Peggy Young as disabled--and suggested that Ms. Young ask for a doctor's note stating that

she could not work at all (which Ms. Young refused to do because it was not so).

UPS's refusal to allow Ms. Young to perform her regular job violated the PDA.  UPS also violated the PDA--and the ADA--when it failed to follow the law and its own procedures that require an individualized consideration of an accommodation request and when it refused to accommodate the lifting restriction that it had contrived for Ms. Young and denied her alternative request for light duty. For its drivers who are temporarily unable to perform their regular jobs because of medical conditions or drunk driving convictions, UPS routinely provides alternate work assignments.  However, UPS has a policy that it will make no such accommodation for a pregnant driver who presents a temporary weight-lifting restriction.   UPS's alleged business reasons for this policy are all pretexts for its discrimination against pregnant employees.

UPS's conception of Peggy Young as a person who wanted "preferential treatment" (UPS Mem. 3, 18) is very far off the mark.  She wanted no preferential treatment, but simply to be allowed do her regular job.  Otherwise, she wanted only to be treated the same as UPS would treat a driver who injured his eye in a bar fight, or who had high blood pressure, or who was convicted of DUI--any of whom might be <u>completely</u> unable to drive and thus unable to deliver <u>any</u> of their packages, but to whom UPS would nonetheless assign alternate work.  Ms. Young, on the other hand, <u>was</u> fully able to drive, and by any reckoning could deliver no fewer than 97% of her packages--but UPS refused to give her alternate work or any other accommodation because she was pregnant.

## FACTUAL STATEMENT

**<u>Ms. Young's employment as a driver</u>**.  Ms. Young was first employed by UPS in 1999 and as a driver in 2002.  (Young Stmt. ¶ 1.)  She was one of 69 part-time drivers, one of 318 total drivers, one of 633 employees in UPS's "D.C. Building" (who are mostly part-time (Arline-Young Dep. 76; UPS Dep. (Brien) 246)), and one of about 9,000 employees in UPS's D.C. Metro District.  (UPS Dep. (Brien),

Exs. 1-2.)  As a woman, Ms. Young was in a distinct minority at UPS:  284 of the D.C. Building drivers were male, and only 28 were female; 6 managers were male, and zero were female.  (*Id.*; *see also* Arline-Young Stmt. ¶ 10, 17, and Dep. 78-81 (UPS bias against women).)  The drivers were unionized, so Ms. Young was in the bargaining unit subject to the Collective Bargaining Agreement ("CBA", PX9), along with the other bargaining unit employees--including feeder drivers, package drivers, air drivers, carwash, local sort, preloaders, loaders, clerical, and "combo" employees who work a combination of jobs. (UPS Dep. (Brien), Ex. 3; PX9, CBA at 238.)

Ms. Young  was an "air driver", which means that she generally delivered the lighter packages sent by the more expensive "air" delivery (in the familiar 10"x13" cardboard UPS envelopes), rather than the heavier packages sent by the less expensive "ground" delivery.  (Young Stmt. ¶¶ 3, 65-66; Reyna Stmt. ¶ 4.)[1]  The air driver's route is longer, but her number of deliveries is fewer.  (UPS Dep. (Brien) 132, 137-139, 260-261; Arline-Young Dep. 110-113.)  An air driver like Ms. Young averages fewer than 20 deliveries a day, of mostly or entirely letter packages.  (Young Stmt. ¶ 66; Gustafson Stmt. ¶ 7; Arline-Young Dep. 14, 111; Gatton Dep. 31-32.)  One should picture Peggy Young not driving a truck full of boxes, but rather with her day's work usually fitting handily on the passenger seat beside her.  She drove an early morning route for UPS that ended between 8:30 and 10:30 a.m. (Young Dep. 66-72), and then starting at 11:00 a.m. she worked a second delivery job, for Floral Express (Young Dep. 41-42).

UPS's position description for the "air driver" job (PX8) lists 26 "Essential Job Functions", two of which are significant here: The air driver is to "Meet all of the applicable requirements as specified by

---

[1]Contrary to UPS's contentions (UPS Mem. 9), Ms. Young's employee profile shows that she <u>was</u> a "bid air driver" (*see* PX27); and, as she testified, during the relevant period she drove the same route every day (Young Stmt. ¶ 3, 66; Young Dep. 411-412, 433-434).  She was not a floater or a pinch hitter.  She did not load or unload airplanes (*see* Young Dep. 100-102; Young Stmt. ¶ 69; *contra* UPS Mem. 9 & n.10) and did not even have the security clearance necessary to do so (Young Stmt. ¶ 69).

the D.O.T." (Department of Transportation); and the air driver is to "Lift, lower, push, pull, leverage and manipulate equipment and/or packages weighing up to 70 pounds."[2]  (Each of these two points--the 70-pound standard and the DOT requirements--is discussed separately below.)  The description concludes:

> The essential functions of this job may vary greatly depending upon the size and location of the UPS facility.  At some locations, employees may not perform all of the essential job functions listed above ....

**The lifting requirement**.  As is set out below (*see* n.12 and accompanying text), UPS has a plethora of employee functions that require no heavy lifting.  However, with few exceptions, most UPS position descriptions, like the "air driver" description, list "Lift[ing] ... up to 70 pounds" as one of the "Essential Job Functions": A "Car Washer" must supposedly "Lift ... up to 70 pounds" (PX11).  An "Auto Painter" must supposedly "Lift ... up to 70 pounds" (PX14).  For the job of an "Operations Clerk"--who does paperwork, uses telephones, computers, and scanners, and performs filing--one of the supposedly  "Essential Job Functions" is to "Lift ... up to 70 pounds" (PX10).  Thus, "essential" is clearly a misnomer, and the ability to lift 70 pounds is often negotiable.  (*See* Smith Stmt. ¶¶5-6 ("Some of the jobs ... don't involve lifting over 20 pounds"); Welch Stmt. ¶5 ("UPS may say that people in those jobs have to lift over 20 pounds, but in reality, people in those jobs do not have to lift over 20 pounds"); UPS Dep. (Brien) 258.)  In fact, when UPS assigns "Operations Clerk" as a temporary alternate work ("TAW") position, it observes that the packages only "occasionally weigh[] up to 70 pounds; [and the] average package weight [is only] 12 pounds".  (PX15 at 1.)  For the letter-carrying air driver, the one-size-fits-all 70-pound lifting requirement is illusory, for three reasons:

---

[2]Of course, the air driver position description was not handed down on Sinai but was composed by UPS. However, despite being noticed for its Rule 30(b)(6) deposition, UPS does not know when or why the essential job functions for the part-time air driver position were written (UPS Dep. (Brien) 182, 184).  They came out of the UPS's corporate legal department.  (*Id*. 183.)

First, the air driver handles very few packages remotely close to 70 pounds.  (Scott Stmt. ¶ 11.)
Even during a recent 8-month period when heavier packages were more numerous (*see* Young Dep. 439,
578-579),[3] Peggy Young averaged only two packages per week that were more than 20 pounds, and only
one package per week was more than 30 pounds.  (Gustafson Stmt. ¶¶ 8-9.)  Second, deliveries of heavy
packages may not require the <u>lifting</u> of those packages.  Loaders, not drivers, load the packages onto the
trucks (Gatton Dep. 33, 69-70); and when making the delivery, the driver is equipped with a hand truck
(Young Dep. 572; UPS Dep. (Brien) 202).[4]  Third, the give-and-take of the air driver group results in
informal allocation of work according to individual drivers' situations, and if a given delivery was
awkward for one driver, it would be picked up by another (Reyna Stmt. ¶ 5; Scott Stmt. ¶ 11; UPS Dep.
(Brien) 260-261; Young Dep. 75, 482-483, 546; Tynette Williams Stmt ¶5; Arline-Young Stmt.
¶¶ 12-15; Arline-Young Dep. 46-48, 58-59, 88-90, 94; McNair Dep. 18).[5]

**Medical impairments and DOT certification**.  A driver must pass the DOT exam at least every
24 months (49 C.F.R. § 391.45(b)(1)) or if the driver's ability has been physically or mentally impaired
(*id*. § 391.45(c)).  The DOT regulations (*id*. § 391.43) specify a wide variety of conditions that affect
one's ability to pass the exam, including many that might be temporary or treatable, such as:

---

[3]Plaintiff contends that her showing that no more than 3% of her deliveries (even in this non-representative period) exceeded 20 pounds shows that the 70-pound requirement was not an essential function.  If the Court concludes otherwise, then it should grant Plaintiff's motion to compel UPS's responses to discovery requests directed toward the delivery weights during the actual, relevant period and should grant Plaintiff's a continuance under Rule 56(f) to let her obtain that information before completing her opposition to UPS's motion for summary judgment.

[4]*See also* PX26 ("Record of Safe Work Methods"; "Uses the existing equipment or facilities to assist in lifting and lowering"; "Uses handcarts for large loads to avoid excess lifting").

[5]UPS cites one worker who divided up packages and took the heavier ones (UPS Mem. 11).  Ms. Young did not need or request this arrangement, but the evidence shows such courtesies were commonplace.

- vision or hearing problems;
- high blood pressure;
- abnormal respiratory rate, wheezing, or impaired respiratory function;
- abdominal hernia; and
- impairment of leg, foot, toe, arm, hand, or finger.

The regulations (*id.* § 391.41(b)) also include a similar list of disqualifying conditions, some of which might be or become permanent (such as diabetes requiring insulin (-41(b)(3); *see* UPS Dep. (Brien) 72-76), or loss of a limb (-41(b)(1)), and some of which might be temporary or treatable, such as--

- impairment of hand, finger, arm, foot, or leg (-41(b)(2)), which, for example, might result from a fracture;
- high blood pressure (-41(b)(6)) (*see* UPS Dep. (Brien) 339; Scott Stmt. ¶ 2; Welch Stmt. ¶¶ 6-7; Lynch Stmt. ¶ 2);
- "mental, nervous, organic, or functional disease or psychiatric disorder" (-41(b)(9)); and
- vision or hearing problems (-41(b)(10)-(11)).

Such medical issues do arise for UPS drivers.  (*See* Martin Dep. 22, 35, 40; UPS Dep. (Brien) 32-35, 148, 324; Cox Stmt. ¶ 4.)[6]  Of course, a loss of DOT certification may arise from a <u>non</u>-work-related injury.  One may fracture a bone while skiing (or injure his eye in a bar fight, or suffer an abdominal hernia from straining at home) and thereby become temporarily disqualified <u>under the DOT regulations</u>.  (*See* Martin Dep. 63-64 (a sports injury could make someone fail the DOT test).)

**Circumstances in which UPS accommodates drivers**.  When a driver becomes "disabled" for purposes of the ADA, UPS grants alternate work.  (PX4 at 2).  In addition, UPS has contractually agreed

---

[6]Ordinarily, when an employee needs an accommodation because of a medical condition that makes him unable to perform his driver job, upon learning of the situation, Carol Martin talks with the employee's manager (Martin Dep. 21) and advises him to consult with the labor manager about whether the employee can perform inside work.  (Martin Dep. 35-36.)  "There's language in the contract that provides for the employee to work inside temporarily, but those two [labor managers] are the ones who would collaborate on where the employee would work."  (Martin Dep. 37-38.)  Those employees who temporarily cannot perform their regular driving jobs because of diabetes, sleep apnea, blood pressure problems, seizure disorders, psychiatric disorders, respiratory problems, and (approximately 10 per year) vision problems (Martin Dep. 22-27) are "given alternative work until they pass the DOT test" (Martin Dep. 35).  "Typically they would work on either the preload or the local sort, carwash.  Inside operations."  (Martin Dep. 40.)

to assign alternate work in non-ADA circumstances to: a driver who becomes unable to do his or her job because of an on-the-job (or "work-related") injury or condition (PX9, CBA at 33-34); a driver who loses his or her driver's license for driving under the influence of alcohol[7] or for other reasons (*id*. at 37-38); a driver who is involved in an accident[8] and is not driving during UPS's investigation of it (*id*. at 46-47); and a driver who fails to meet the DOT requirements (*id*. at 39 (commercial drivers license (CDL) examination), *id*. at 60 ("medically unqualified to drive"), *id*. at 246 (driver's permit revoked)).[9] UPS contends that it does not accommodate workers with injuries or conditions that are not work-related.  However, in its CBA, UPS has expressly undertaken to accommodate medical impairments that implicate DOT certification--<u>whether or not they arise from non-work-related injuries or conditions</u>.

---

[7]*See* Hill Dep. at 6-8, 12 (employee convicted of DUI; UPS assigned another driver to drive the employee's route, and permitted him to simply navigate the route and make deliveries); Gatton Stmt. ¶6; Gatton Dep. at 45, 51; Lynch Stmt. ¶¶9-10 ("Someone else drove for him for a while, and he delivered his packages"; "they were accommodated by their managers by being given a driver for a while, and they delivered packages").  Approximately 2 employees per year fail the drug test (Martin Dep. 45), and the CBA (PX9 at 38-39) provides for alternate work for them (Martin Dep. 50).  The CBA also provides (PX9 at 246) that a driver who loses his driving permit "shall be offered non-driving jobs where such jobs are available."

[8]*See* Scott Stmt. ¶ 2; Arline-Young Dep. at 65-667.  *See also* Lynch Stmt. ¶ 4 ("I was in an accident at UPS.  It was the other driver's fault.  I was not terminated right away, and I was put on light duty at the customer counter").  The customer counter position was technically not a bargaining unit position (UPS Dep. (Brien) 234), but bargaining unit employee Lynch was put there anyway.

[9]UPS contends that its accommodations to these above-listed categories of drivers are irrelevant here, since, it argues, Peggy Young was not ADA-"disabled", was not injured on the job, did not lose her license, was not involved in an accident, and did not fail to meet DOT requirements.   These other accommodations are certainly relevant, however, for two reasons: First, as we argue below, the issue here is whether, at UPS, "women affected by pregnancy ... [are] treated the same for all employment-related purposes ... as other persons not so affected but <u>similar</u> in their ability or inability to work".  42 U.S.C. § 2000e(k) (emphasis added).  Peggy Young is admittedly not <u>identically</u> situated to these other drivers, but she is "similar" to them in their "inability to work"--except that she can indisputably deliver no fewer than 97% of her packages, while many of them can deliver 0%.  Second, UPS's ability to accommodate all these types of impairments renders incredible any suggestion that business exigencies require it to rigorously maintain its 70-pound lifting requirement for pregnant drivers and make no accommodations for them.  Rather, its numerous accommodations for drivers in other circumstances show that its personnel situation is not so brittle that every air driver must be able to handle the rare 70-pound package.

Furthermore, beyond those instances in which UPS has contractually bound itself to accommodate impaired drivers, UPS sometimes at its discretion makes other *ad hoc* accommodations--*e.g.*, for cancer (given "light duty"; *see* Arline-Young Dep. at 59-63; Arline-Young Stmt. ¶ 23; Gatton Stmt. ¶ 7; Gatton Dep. 45; 52-55; Scott Stmt. ¶ 2) and partial hearing loss (*see* PX32 at D6197, 6200, 6204 ("Nothing in this arrangement is to be construed as an admission by UPS that the company is obligated, contractually, legally or otherwise, to provide you with a job-related accommodation")).

A part-time employee is sometimes permitted by the CBA to displace a junior part-time employee (PX9 at 246); but an employee being moved into a light duty job need not displace another employee (UPS Dep. (Brien) Dep. 31), because "usually there will be positions available that they can just slide into" (*id.* 32)--sometimes positions in other buildings (*see id.* 299-300).  *See also* Martin Dep. 124 ("typically, when you are taking someone out of their driving position and putting them inside to provide TAW, you're placing them in positions that are open and available without displacing someone"); McNair Dep. at 38 (given inside work without replacing anyone); UPS Dep. (Brien) 404 (high turnover).

The person who receives a request for accommodation is the District OHM (UPS Dep. (Brien) 57).  The OHM then discusses the accommodation request with the manager of the Division of which her District is a part (*i.e.*, Capital Division Manager Myron Williams) (*id.* 58) and together they review "what the decision would be on moving forward with that employee" (*id.* 59).  (*See also* Martin Dep. 35-40; PX35 at D6324, 6448, 6470.)  Neither the OHM (Martin Dep. 173-176) nor UPS managers generally (*see* UPS Dep. (Brien) 37-40, 67) have ever received any training on the PDA.

**UPS's vocabulary for alternate work**.  The CBA (PX9 at 32-39) uses various overlapping terms for alternative work that may be given to an employee: "temporary[10] alternate work" ("TAW"), "alternate work", "alternative work","inside work", and "light duty".   In addition, UPS personnel use such terms as "modified duty" (PX35 at D6359) and "residual work" (*id.* at D6311, 6448).   In this brief, we will use the general term "alternate work" to include these seven terms collectively.   In argument UPS attempts to maintain distinctions among these terms (e.g., that drivers who fail their DOT tests get "inside work" only, not TAW; that "inside work" is not ever "light duty" but always "heavy duty" (Martin Dep. 114; *but see* PX16); that TAW "light duty" is only for on-the-job injuries; and that supervisors get only "residual work").   However, the supposed distinctions do not hold.   In the CBA (PX9 at 38), "inside work" is a species of "alternative work".   "Light duty" is sometimes given for non-work related conditions.   (*See* Welch Stmt. ¶¶ 6-7; UPS Dep. (Brien) 76.)   UPS personnel and even UPS managers do not use the terms--or apply the distinctions--in accord with UPS's litigating position. Rather, the terms are used interchangeably, and virtually any accommodation might be called by almost any of these terms.   (*See* UPS Dep. (Brien) 12, 17, 29, 85, 151, 315, 343, 347-349, 519; compare PX35 at D6360 ("TAW"), D6359 ("modified duty"), D6448, D6311 ("residual work"); Smith Stmt. ¶4; Arline-Young Stmt. ¶8; Young Dep. 531-532; Young Stmt. ¶28.)   And, as is shown above, UPS assigns, in widely varying circumstances, alternate work consisting of non-lifting functions that can fairly be called "light duty".

---

[10]In the TAW context, "Temporary" should not be strictly construed, since it is often extended.  *See, e.g.,* UPS Dep. (Brien) 77 (no time limit on TAW for diabetics), 306; *see also* PX24 at D4697 (38 TAW days); D4705 (510 days, 73 days); D4706 (38 days); PX9, CBA at 246 (2 years).  UPS claims that TAW is part of a "work-hardening program" (UPS Mem. 5), but it has produced no documents mentioning such a program.

**"Light duty" for non-work-related injuries**.  UPS contends, however, that it does not allow

"light duty" for <u>non</u>-work-related injuries or conditions.  Discovery conducted so far has unraveled this

contention and has disclosed multiple instances in which UPS <u>did</u> grant light duty to (non-pregnant)

employees with non-work-related injuries and conditions:

- •   a driver was given an inside job (chiefly, making phone calls) after she had kidney disease and a stroke (McNair Dep. 5-11);
- •   a driver with a non-work-related ankle injury was given "light duty"--i.e., scanning packages on trucks (Gatton Dep. 44-50, 61);
- •   an employee with cancer was given "light duty" (Arline-Young Dep. at 59-63; Arline-Young Stmt. ¶ 23; Gatton Stmt. ¶ 7; Gatton Dep. 45; 52-55; Scott Stmt. ¶ 2); and
- •   an employee with a lifting restriction from a <u>non</u>-work-related injury was accommodated even when UPS was "unable to conclude that you are eligible for a reasonable accommodation pursuant to the Americans with Disabilities Act."  (PX35 at D6302, 6322, 6329, 6382, 6392, 6399, 6416, 6417, 6446, 6449); PX3.)[11]

Thus, UPS's professed distinctions are not borne out by the facts.  UPS does, from time to time, give

light duty to employees with non-work-related conditions.  However, there are no policies or criteria by

which UPS decides which case will be treated in what manner.  (*See* UPS Dep. (Brien) 63, 78-132.)

**Numerous non-lifting functions**.   A big delivery company like UPS with over 600 employees in

a single location has many employee functions to which an employee with a lifting restriction can be

assigned.  UPS itself testified, "They could be a scanner, they could do some of the carwash positions,

they could sort packages in certain locations, they could pick up packages in certain locations[, t]hey

could work on the local sort, they could work in keying packages into a computer".   (UPS Dep. (Brien)

---

[11]In addition, the listing for one employee who was allowed alternate work as a Rewrap and Correct Clerk because of a 10-pound lifting restriction shows no Worker's Compensation claim, indicating that the restriction may not have been work-related.  (PX23 at 42.)  *See also* Lynch Stmt. ¶ 8 ("I have noticed that it is in UPS's discretion whether or not to accommodate a weight restriction").  If the Court considers the instances listed here insufficient to make the point, then it should grant Plaintiff's motion to compel UPS's responses to discovery requests directed toward the instances of UPS's accommodations and should grant Plaintiff's a continuance under Rule 56(f) to let her obtain that information before completing her opposition to UPS's motion for summary judgment.

506-507.)[12]  UPS has set jobs or "positions" that consist of a certain combination of tasks or functions

and for which it has position descriptions; and some of those position descriptions involve no lifting

requirement (or a modest lifting requirement), so that UPS could accommodate an employee's lifting

impairment by assigning him, as alternate work, to such a position.   For example, the "Smalls Sort"

worker handles only "smalls" (*i.e.*, small packages),[13] and the description for this position (PX13) says

that the worker is to "Continuously lift/lower, push/pull manipulate and carry packages weighing up to

10 pounds".  (*See also* PX15 at 16-17; PX16.)   The "Scan" position has no lifting requirement as an

"Essential Job Function" (PX15 at 14).  The general "Office Administrative Assistant" position (which

includes specific jobs such as "Data Entry" and "File Person") has no lifting requirement as an

---

[12] *See also* Martin Dep. 89 ("carwash, sweeping out the back of package cars, or washing windows, something to that effect"), 156 ("clerical"); Gatton Dep. 43-50 (delivering letter; "You could go and scan trucks, ... before they go out for delivery, scan the packages in the trucks, and it's a small hand-held scanner. Basically, that's all you have to do is be able to walk into the truck"; Hill Dep. 17-18 ("answering phones and sweeping out trucks"); McNair Dep. 15-16 ("gather packages to be readdressed or redirected to a different address"); Arline-Young Dep. 27, 30, 65-71, 93, 104-106  (phones, scanning packages, typing, address corrections, labels, customer service counter); Arline-Young Stmt. ¶¶ 9, 22, 29 (scanning bar codes, address corrections, answering the phone, xeroxing, sorting "smalls", washing and parking vehicles, cleaning truck windows); Cox Stmt. ¶ 3 ("I have seen other drivers come in and do clerical work or just handle paperwork or the phones when they are on light duty"); Lynch Stmt. ¶ 2 ("I only scanned packages and made address corrections, and put on address labels"),¶ 5 ((customer service counter); Scott Stmt. ¶¶ 2, 12-13 (typing and making address corrections, small sort, car wash); Smith Stmt. ¶ 6 ("Some of the available work that might not require an employee to lift over 20 pounds are scanners, small package sorters, some clerical positions and carwash positions"); Welch Stmt. ¶¶ 2-3 ("answer phones"; "pumping gas"); PX23 ("Rewrap Correct Clerk").  Part-time bargaining-unit employees can hold clerical positions.  *See* PX9 (CBA at 238).

[13] *See* Cox Stmt. ¶¶ 2-3 ("Most all of the packages that are handled on small sort are letters and small packages that weigh less than 20 pounds.  Not very often, but sometimes, heavier packages accidentally get put on the small sort belt.  There are usually about 10 people working on the small sort, so if one person cannot lift a heavier package the other people on small sort could lift it.  Not every one working on small sort handles every package.  If one person could not handle a package, they could just let it go further down the belt to be handled by someone else....  I have seen people who had lifting restrictions because of on-the-job injuries be moved to work in small sort for a while"); *see also* Scott Stmt. ¶ 12.

"Essential Job Function" (PX15 at 11-12; PX21 at 4), nor does the "Non-Operations Specialist" (PX21 at 49).  An employee with a lifting impairment could therefore be given one of these jobs.

However, when UPS undertakes to make such an accommodation, it can instead "develop a ... position, if possible out of available work." (PX9, CBA at 60 (emphasis added).)  That is, the accommodated employee may be "allowed to do portions of jobs, or certain tasks assigned to a job, as opposed to being required to do the entire job" (UPS Dep. (Brien) 519).  Thus, the lack of a "job" or "position" that corresponds to an employee's impairment does not mean that his impairment cannot be accommodated.  Rather, a "job" or "position" is sometimes developed for him.

**UPS's policy of not accommodating pregnant employees**.  While UPS's granting of alternate work is inconsistent and ambiguous in many respects, its policy and practice about pregnancy is crystal-clear: Since at least as early as 1991 (when UPS's OHM joined the company), UPS has had the policy of not granting light duty (or "temporary alternate work" or "inside work") for pregnancy.[14]  The CBA is interpreted <u>not</u> to provide for light duty or other accommodations to pregnant employees.  *See* UPS Dep. (Gordanier) 16-18.  The OHM did not make up this policy, and did not explain a reason for it (Martin Dep. 112),[15] but simply learned it when she joined UPS and continued thereafter to enforce it when

---

[14]*See* Martin Dep. 66-70, 74; UPS Dep. (Brien) 150, 169.  However, in at least some locations UPS previously did allow light duty work for pregnant employees.  (PX20.2 at D5894; Scott Stmt. ¶¶ 9-10.)

[15]Since UPS cannot show the reasons for the adoption of this pregnancy policy, the Court should make a negative inference for purposes of summary judgment.   UPS's long-time counsel (who has represented UPS in employment discrimination matters since at least 1996 (*see Smith v. UPS*, 947 F.Supp. 190 (D.Md. 1996); *Davis and Coates v. UPS*, 1997 WL 702278 (4th Cir. 1997); *Gamble v. UPS*, 1997 WL 592822 (4th Cir. 1997); *Prestianni v. UPS*, 1998 WL 276455 (4th Cir. 1998); *Weaver v. UPS*, 307 F.Supp.2d 616 (D.Del. 2004); *Bean v. UPS*, 2005 WL 1995442 (D. Md. 2005), *aff'd*, 185 Fed. Appx. 259 (4th Cir. 2006)) betrayed UPS's myth-based attitudes toward pregnancy with his leading questions to the effect that "you could be endangering the fetus if you lifted over 20 pounds" (Young Dep. 158-159).  Even if counsel's supposition were correct, UPS may not discriminate against pregnant women in order to protect their fetuses.  *See Johnson Controls*, *infra*.

requests for pregnancy accommodations were referred to her (Martin Dep. 75-76, 112, 135)--just as other managers enforce the policy by denying light duty to pregnant women in circumstances that they do not refer to the OHM (*id.* 181; *see also* PX17 at 37 (broad delegation of authority to managers); PX35 at D6324, 6448, 6470 (OHM consults with "region"); Martin Dep. 35-40 (OHM consults with manager). Therefore, when a pregnant employee at UPS has a lifting restriction, she is not granted any accommodation.  (Arline-Young Dep. at 54-55, 81-84; Young Stmt. ¶ 26; Young Dep. 200.)  Unflinching in its adherence to its principle of no accommodation for pregnancy, UPS applied it even to a pregnant woman with a clerical job of correcting addresses.  She was normally required to stand for her job, but at her doctor's suggestion she asked to be allowed, off and on during the day, to use a stool in order to relieve pregnancy-related swelling in her legs and ankles.  UPS refused to allow the use of the stool.   (Tynette Williams Stmt. ¶¶ 6-9, 14-15; Tynette Williams Dep. 22-247; UPS Dep. (Brien) 358.)

**CBA negotiation**.  Much of the accommodation that UPS <u>does</u> make for workers' impairments, described above, is made pursuant to the CBA.  While the provisions of the CBA are of course legally enforceable against UPS, the CBA was not imposed on UPS by the government but was negotiated between UPS and the union and entered voluntarily.  Why was UPS willing to agree in the CBA to accommodate the impairments of drivers with, for example, diabetes or high blood pressure?--"It's a smart business decision because instead of letting a person not work here anymore, you are still keeping him employed."  (UPS Dep. (Brien) 93-94, 403.)  Giving light duty to the temporarily impaired worker keeps him or her with the company, saves the cost of hiring and training new employees, and keeps that employee's expertise within the company.  (UPS Dep. (Brien) 124-127.)  UPS would therefore rather keep the employees even if it must bear the expense and trouble of accommodating them.

UPS denies such accommodation to pregnant employees because (it says) the CBA does not call for it.  (*See* UPS Dep. (Brien) 120, 129.)  UPS <u>could</u> have agreed in the CBA to make such accommodation (Martin Dep. 136, 142), but the CBA does not so provide only because UPS did not negotiate the inclusion of such a term.  In fact, UPS affirmatively <u>rejected</u> the proposed inclusion of such a term, which the union requested.  (UPS Dep. (Gordanier) 15-18; Robinson Stmt. ¶¶ 4-5; PX20.1 at D5870.)  One may wonder: Wouldn't it have been a "smart business decision" to keep the pregnant woman with the company, save the cost of hiring her replacement, and keep her expertise within the company?  Evidently not, in the view of UPS.[16]  It would rather lose the pregnant employees than bear the expense and trouble of accommodating them.  It was in this inflexible employment context that air driver Peggy Young became pregnant.

**Ms. Young's pregnancy**.  In July 2006 Ms. Young went on approved, unpaid leave for an in vitro fertilization procedure (which resulted in a pregnancy).  (Ans ¶ 12; Young Stmt. ¶ 9; UPS 6/11Stmt. at 4, D342.)  Since UPS has erroneously characterized this unpaid leave as "FMLA leave" (UPS Mem. 11, 12, 13, 16), it should be noted that it was <u>not</u> FMLA leave or FMLA-equivalent leave which she some-how exhausted (*contra* UPS Mem. 12 n.14), nor was it special leave that UPS granted to Ms. Young as an exceptional act of benevolence that somehow entitled UPS to bar her when she returned.  Rather, though UPS prescribed FMLA forms for Ms. Young's leave request, the unpaid leave was properly requested and granted as maternity leave pursuant to the CBA, which sets no limit on such leave.[17]

---

[16]The question stumped UPS at deposition.  *See* UPS Dep. (Brien) 128 ("I can't answer that question").

[17]*See* PX9, CBA at 39 ("maternity leave for female employees shall be granted with no loss of seniority <u>for such period of time as her doctor shall determine</u> that she is physically unable to return to her normal duties"); UPS Dep. (Brien) 152-156 (no guidelines on length of maternity leave); Tynette Williams Stmt. ¶3, 12-15; Martin Dep. 81; Young Stmt. ¶ 15.  UPS also permitted long absences for other reasons.  (*See* PX24 at D4697 (280 days), D4698-4699 (200+ days off), D4699-4700 (722 days off), D4705 (237 days off);

Before Ms. Young took her leave, Carol Martin, the UPS District Occupational Health Manager, told Ms. Young that, in order for her to return to work while pregnant, she would need a medical note explaining Ms. Young's "restrictions".  (Young Stmt. ¶ 8.)  This instruction to bring "restrictions" is not required in UPS's written policy, which simply permits (and does not require) that "[i]n some cases of personal injury or illness, UPS may require an employee to provide a fitness-for-duty certification before returning to work" (PX18 (emphasis added)).  (Ms. Young had been neither injured nor ill, so it is noteworthy that she was selectively required to bring not a fitness-for-duty note but a note with restrictions.)  UPS's OHM does not generally solicits doctors' "restrictions" from workers returning from leave,[18] but does it at her whim (Martin Dep. 112)--and it is a ploy she uses in the case of a pregnant employee.  Peggy Young naively supposed that this request was a prelude to UPS's cooperating with her in crafting an accommodation that any "restrictions" might require (Young Dep. 450).

**Ms. Young's attempt to return to work**.  In September 2006 when Peggy Young was nearing the end of her first trimester and was getting close to the time she would want to return to UPS, she contacted the OHM about her desire to resume her air driver job (Young Dep. 167; Martin Dep. 79).  UPS's OHM did not ask for a "fitness for duty certification" (PX18) but instead asked--again--for a

---

McNair Dep. 10-12 (9 months).) Title VII requires the employer to treat pregnancy and related conditions the same as non-pregnancy conditions, so that if an employer provides unlimited unpaid leave for non-pregnancy medical conditions, the employer must also provide unlimited unpaid leave for pregnancy-related medical conditions.  *See* 29 CFR §1604.10(b); *see generally* 29 CFR pt. 1604,  App. (Q&As on the PDA).

[18]*See* Martin Dep. 111; Hill Dep. 21-22 (employee returning after DUI; no substance abuse counseling required); (PX35 at D6302-05, 6322, 6382, 6399, 6416, 6417, 6329, 6392, 6446, 6449); PX3 (employee "E441", allowed to return to work full duty on her own say-so).  In fact, when Peggy Young returned to work after her pregnancy--i.e., returned to work not pregnant--the OHM did not require any doctor's note (with "restrictions" or otherwise).  Martin Dep. 173; Young Dep. 124-125; Young Stmt. ¶51 ("No one at UPS asked me for any doctor's note when I returned to work following my pregnancy").  A doctor's note upon return to work is a special requirement, given to women who want to work while pregnant.

doctor's note stating her "restrictions".  (Young Stmt. ¶ 15).  By October 2006 Peggy Young was at the

end of her first trimester of pregnancy, had a good ultrasound (Young Dep. 555), and had experienced no

problems despite continuing her Floral Express delivery job (Young Dep. 42).  She was under no

restrictions (Young Dep. 450), and on October 11, 2006, she had "no complaints" and was "Released

w/o limitations" by her midwife (Shawl Stmt. ¶ 2, Ex. A).  However, Ms. Young had been told by the

OHM that she had to have a note with restrictions (Young Dep. 441-451, 550-560, 581-582, 605), so she

obtained a note from her midwife that did not state "restrictions" but did state a "recommend[ation]":

> Due to her pregnancy it is recommended that she not lift more than 20 pounds.  Should
> you need any further information or have questions, you may contact me at the above
> telephone number or email me at [address].

As the midwife later explained (Shawl Stmt. ¶ 4), "I wrote this note only because Ms. Young told me

she needed a letter for work stating her restrictions.  I did not use the word 'restriction' because I was

making only a recommendation."[19]

**UPS's refusal to allow Ms. Young to work**.  The midwife's note, with its recommendation, was

read over the phone to the OHM (Martin Dep. 75-76, 180-81, 183) and was faxed to her (Young Dep.

543-545; Young Stmt. ¶19) around the time that the pregnant Peggy Young tried to return to work in

---

[19]UPS repeatedly distorts the fact of this recommendation.  In its pending motion papers, UPS cites the medical notes that make only "recommend[ations]" (Docs. 60-12, 60-13) but repeatedly alleges "restrictions".  *See* UPS Mem. at 13, 14, 15, 17, 20, 22, 23, 27, 29, 30, 40, 44, 46.  Ms. Young knew no better than to adopt in her own comments the OHM's lingo and to characterize the note as stating "restrictions" and to later characterize the giving of the note as requesting "light duty"; but there is no reason to suppose that UPS's decision would have been any different if Ms. Young had known to stress the distinction between "restrictions" and "recommendations".  On the contrary, the OHM testified that UPS employees must follow even their doctors' mere recommendations (Martin Dep. 138); that she would not consider giving an employee the option of disregarding such recommendations (*id*. 139), and that it would be unethical to tell the employee that she could do her regular job at her own risk (*id*. at 141).

October 2006.[20]  When Carol Martin learned of the note, she immediately applied UPS's policy of non-accommodation for pregnancy and stated that Ms. Young could not return to work.  (Martin Dep. 74-78.)  In reaching this conclusion so promptly, the OHM by-passed the procedures mandated in UPS's Americans with Disabilities Act Procedural Compliance Manual, which applies to "all requests for accommodation",[21] and departed from UPS's general policy (obviously not applicable to pregnant employees) of getting employees back to work as soon as possible after leave (UPS Dep. (Brien) 12, 40, 71, 124, 403-405; Arline-Young Dep. 84-88; Welch Stmt. ¶ 4.)  However, she did not hesitate because, "Based on company policy, I, unfortunately, could not allow her to continue working with her 20-pound lifting restriction [*sic*]."  (Martin Dep. 79 (emphasis added); *see also* Young Stmt.  ¶¶ 19-20.)

---

[20]Taking a sentence out of context, UPS argues (UPS Mem. 28, *citing* Young Dep. 444) that Ms. Young "admits that she would have been permitted to return to work ... had she not presented UPS with a doctor's note."  But Ms. Young immediately went on to explain--as she has always said (*see* Young Stmt. ¶¶ 8, 15)-- that she brought the note only because UPS had told her to do so (Young Dep. 444-449).

[21]PX29 at D5773 (emphasis added); *see also id*. at D5808 (" Generally, any notification that a job modification is needed because of a physical ... impairment will be sufficient to trigger this inquiry"; emphasis added); PX38 ("flow chart" showing prescribed procedures).  Thus, the manual applies to "all requests" and "any notification"--*i.e.*, not only requests that an employee knows to make under the ADA *per se*, and not excluding requests that may not seem promising under the ADA.  *See also* PX19 at 4987 ("UPS procedure requires specific steps to be followed when a request for an accommodation is received....  If an employee makes a request for an accommodation, the individual should be assured that their request will receive attention by the appropriate management people....  Each accommodation request must be examined on a case-by-case basis").  For examples of UPS's handling of a non-pregnancy situation, see PX33 at D6218-6222, 6224, 6233, 6235, 6243.  Had the OHM complied with the manual and investigated Ms. Young's "disability", she would have concluded--as Ms. Young's midwife already had--that Ms. Young suffered no impairment or disability at all and should therefore be allowed to work her regular job, as she was requesting to do.  Like UPS's ADA manual, UPS's diabetes protocol (PX28) precludes snap judgments about the disability of a diabetic and prescribes instead a multi-step process that includes obtaining specific medical information.  Sadly, UPS's unwritten pregnancy protocol is a general and institutional snap judgment.

Ms. Young protested to the OHM that she wanted to work (Martin Dep. 79) and was willing to do

either light duty or her regular job (Martin Dep. 81[22]; Young Stmt. ¶¶ 19-20; Young Dep. 325, 557-558).

During a prior pregnancy Ms. Young had no difficulty regularly lifting a 35-pound child  (Young

Dep. 574-575) and worked her job until she went into labor (Young Dep. 40); and the lifting involved in

her job would pose no problems for her (Young Dep. 233, 259-60, 509; Young Stmt. ¶¶ 67-68; Arline-

Young Stmt. ¶ 15).  The OHM, however, declined to let Ms. Young work her regular job, invoking the

supposed "restrictions" in the medical recommendation.  Despite Ms. Young's insistence that she could

do her regular job without accommodation, the OHM did not consult Ms. Young's delivery records to

learn the actual weights of her deliveries; nor did the OHM contact the midwife for clarification or

confirmation (Shawl Stmt. ¶ 3, 5), as her note had offered and as the manual required[23]; nor did the

OHM suggest that a different doctor's note approving full duty would enable Ms. Young to work her

regular job.  (Young Dep. 560.)[24]  On the contrary, the OHM instead made to Ms. Young two opposite

suggestions: First, the OHM suggested that Ms. Young ask her doctor for a note saying that Ms. Young

---

[22]UPS thus egregiously misstated the facts to the EEOC when it said, "Ms. Young did not wish to, and in fact claims that she was not able to, continue working in her job" (PX5 at 2).

[23]See Shawl Dep. Ex. B ("Should you need any further information or have questions, you may contact me at ..."); PX29 at 44 ("The OHS is responsible for securing all medical information from the employee and the employee's physician relating to the request for accommodation").  Had the OHM submitted the prescribed inquiry (id. at 64) to Ms. Young's midwife, the first question would have been "Is the employee currently able to perform all of the physical and mental functions of his/her position?", and the affirmative answer would have restored Ms. Young to her regular job, as she was requesting.

[24]Getting a no-restriction letter from the doctor is the OHM's usual suggestion when a formerly restricted employee professes to be able to return to work (Martin Dep. 141), but she did not do so in the case of the pregnant Ms. Young.  If she had, Ms. Young would have gotten a second note.  (Young Dep. 561.)  The OHM's declaration (Doc. 60-5, ¶ 13) and UPS's current contention (UPS Mem. 15) is that a second note explicitly stating that the employee was under no restrictions would have been promptly honored; but the OHM's previous unrehearsed testimony was otherwise: "I don't know.  You're asking me a question that I haven't really had to--I might ask for a second opinion.  I don't know at this point."  (Martin Dep. 142.)  The OHM made no suggestion that Ms. Young could bring in a note explicitly stating no "restrictions".

could not work at all--a suggestion Ms. Young did not follow, since she was able to work and wanted to

work.  (Young Stmt. ¶ 20; *see also* Young Dep. 317, 559.)  Second,

> Ms. Martin said I needed to think about my job with UPS because I was pregnant and I had used
> up my FMLA leave [*but see* p. 15, *supra*].  She was clearly suggesting that I should quit my job
> because I was pregnant. [Young Stmt. ¶ 21.]

The OHM thus refused to allow Ms. Young to go back to work on any terms.  Ms. Young met similar

refusal when she appealed to other of her superiors at UPS.  (Young Dep. 191-192, 325, 329, 556, 452

("I begged for my job.  I wanted my benefits"), *id.* 584 ("I didn't need any accommodations made for me

because I could have done my regular job"); Young Stmt. ¶ 18.)

In early November 2006 Ms. Young finally appealed to Myron Williams.  He was no mere crew

chief, subject to being overruled by the OHM.  Rather, Mr. Williams was the Division Manager of

UPS's Capital Division--of which the 9,000-employee D.C. Metro District was only a component (UPS

Dep. (Brien) 64, 241, 397, 402), and he could have allowed Ms. Young to work (Arline-Young Stmt.

¶ 11; *cf.* Martin Dep. 181).  He was "the Big Boss".  (Young Dep. 562.)  There was no  higher official in

UPS who was accessible to, or even visible to, a D.C. Metro air driver.  Ms. Young explained that her

doctor had recommended a weight limit but urged that she could do her regular job without any

accommodation.  (Young Stmt. 26; Young Dep. 198-200.)  But UPS's "Big Boss" in the Capital

Division spoke plainly to Ms. Young: She should go home and not come back to the D.C. Building until

she was no longer pregnant, because she was "too much of a liability".  (Young Stmt. ¶ 26; *see also*

Young Dep. 563-564;  Gatton Dep. 12-13, 72-73 .)   To the same effect, a lower-level supervisor told

another air driver that Peggy Young could not work because she was pregnant.  (Gatton Dep. 42.)

Clearly, everyone understood that Ms. Young was absent from work because she was pregnant.

**Ms. Young's "disability" status**.  Having said that Peggy Young could not work for the rest of her pregnancy, OHM Carol Martin now had to do the paperwork.  It was the OHM who routinely gave instruction about how to code an employee's absences (*see* PX6-7), and she told Ms. Young that she would "code" Ms. Young as disabled.[25]  (Young Dep. 166-170.)  The OHM did so, and on payroll records beginning November 2006, Ms. Young's status was reported as code 18, which indicates "Disability".  (PX2.)  UPS used the "Disability" code for Ms. Young, rather than any of the other available codes (*see* PX22), such as 24 ("Personal Leave"), 28 ("Suspended"), 36 ("Family Leave"), 37 ("Maternity/Paternity Leave"), or 47 ("Sick Day").  This (mis-) characterization of Ms. Young as "disabled" corresponded to UPS's (mis-) judgment that Ms. Young "couldn't do <u>any</u> of the bargaining unit jobs at UPS".  (UPS Dep. (Brien) 511; *see also id*. at 211.)

**Ms. Young's damages**.  Ms. Young was forced to remain on unpaid leave, from the date she was able to work (October 11, 2006, the date of her doctor's statement) until her baby was born (April 29, 2007; Young Stmt. ¶ 50)--*i.e.*, for 28-1/2 weeks (Young Dep. 40, 219-220).  Because Ms. Young was prevented from working after October 2006, her short-term disability under the UPS plan ceased on December 31, 2006, "[a]s a result of your reduction in hours" (PX1 at 1), so that she was deprived of disability benefits during the period from the birth of her child (April 29, 2007) through the date she returned to work (June 26, 2007).  She was also deprived of credits to her pension account.  (UPS Dep. (Brien) 441.)  She was also deprived of medical insurance benefits--for her, one of the principal benefits of employment at UPS (Young Stmt. ¶ 39)--which was worth $992.78 per month  (Young Stmt. ¶ 44; UPS Dep. (McDonnell) 7-8) and which she could not afford to continue during her unpaid leave.

---

[25]In her declaration, the OHM asserts that she did not regard Ms. Young as disabled.  (Doc. 60-5, ¶¶ 14-16.)  At her deposition, however, she candidly said "I honestly don't know" when asked, "what broad range of jobs did you regard Peggy Young as being able to perform [in October 2006]?"  (Martin Dep. 167.)

Those items--wages, disability benefits, and medical coverage--are the monetary losses that

Ms. Young suffered and that she would not have incurred if she had been allowed to continue to work

her regular job (or to work "light duty").  She was <u>not</u> able to mitigate these losses:

> I did not look for another job for several reasons: I did not have the emotional strength to look for a job or train for a new position because of how depressed I was from being told I had to go home until I was no longer pregnant.  Also I knew I would be going back to my UPS job as soon as I could after the pregnancy.  It did not make sense to look for a job and train for a job when I was going to have to be taking maternity leave so soon.  (By the time Myron Williams told me not to come back to the building until I was no longer pregnant, I was looking pregnant, and it's very difficult to get hired when you're looking pregnant.)  And mostly, I knew from experience that I would not be able to find another part-time job with the benefits that I had at UPS.

(Young Stmt. ¶  39; *see also* Young Dep. 511-12.)  Moreover, Ms. Young's non-monetary loss--

completely ignored in UPS's argument--was not susceptible of mitigation:

> I believed I was being discriminated against because of my pregnancy, and I was beside myself over this.  I could not think straight.  I felt sick to my stomach and experienced bad indigestion.  I was very, very worried about our finances because we were getting behind financially.  I experienced trouble sleeping at night.  When I woke up, this was the thing on my mind. I was emotionally very fragile and found it harder not to be short-tempered with my older children.  My husband and I had been hoping to have a baby for a long time.  What should have been a very happy pregnancy was instead one of the most stressful times of my life. [Young Stmt. ¶ 27.]

(*See also* Young Dep. 505-524; Arline-Young Dep. 96-97.)  This emotional distress was the result of

UPS's discriminatory policy that it applied against Peggy Young to bar her from working.

## ARGUMENT

Plaintiff  is the non-moving party, and under Rule 56 every factual dispute must be resolved in her

favor and every inference must be drawn in her favor.  Even a casual reading of the two parties' state-

ments shows that the material facts that UPS alleges in support of its motion are very much in dispute.[26]

---

[26]*See also* Plaintiff's Annotation of UPS's "Statement of Undisputed [*sic*] Facts" (UPS Mem. 3-16), attached hereto as Appendix 1, on which UPS's disputed assertions have been underscored and Plaintiff's counter-statement (citing record evidence) has been cross-referenced.

I.   **UPS violated the Pregnancy Discrimination Act.**

A.   **Pregnancy discrimination is against the law.**

Under Title VII, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex". 42 U.S.C. § 2000e–2(1). In 1978 Congress added § 2000e(k) to make it clear that this prohibition of sex discrimination also prohibits pregnancy discrimination:

> (k)   The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work ....

As the U.S. Supreme Court has stated, "'The Pregnancy Discrimination Act has now made clear that, for all Title VII purposes, <u>discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex</u>.'" *International Union v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) (quoting *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983)); and "With the PDA, Congress made clear that the decision ... to work while being ... pregnant ... was reserved for each individual woman to make for herself." *Johnson Controls*, 499 U.S. at 206.

This court has previously set out the prima facie case of discrimination under the PDA, in *Holmes v. E.Spire Communications, Inc.*, 135 F.Supp.2d 657, 661(D.Md. 2001)[27]:

> To survive summary judgment, Plaintiff must establish her Title VII discrimination case by one of two methods. First, Plaintiff can utilize "ordinary principles of proof using any direct or indirect

---

[27]In *Holmes* the court granted summary judgment to the defendant-employer where the plaintiff had been terminated because she could not return to work at the conclusion of her FMLA leave. Unlike this case, in *Holmes* there was no evidence of any nonpregnant employees who were treated more favorably; there was no evidence that the defendant's explanation for the termination was pretext for discrimination; and there was no evidence of "a discriminatory attitude" or intentional discrimination. *Id.* at 660-661. *See also Johnson Controls,* 299 U.S. 187 at 200.

evidence relevant to and sufficiently probative of the issue." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999) (internal quotation marks and citations omitted).  Under this approach, [Plaintiff] would have to produce "direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact."  Id. (internal quotation marks omitted) (quoting *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988))....

UPS skips right over this first method of proof--by which, as we will show, Ms. Young plainly establishes her PDA discrimination claim--and goes straight to a contention that "Young cannot establish a prima facie case of discrimination" by the <u>second</u> method of proof, the *McDonnell Douglas* framework (UPS Mem. 21), as to which this Court noted in *Holmes*,

> Under the second method of proof, the *McDonnell Douglas* framework, Plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence.  [Citations omitted.] To establish a prima facie case of pregnancy discrimination, Plaintiff must demonstrate that (1) she was pregnant; (2) she suffered an adverse employment action; (3) at the time of the adverse employment action she was performing her job satisfactorily; and (4) the position remained open or was filled by a similarly qualified applicant outside of the protected class--someone not pregnant. [Citation omitted.] Some courts have framed the fourth inquiry to require a PDA plaintiff to offer evidence of disparate treatment, which means showing that the defendant treated similarly situated nonpregnant employees more favorably. [Citations omitted.] The question under either approach is whether there is evidence that the defendant treated similarly situated nonpregnant employees more favorably, ... by not ... taking adverse employment actions when encountered with a situation similar to the plaintiff employee's.

135 F.Supp. at 661-662.   The Court continued its discussion of the fourth prong of a prima facie case under the PDA (*id*. at 668, n.4):

> The Fourth Circuit has recognized that because a particular prima facie case may vary depending on the relevant facts and context of the situation, a plaintiff may also have the option of satisfying the fourth inquiry by establishing that the adverse employment action occurred under circumstances that give rise to a reasonable inference of discrimination.  *See Taylor v. Virginia Union Univ.*, 193 F.3d 219, 230 (4th Cir. 1999) [other citations omitted].

However, Ms. Young establishes a prima facie case under <u>both</u> these methods of proof:

**B.      Direct evidence shows that UPS sent Peggy Young home because she was pregnant.**

Where there is "substantial" direct evidence of a biased motivation, plaintiffs can establish a prima

facie case without proceeding under the McDonnell Douglas burden-shifting analysis; "very little"

evidence of discriminatory motive is needed in order to raise genuine issue of material fact regarding

pretext.  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).

**1.      UPS told Peggy Young to go home until she was no longer pregnant because she was "too much of a liability".**

Ms. Young was fully capable of performing her regular job, and completely willing to perform a

light-duty job; but UPS sent her home until she was no longer pregnant.  Ms. Young told her superiors

that she was able to perform her regular job, and her medical file--which indicates that she had no

medical complaints and that she was released without limitations--corroborates her.  The Division

Manager--the superior over many thousands of UPS employees and the highest-level UPS agent involved

in Peggy Young's case--told Ms. Young to go home because she was "too much of a liability".  His

statement is direct evidence of UPS's discriminatory animus against pregnant employees.

To attempt to mitigate this ugly statement, UPS suggests that OHM Carol Martin was the

decisionmaker, rather than Myron Williams.  However, by Ms. Martin's own testimony, she was not

making a decision when she told Peggy Young that UPS gave no light duty for pregnancy.  She was

simply announcing UPS's no-light-duty-for-pregnancy-policy that was in place before she came to UPS

in 1991.  Ms. Martin also testified that it was not she but the managers who ordinarily made decisions

regarding employees and alternate work, and that the managers refer employees such as Ms. Young to her

only when the managers do not want to deliver the bad news.[28]  It is clear that the Division Manager, who

---

[28]*See* Martin Dep. 181-182; PX17 at 7, 20, 37-38 (broad authority delegated to UPS managers); Arline-Young Stmt. ¶ 11 (managers normally decide whether an employee gets light duty).

vastly outranked the OHM, was in communication with her regarding employees and their work limitations.  (UPS Dep. (Brien) 57-59 ("making sure everybody's on the same page, to determine what that person would be doing").)  Given UPS's hard-and-fast rule, it is misguided to look to either Ms. Martin or Mr. Williams as "the" decisionmaker.  The fact is that, whatever their behind-the-scenes communications were, each of them, acting on behalf of UPS, enforced its standing policy by deciding and announcing that Ms. Young must go home.

Even apart from the Division Manager's status as the decisionmaker, his statement is an indication of the corporate environment at UPS, and it places the OHM's selective requirement of a doctor's note with restrictions in a "less neutral context".  *Merritt v. Old Dominion Freight*, 601 F.3d 289, 301 (4th Cir. 2010).  Furthermore, the Division Manager's statement was UPS's admission that the company did not want Peggy Young at work while pregnant, because the company considered her too much of a liability.[29] Even if Carol Martin were viewed as the decisionmaker, she consciously made her decision on the basis of a company policy that refuses to accommodate the medical restrictions of pregnant women, while  it accommodates non-pregnancy-related medical restrictions such as diabetes, high blood pressure, and vision problems.  Ms. Martin's decision to enforce such a discriminatory policy is sufficient direct evidence of discriminatory animus on the part of the company to support Ms. Young's prima facie case of pregnancy discrimination.  *See Merritt*, 601 F.3d at 300 ("plaintiff does not need a 'smoking gun' to prove invidious intent").

---

[29]*See Carter v. University of Toledo*, 349 F.3d 269, 273-274 (6th Cir. 2003) (Provost's statement about racist decisionmaker was University's admission); *Schafer v. State of Maryland*, 359 Fed. Appx. 385, 388-389 & n.2 (4th Cir. 2009) (summary judgment for employer overturned where discriminatory comments made by "employee [who] possessed such authority as to be viewed as the one principally responsible for decision"; statement was non-hearsay under Fed. R. Evid. 801(d)(2)); *Pitrolo v. County of Buncombe*, 2009 WL 1010634 at *2 (4th Cir. March 11, 2009) (Director's statement regarding applicant admissible under Fed. R. Evid. 801(d)(2)).  *See* UPS Dep. (Brien) 403-405 (Williams oversaw staffing and turnover issues).

**2.** **UPS required Ms. Young to bring in a doctor's note with her "restrictions" and later told her to get a doctor's note saying she could not work at all.**

UPS defends its discriminatory treatment of Ms. Young by referencing the recommendation, in her midwife's note of October 11, 2006, that Ms. Young not lift over 20 pounds for the remainder of her pregnancy. This defense is unavailing for several reasons:[30]

- UPS does not have a policy of requiring fitness-for-duty notes for all employees returning to work from illness or injury--only for some. Ms. Young was selected because she was pregnant, and the note UPS required her to bring was with "restrictions".

- By requiring a doctor's note with "restrictions"--rather than requesting, at most, a doctor's note indicating that Ms. Young was released to full duty--UPS showed its assumption that a pregnant woman should have restrictions. *See Merritt*, 601 F.3d at 300 (selectively requiring physical test of female driver returning to work from injury, V.P. of Safety and Personnel "could be seen by a jury to embrace beliefs that women are unsuited for ... manual labor and, once injured, are less resilient in their ability to recover").

- By requiring a doctor's note with "restrictions", UPS attempted to concoct a reason to require Ms. Young to take unpaid leave. This is especially evident because, when Ms. Young brought a note with only a recommendation (and explained that she was able perform her regular job), UPS told her to get a doctor's note saying that she could not work at all.

- By not following up the midwife's note with a more detailed inquiry, UPS was departing from its policies, was treating Ms. Young differently than it treated employees who were not pregnant, and was demonstrating its desire to force Ms. Young onto unpaid leave.

- The note that Ms. Young presented to UPS did not state that she had any impairments, limitations, or restrictions. A good faith inquiry into the basis for the note would have corroborated Ms. Young's representation that she was able to perform her regular job.

The "recommend[ation]" given to Ms. Young was milder than a doctor's "restrictions" in

*Leuzinger v. County of Lake*, 2008 WL 323870 (N.D. Cal. Feb. 5, 2008), but even those "restrictions"

were properly understood as non-absolute. (*Leuzinger* arose under provisions of California's Fair

Employment and Housing Act that are equivalent to the federal ADA.) There the defendant-employer

---

[30]As is discussed below in part II.A, another reason that UPS cannot defend on the basis of Ms. Young's midwife's note is that, in requiring a doctor's note with restrictions, UPS violated the ADA.

argued that a correctional officer could not perform the essential job function of restraining juveniles where her doctor's note stated that it was "reasonable for her to avoid lifting more than approximately seven pounds with her left wrist" and that "she needs to limit the amount of times that she has to forcefully restrain a client....  However, I don't think that any of these should stop her from doing her normal job since she is able to compensate using her right hand, have a co-worker assist her, ... etc." *Id.* *5.  A second doctor's note referenced the first doctor's note and opined of the plaintiff that the second doctor believed "she should have those restrictions".   *Id*.  However, as the court noted in its order denying the defendant's motion for summary judgment:

> There are a number of difficulties with relying on these physician reports as "physician-imposed limitations."  First the limitations imposed are equivocal....  What his report seems to be are suggestions to prevent Leuzinger from aggravating her left wrist; it is not a conclusion that she was unable to perform the functions of her job.  Second, the suggestion that "she needs to limit the amount of times that she has to forcefully restrain a client" is not a declaration that Leuzinger was incapable of performing the essential function of restraining wards; it [is] an assertion that Leuzinger needed to limit how often she had to use force. [*Id*. *6.]

In its later order denying defendant's motion for judgment as a matter of law, the *Leuzinger* court noted, "The difficulties with the defendant's interpretation of these reports noted by the Court were in fact borne out before the jury by the testimony of both [doctors].  Dr. Nelson confirmed that he released Leuzinger to return to work without restrictions....  As far as his 'restriction' that Leuzinger not lift more than seven pounds, Dr. Nelson clarified" that he did not intend the sentence as "an absolute".  *Id*.  The court noted that "the evidence ... was not that physically restraining juveniles was a continuous and constant function of the position."  *Id*. *7.  The jury concluded, as the court had determined that a reasonable jury could conclude, that the plaintiff was qualified to perform the essential functions of her job.[31]

_____

[31]*See also Calef v. Fedex Ground Packaging Sys.*, 343 Fed. Appx. 891, 896 (4th Cir. 2009), a case under the West Virginia Human Rights Act, similar in relevant respects to the ADA, in which the Fourth Circuit affirmed the denial of FedEx's Rule 50 motion with respect to the jury's finding that FedEx regarded Calef

Likewise, Peggy Young's midwife at most suggested her belief that it would be preferable if Ms. Young did not lift heavy weights during her pregnancy.  The midwife was not told how infrequently Ms. Young's job called on her to handle packages over 20 pounds, and even so she made no statement that Ms. Young was unable to perform her regular job, nor even that Ms. Young was unable to lift over 20 pounds.  A reasonable jury could conclude that Ms. Young was qualified to perform her regular job.

    **3.**    **UPS has an explicit, stated policy of denying accommodations to employees with pregnancy-related limitations.**

The evidence shows--and UPS does not deny--that it maintains a no-light-duty-for-pregnancy policy.  This policy is a per se violation of the PDA.  As the PDA regulations clearly state:

> A written or unwritten employment policy or practice which excludes from employment applicants or employees because of pregnancy, childbirth or related medical conditions is in prima facie violation of title VII.

---

as disabled.  *Id*. at 902.  Calef had a doctor's note stating that she should not lift more than 20 pounds.  Though Calef claimed to be able to perform her regular job, the HR manager "ordered Calef to 'go home,' file a claim for [STD] benefits and stay away from work'" until further instructions.  "[N]o sincere effort [was] made ... to evaluate her condition....."  *Id*. at 894.  The jury found FedEx had regarded Calef as disabled.  The Fourth Circuit concurred with the trial court in finding that there was

> [n]o doubt [that] FedEx relied in part on [the doctors'] notes in making its decision to place Calef on leave.  What it fails to comprehend, however, is that none of these notes indicated Calef was unfit to work or that she desired to be placed on leave....  Moreover, the jury clearly found that Calef was still able ... to perform the essential functions of her job on the date that FedEx placed her on leave, despite the limitations described in these notes.

*Id*. at 902.  "FedEx simply proclaimed Calef to be disabled and prematurely abandoned its own reasonable accommodation process without fully examining whether Calef could remain on the job."  *Id*. at 903.  "[T]he jury very well may have concluded that FedEx concocted package delivery as an essential function of the ... position as part of a scheme to get rid of Calef by deeming her incapable of performing her job."  *Id*. at 903.

29 CFR § 1604.10(a).  UPS's policy accommodates employees with off-the-job medical conditions such as vision problems, diabetes, high blood pressure, sleep apnea, psychiatric problems, injured limbs, etc., while UPS maintains a flat policy of "no light duty for pregnancy."  The bias in such a policy is obvious.

Because of this direct evidence of pregnancy discrimination--i.e., the District Manager's instruction to stay home because a pregnant employee is too much of a liability; the OHM's special instruction to the pregnant employee to get a doctor's note with restrictions and then to get a note attesting a complete inability to work, and the company policy of no light duty for pregnancy--the Court need read no further to deny UPS's motion for summary judgment.  This is evidence of the sort that the Fourth Circuit has determined is sufficient to defeat an employer's motion for summary judgment, *i.e.*, "'evidence that clearly indicates a discriminatory attitude at the workplace and ... illustrate[s] a nexus between that negative atitude and the employment action.'"  *Lettieri v. Equant Inc.*, 478 F.3d 640, 649 (4th Cir. 2007), *quoting Brinkley, supra*, 180 F.3d at 608; *see also Hill v. Bd. of Supervisors*, 1993 WL 219810 (4th Cir. 1993) (upholding trial court decision for PDA plaintiff based on disputed comments of plaintiff's supervisor and his superior that showed pregnancy was a factor in termination decision).  Nonetheless, we proceed to the *McDonnell Douglas* analysis, which compels the same outcome.

**C.**   **Other evidence shows that UPS committed pregnancy discrimination in four ways.**

   **1.**   **UPS violated the PDA by refusing to permit Peggy Young to perform her regular job because she was pregnant.**[32]

Peggy Young was healthy and physically fit in October 2006, when she attempted to return to work at UPS pregnant.  There is no contrary evidence.  UPS's only defense of its decision to exclude Ms. Young from work is her midwife's recommendation that she not lift over twenty pounds--a "restriction"

---

[32]The Court has already ruled, over UPS's objection, that this claim--that Ms. Young was wrongly denied her regular job--is properly pleaded in this case.  *See* Order of March 30, 2010 (Doc. 44).

in fact solicited by UPS.  However, UPS could have and should have either accepted Ms. Young's

representations that she could do her regular job, or initiated any action reasonably necessary to confirm

those representations, or given her alternate work.

### a.   Because Ms. Young was pregnant, UPS did not let her decide for herself whether she would work her regular job.

With non-pregnant employees (such as employee "E441"; *see* n.18, *supra*), UPS let the employee

return to full duty on his or her own say-so, without any doctor's note.  However, UPS did not treat the

pregnant Peggy Young this way, and OHM Carol Martin's deposition testimony and the questions UPS's

attorney put to Peggy Young at her deposition shine a light on the reason why:  The OHM testified that

she "wouldn't even consider" letting Peggy Young make her own decision about whether or not to

continue to perform her regular job at her "own risk" because to do so would not be "ethically correct".

Similarly, UPS's counsel's questions to Peggy Young at her deposition suggest that UPS sent her home to

keep her from "endangering the fetus" (*see* n.15, *supra*, *citing* Young Dep. 158-159).

UPS's alleged ethical concerns are a mask for discriminatory paternalism.  Whether UPS's reason

for refusing Ms. Young the right to perform her regular job was animosity towards pregnant women,  or

an "ostensibly benign" desire to protect her from danger, or a desire to protect itself from the risk of

liability, its refusal to let her work violated the PDA.  *See International Union v. Johnson Controls, Inc.*,

499 U.S. 187, 198 (1991) ("It is no more appropriate for the courts than it is for individual employers to

decide whether a woman's reproductive role is more important to herself and her family than her

economic role.  Congress has left this choice to the woman as hers to make"); *id*. at 210-211.  The law

prohibits an employer from preventing a pregnant woman from working unless she is <u>unable</u> to do her

work; and this truth was made crystal clear by the Supreme Court in *Johnson Controls*, 499 U.S. 187 at

204 (1991).  In *Johnson Controls*, the Supreme Court noted that it had previously held that an employer's concern about "danger to a woman herself does not justify discrimination" because it is "the 'individual woman's decision to weigh and accept the risks of employment.'" *Id.* at 202, quoting *Dothard v. Rawlinson*, 433 U.S. 321, 335 (1977).  The *Johnson Controls* Court went on to hold, 499 U.S. at 205-206, that an employer's concern about the danger to a woman's fetus does not justify discrimination:

> The Senate Report ... states that employers may not require a pregnant woman to stop working at any time during her pregnancy unless she is unable to do her work.  Employment late in pregnancy often imposes risks on the unborn child, see Chavkin, Walking a Tightrope: Pregnancy, Parenting, and Work, in Double Exposure 196, 196-202 (W.Chavkin ed. 1984), but Congress indicated that the employer may take into account only the woman's ability to get her job done.  (See Becker, From Muller v. Oregon to Fetal Vulnerability Policies, 53 U.Chi.L.Rev. 1219, 1255-1256 (1986).)  With the PDA, Congress made clear that the decision ... to work while being ... pregnant ... was reserved for each individual woman to make for herself.

UPS was required to leave to Ms. Young any decisions about her own welfare and the welfare of her child.  By forcing Ms. Young to go on unpaid leave on these facts, UPS violated the PDA.

### b. Because Ms. Young was pregnant, UPS did not bother to confirm that Ms. Young could work her regular job.

Under *Johnson Controls*, UPS's only alternative to allowing Ms. Young to work was to determine whether she was "unable to do her work"; but it failed to do so and instead proposes discriminatory burdens on the pregnant employee.  As it typically did for non-pregnant employees (*see* part I.C.2.b, *infra*), UPS could have (1) looked into Ms. Young's representations about the weights of packages that she actually had to lift,[33] and would have found that heavy packages were few and far between (*see* pp. 6 *et seq.*, *supra*); (2) provided to Ms. Young or her midwife UPS's more detailed medical inquiry forms (as it did with non-pregnant employees; *see* n.23, *supra*), whereby it would have confirmed Ms. Young's

---

[33]*See* "Interpretive Guidance on Title I of the Americans With Disabilities Act", 29 C.F.R. part 1630, Appendix (hereinafter, "EEOC ADA Guidance"), § 1630.9 (upon receiving the accommodation request, the employer should "analyze the particular job ... and determine its ... essential functions").

ability to work; (3) telephoned the midwife (as she had invited) to discuss Ms. Young's supposed

restriction (as the OHM did with other employees' doctors (*see* PX37 at D6586); or (4) advised Ms.

Young to bring in a doctor's note saying that she could perform her regular job (as it did with non-

pregnant employees; *see* Martin Dep. 141).  OHM Carol Martin did none of these things because Ms.

Martin was a loyal UPS employee who did her job and, when the opportunity presented itself, sent home

the pregnant employee until she was no longer pregnant.  UPS did not more closely examine the issue of

Ms. Young's ability or inability to work because UPS correctly supposed that the midwife's note was the

strongest evidence it could obtain to suggest that Ms. Young might have some physical impairment that

could prevent her from working her regular job.  UPS evidently decided to cling to what it had.  A

reasonable jury could conclude from this evidence that Ms. Young's pregnancy and not the 20-pound

lifting recommendation was the real reason that UPS forced her onto unpaid leave.  *Notter v. North Hand

Protection*, 1996 WL 324008 at *4 (4th Cir. 1996; unpublished opinion), *quoting St. Mary's Honor Ctr.

v. Hicks*, 509 U.S. 502, 511, n. 4 (1993) ("rejection of the defendant's proffered reasons is enough at law

to sustain a finding of discrimination").

UPS contends that if Ms. Young had brought in a second doctor's note without restrictions, then

UPS would have let her work.  This contention is factually incorrect (*see* n.19, *supra*); and more

important, even if true it would place on the pregnant employee a burden of initiating action that the non-

pregnant employee is not required to initiate.  And in this case, UPS told her to do the opposite (i.e., to

bring in a second note saying she could not work at all) and put her into despair with the Big Boss's put-

down that she should go home until she was no longer pregnant--something a second doctor's note could

not fix.  Had UPS suggested getting a note with no restrictions, Ms. Young would have promptly done

so--but UPS never made any such suggestion.  (Young Dep. 560-561.)

In the typical PDA case involving an actual light duty restriction, the employer forces the plaintiff into the Hobson's choice of having to working full duty in violation of medical restrictions or having to take an undesired leave of absence.  *See, e.g.*, *Lehmuller v. Incorporated Village of Sag Harbor*, 944 F.Supp. 1087, 1089-90 (E.D.N.Y. 1996)  UPS denied Ms. Young even this choice (which, for her, would have been easy); UPS would not permit Ms. Young the right to consider her midwife's recommendation and then make her own decision about whether or not she wanted to continue to work her regular job.

2.     **UPS violated the PDA by implementing and enforcing a policy of not accommodating employees with pregnancy-related conditions and by following discriminatory procedures that abet that policy.**

a.     **UPS's policy of non-accommodation violates the PDA.**

The PDA requires UPS to treat "women affected by pregnancy ... the same ... as other persons not so affected but <u>similar in their ability or inability to work</u>."  42. U.S.C. 2000e(k).  That is, the PDA grants a right to a workplace accommodation for pregnancy and its temporary limitations, to the extent those rights are provided to other employees with temporary limitations on their ability to work.  Missing the mark, UPS focuses on the similarities in an employee's <u>condition</u> or <u>impairment</u> rather than on the similarities in an employee's <u>ability or inability to work</u>.  The issue is <u>not</u>, as UPS repeatedly and wrongly states, whether UPS treated Ms. Young the same as "male delivery drivers who presented a doctor's note with a <u>similar lifting restriction</u> resulting from an off-the-job[34] injury or illness."  (UPS Mem. 22

---

[34]UPS spends pages 23 to 26 of its brief arguing that "Employees with on-the-job injuries are not similarly-situated", but the employee injured on the job is not the primary comparator that plaintiff offers in this case.  Because UPS treated employees with all sorts of <u>off</u>-the-job medical conditions more favorably than it treated Ms. Young, the Court need not even consider the worker injured on the job in order to deny UPS's motion for summary judgment.  As for on-the-job injuries, there is a split in the Circuit Courts of Appeals as to whether an employer may treat an employee who needs a job accommodation due to an on-the-job injury more preferably than it treats the employee who needs a job accommodation for pregnancy-related reasons.  Defendant correctly notes that this Court has held such a distinction to be permissible where the employer proves business necessity due to the cost savings to the employer who must pay workers'

(emphasis added); *see also id.* at i, ii, 2, 7,  20, 22 (twice), and 23 (twice).)  The PDA issue is not whether

UPS treated Ms. Young as well as it treated other employees with <u>similar conditions</u>.  Rather, the issue is

unequivocally stated in the statute itself: whether UPS treated Ms. Young the same as other employees

"similar in their <u>ability or inability to work</u>."  As the Court said in *Johnson Controls*, 499 U.S. at 204:

> Unless pregnant employees differ from others "in their ability or inability to work," they must be
> "treated the same" as other employees "for all employment-related purposes."  42 U.S.C.
> §2000e(k).  This language clearly sets forth Congress' remedy for discrimination on the basis of
> pregnancy....  Women who are pregnant ... must be treated like others "similar in their ability ... to
> work."  *Ibid.*  In other words, women as capable of doing their jobs as their male counterparts may
> not be forced to choose between having a child and having a job.

---

compensation benefits to an employee injured on the job who is not permitted to work.  Neither the Supreme
Court nor the Fourth Circuit has specifically addressed the issue.   The PDA is silent as to the location where
any inability to work arose.  The Supreme Court has noted that "in passing the PDA, Congress considered at
length the considerable cost of providing equal treatment of pregnancy and related conditions, but made the
'decision to forbid special treatment of pregnancy despite the social costs associated therewith.'"  *Johnson
Controls*, 299 U.S. 187 at 210.  We therefore submit that the Supreme Court would not find that cost savings
to the employer would protect an employer from PDA liability where the employer treated more favorably
the employee injured on the job than it treated the pregnant employee.   In a ruling of February 8, 2010, the
EEOC found sex discrimination where "American Airlines has a 'light-duty' program for employees who
are injured on the job.  AA, however does not allow pregnant women at JFK to use that benefit."
www.legalmomentum.org/news-room/press-releases/eeoc/finds/american/airlines.html.  Plaintiff contends
that the position articulated by the Sixth Circuit in *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir.
1996), is correct in holding that pregnancy discrimination is demonstrated whenever another employee,
similar in ability or inability to work, received more favorable treatment than the pregnant employee
received, even where the non-pregnant employee's inability to work was due to on-the-job injury.

Even if workers' compensation costs are an appropriate employer defense in a PDA case, this must
be so <u>not</u> at the prima facie case stage--where as to the fourth prong the employee must show that others
were treated more favorably--but at the stage where the employer produces evidence of its "non-
discriminatory reason".  Where the employer truly accommodated only limitations arising from on-the-job
injuries as a means of saving workers compensation costs, a defense would have merit under the
reasoning of some circuits.  But in a case where (as here) the employer also accommodates limitations
arising from non-pregnancy off-the-job circumstances (e.g., medical problems and drunk driving situations),
where workers' compensation costs are not at issue, such a defense would be vulnerable to evidence that the
employer's alleged non-discriminatory reason was pretext for discrimination against pregnant employees.
*See Parker v. Albertson's Inc*., 325 F.Supp.2d 1239, 1247 (D.Utah 2004) (warning against "'short-
circuit[ing]'" case at the prima facie stage and denying plaintiff "the opportunity to show that the policy,
which may be facially neutral, is actually a pretext for unlawful discrimination"), *citing EEOC v.
Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1195 N.7 (10th Cir. 2000).

UPS avoids the actual statutory issue because it cannot show that it treats the employee whose ability to work is affected by pregnancy the same way it treats the employee whose ability to work is similarly affected by such things as high blood pressure, diabetes, vision problems, and drunk driving convictions because it gives inferior treatment to the former and preferable treatment to the latter.[35]  Of course, UPS would like to pick and choose certain other employees whom it did <u>not</u> accommodate (whether lawfully or unlawfully) and thereby find a (selective) group that it arguably treated as badly as it treated pregnant employees.  However, trying to disprove pregnancy discrimination by this degraded standard is in direct conflict with the statute, which provides that the appropriate comparator is the other employees similar in their ability or inability to work.  The statute does not say that an employer must treat its pregnant employee no worse than it treats <u>some</u> other employee to whom it gives the worst treatment.  The PDA does not codify a lowest common denominator, a least-favored-nation rule.

      **b.**    <u>**UPS's procedures for pregnant employees depart from its usual procedures for employees who request or need accommodations.**</u>

     Under the PDA, "An employer may not single out pregnancy-related conditions for special procedures for determining an employee's ability to work."  29 C.F.R. part 1604, Appendix (Q&A 6).  However, UPS's ultimately discriminatory treatment of a pregnant employee--i.e., its denial of accommodations--is facilitated by its following two different sets of procedures for the consideration of employees with limitations:  for the non-pregnant employee, a fair inquiry into the situation; but for the

---

[35]UPS incorrectly states that *Daugherty v. Genesis Health Ventures of Salisbury, Inc.*, 316 F.Supp. 2d 262 (D.Md. 2004), is on "all fours" with Ms. Young's case.  (UPS Mem. 24.)  In *Daugherty*, the defendant's policies were "justified by 'business necessity'", *id.* at 264 (unlike UPS's 70-pound requirement; *see* n.2, *supra*), and it was "undisputed by plaintiff that defendant treats all disabilities ... that arise other than on-the-job equally".  The plaintiff "failed to marshal any evidence to call into question the bona fides of defendant's limited 'light duty' policy" and did "not remotely show[] that the policy has ever been applied in a discriminatory manner" *id.*, 316 F. Supp. at 264-265 (unlike UPS's accommodations for non-work-related injuries and conditions; *see* pp. 11 *et seq., supra*).

pregnant employee, a cursory rejection of the request.  OHM Carol Martin makes the decision of whether to require a doctor's note for an employee to return to work after a medical absence, and she does not always require such a note.  UPS sometimes ignores doctor's notes when volunteered by returning employees.  (*See* n.?, *supra*.)  The only note that is ever required of a non-pregnant employee is a note stating that the employee is able to return to work.[36]  In Ms. Young's instance, if the OHM had required no note, or if she had solicited a note confirming fitness for duty, then Ms. Young would have resumed work.   However, since Ms. Young was pregnant, the OHM instructed her[37] and then reminded her that she would need a doctor's note stating her "restrictions" if she wished to return to work.  This special rule for pregnant employees violated the PDA.  *See Spees v. James Marine, Inc.*, ___ F.3d ___, 2010 WL 3119969 at *11-12 (6th Cir. Aug. 10, 2010) (summary judgment for employer overturned where foreman told pregnant employee to obtain doctor's note limiting her to light duty and then relied on the note to transfer her to less desirable light duty position).

UPS also violated the PDA when it deprived Ms. Young of its standing routine for obtaining necessary medical information.[38]  When any employee requests a workplace accommodation, the ADA

---

[36]*See* PX18.  UPS's Rule 30(b)(6) designee testified that UPS does not require doctor's certifications when the employee starts.  When an employee is injured "the certification needs to say that the employee is able to return back to work with no restrictions to their regular job."  (UPS Dep. (Brien) 194.)  All that UPS's FMLA policy sometimes requires is a "fitness for duty" doctor's note.

[37]When Ms. Young first informed OHM Martin of her pregnancy, the OHM's immediate response was to remind her that she must bring a note with restrictions in order to return to work.  "The employer's initial reaction upon learning of [an] employee's pregnancy can be circumstantial evidence of pretext and intent to discriminate."  *Notter*, 1996 WL 342008 at *7.

[38]UPS uses this failure as a defense against the suggestion that UPS regarded Peggy Young as disabled.  (UPS Mem. 39.)  However, if an employer can defend against regarded-as-disabled claims by simply demonstrating that the employer failed to follow the procedure for accommodation requests that is required by the ADA, then no employer would ever be liable for a regarded-as disabled claim.  The employer would simply terminate all such employees prior to examining their requests for accommodation.

(as discussed below) requires that the employer begin an interactive process with that employee.   UPS's

policy, outlined in the UPS ADA Compliance Manual and instituted according to EEOC regulations,

likewise ostensibly provides for a multi-step Accommodation Request procedure that is to be followed

for each employee who requests an accommodation.   Of course, an employee need not prove disability

under the ADA <u>before</u> she can begin the interactive process.   Rather, the determination regarding ADA

eligibility is made during its early steps.   According to UPS's manual (PX19 at 4987):

> UPS procedure requires specific steps to be followed when a request for an accommodation is
> received....   An individual requesting an accommodation must participate and cooperate in the
> evaluation process.   Each accommodation request must be examined on a case-by-case basis.

However, for the pregnant employee who requests an accommodation, OHM Martin does not commence

the accommodation request procedure.   Rather, she short-circuited that procedure by her conclusory

determination that Ms. Young must leave work for the duration of her pregnancy.

UPS also violated the PDA when it deprived Ms. Young of its standing routine for internal

consultation about the nature of her work.   For the driver who needs an accommodation because of a non-

pregnancy-related medical condition[39] that makes him temporarily unable to perform his driver job, the

OHM talks with the employee's manager (Martin Dep. 21) who then consults with the labor manager

about what inside work the driver may perform (Martin Dep. 35-36), and the driver is then "typically"

accommodated by being placed "on either the preload or the local sort, carwash.   Inside operations."

(Martin Dep. 40.)  However, for the driver who needs an accommodation because of a pregnancy-related

---

[39]UPS has followed this procedure even for employees such as those with vision, blood pressure, and diabetes-type conditions that UPS has contended are not protected by the ADA.  *See* PX4, UPS's EEOC Stmt. at 10 (citing *Oswalt v. Sara Lee Corp*., 74 F.3d 91, 92 (4th Cir. 1996) ("[h]igh blood pressure, alone without any evidence that it substantially affects one or more major life activities, is insufficient to bring an employee within the protection of the ADA'")).  Nonetheless, UPS accommodates the driver who temporarily cannot perform his regular driver job due to high blood pressure.  By not similarly accommodating the driver who temporarily cannot perform her regular driver job due to pregnancy, UPS violates the PDA.

condition that makes her temporarily unable to perform her regular driver job, Ms. Martin does not speak

with the employee's manager, and no collaborative process occurs.  Instead, Ms. Martin summarily rules

that the pregnant employee with a lifting restriction must go on leave.  If the pregnant employee is not yet

20 weeks pregnant, she tells the employee that she is not entitled to short-term disability benefits.

### c.   Peggy Young was "similar in [her] ability or inability to work" to other employees whom UPS accommodated.

Two of the 26 "Essential Functions" of the Air Driver Position are relevant here:  The employee

must "[m]eet all of the applicable requirements as specified by the D.O.T." (*i.e.*, Department of Transpor-

tation), and the employee must be able to lift 70 pounds.[40]  UPS contends that an employee must meet

both of these qualifications to perform the job.  Therefore, when an employee is temporarily unable to

perform either of them, he is temporarily unable to perform the job of an Air Driver.  For purposes of the

PDA, a driver unable to meet the DOT requirements and a driver unable to lift 70 pounds are both

temporarily unable to perform the job of an Air Driver, and they are therefore "similar" in their inability

to work.  When UPS gives an alternate job to the driver who fails to meet the DOT requirement and sends

home the driver who, because of pregnancy, fails to meet the lifting requirement, UPS violates the PDA.

An Air Driver who cannot <u>drive</u> is entirely disqualified from his regular job.   He cannot make a

single delivery; he can deliver 0% of his packages; but UPS will make major accommodations for him.

However, a pregnant Air Driver who can drive, but who UPS thinks can <u>lift</u> up to only 20 pounds –that

pregnant driver can make no less than 97% of her deliveries and must transfer no more than 3% to other

---

[40]As is discussed below, the 70-pound lifting requirement is not a true "Essential Function" of the job, and UPS's listing it as such is a pretext for discrimination and has an adverse effect on pregnant women.

drivers, but UPS makes no accommodation and sends her home.[41]  That is pregnancy discrimination.  *See Wesley v. Arlington County*, 354 Fed. Appx. 775, 782 (4th Cir. 2009) (overturning summary judgment for employer:  "The purported importance of some marginally relevant qualifications and disregard of other, seemingly pertinent aspects ... raise a genuine question of material fact").

> **d.   UPS's basis for denying Peggy Young an accommodation was a pretext for its pregnancy discrimination.**

UPS's supposedly gender neutral policy that prohibits women with pregnancy-related limitations from being accommodated with alternative work (i.e., the supposed policy that only employees with on-the-job limitations are accommodated) does not stand up to scrutiny and is a pretext for discrimination.  The real reason for UPS policies is its intention to discriminate against pregnant women.  Where other evidence supports an inference of discriminatory motive, proof that the employer's reasons are illogical and inconsistent may "considerably assist" plaintiff's case because it suggests the employer had cause to hide its true reasons, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)--and we now show how illogical, inconsistent, and sometimes dishonest[42] UPS's contentions have been.

**Factually false contentions.**  The 70-pound requirement lacks business justification, is not "essential",[43] and exists as a justification for discrimination.  "I know that UPS likes to say that every

---

[41]Likewise, UPS accommodates the male driver convicted of DUI by permitting another employee to drive for him while he makes deliveries; but UPS refuses to accommodate the pregnant clerical worker who wants only to use a stool from time to time throughout the day to reduce the pregnancy-related swelling of her legs and feet.  The DUI convict gets a <u>driver</u>; the pregnant worker gets <u>no stool</u>.

[42]In *Holmes v. E.Spire Communications*, 135 F.Supp.2d at 668 n.6, this court noted: "In *Reeves*, the Supreme Court clarified that it is 'permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation.'"

[43]Under the EEOC's regulations, whether or not a job qualification is an essential function of a job depends on many factors, including "the amount of time spent on the job performing the function".  *See* 29 CFR § 1630.2(n) ("The term 'essential functions' does not include the marginal functions of the position"; a

employee has to be able to lift 70 pounds, but the truth of the matter is that many of the UPS employees do not lift over 20 pounds in their jobs." (Scott Stmt. ¶ 12; *see also* p. 5, *supra*.)  The ability to lift over 20 pounds is not an essential function of the Air Driver position, because of the very low number of packages over 20 pounds that are delivered by Air Drivers, the large number of drivers who could deliver those infrequent packages, and the availability of handtrucks for every driver.[44]

Whether an ostensibly essential job requirement is truly essential--or is instead a "mask" for discrimination--is an issue for the jury.  In *Aksamit v. UPS*, No. 03-cv-0956 (D. Ariz. August 30, 2004) (copy attached), UPS fired a full-time pregnant driver who had a restriction of working only six hours per day due to pregnancy complications.  She refused to apply for leave because she wanted to work.  UPS argued that working 10 hours a day was an essential part of her duties.  The Court stated:

> Aksamit was aware that working ten hours a day could be required.  But, she argues, the ability to do so was not essential because full-time shifters often worked fewer than eight hours a day....  There is evidence that the ability to work ten hours a day, five days a week, was not an essential function of Aksamit's job.  Thus, she has established the qualification element of her prima facie case.... [T]here is a factual issue whether UPS fired her because she could work only six hours a day, or used that reason to mask its distaste for cutting slack for pregnant employees....

---

factor is "the number of other employees available to perform that function or among whom the performance of that job function can be distributed"); EEOC ADA Guidance, § 1630.2(n).  Although the requirements stated on an employer's position description is one factor that may be considered (29 CFR § 1630.2(n)(3)(ii)), it is by no means determinative.  *See Rohr v. Salt River Project Agricultural Imp. & Power Dist.*, 555 F.3d 850, 863-864 (9th Cir. 2009) (finding a factual dispute whether the work that the plaintiff could not do was an "essential function" of his job; "an employer must demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform the essential functions of the job"), *quoting Bates v. UPS*, 511 F.3d 974, 996 (9th Cir. 2007).

[44]The ADA regulations note that "It may also be a reasonable accommodation to permit an individual with a disability the opportunity to provide and utilize equipment ... that an employer is not required to provide as a reasonable accommodation."  Here, the only equipment that Peggy Young would ever have needed to utilize in order to deliver (but not lift) packages over 20 pounds is the handtruck that UPS had already provided to her.

In this case, Ms. Young has made an adequate showing that the 70-pound lifting requirement is a "reason

to mask [UPS's] distaste for cutting slack for pregnant employees", a pretext for its discrimination.

Others of UPS's factual contentions have been false:

• In its position statement to the EEOC, UPS falsely claimed that "Ms. Young did not wish to, and in
fact claims that she was not able to, continue working in her job" (PX5 at 2).  Even the OHM's
testimony (*see* Martin Dep. 81) shows this to be false.

• UPS has falsely claimed that all TAW positions are "heavy duty" positions (*see* UPS Mem. 5, n.6),
and the OHM testified that all inside jobs at UPS are "heavy duty" jobs (Martin Dep. 114), but this
claim has no support.  The CBA, which is the source of an employee's right to an inside job, never
mentions anything about inside jobs being heavy duty, nor does any document produced in
discovery in this case.  In truth, several of the position descriptions for inside jobs do not require an
employee to lift heavy weights, and many of the employees even in positions where the position
descriptions do state such a requirement in reality did not have to lift heavy weights.  UPS has a list
of temporary alternate work assignments, several of which do not require that an employee be able
to lift over 20 pounds.  *See also* PX16.

• UPS has contended that Ms. Young exhausted her FMLA or FMLA-equivalent (*see* UPS Mem. 12-
16 & n.14), implying that excessive absence might have justified adverse action against her; but the
CBA imposed  no limit on unpaid maternity leave (*see* n.17, *supra*).

**Contradiction of business interests.**  UPS's policies denying accommodation for pregnant

employees is counter to its own explanations of its business interests in personnel matters--showing that

those policies are not justified by business considerations but by discriminatory animus:

• To address the high turnover of employees, UPS "mak[es] sure that every employee is at work
every day" and gets absent employees back to work as soon as possible (UPS Dep. (Brien 403-
405)--except for a healthy but pregnant employee begging for the opportunity to return to work.

• Accommodating medical conditions to let drivers work is a "smart business decision", and "when
you have someone covering for an employee there is an extra expense that they can't do the job as
efficient as that person that was doing it before" (UPS Dep. (Brien) 124)--except that, to UPS,
bearing that expense and inefficiency was preferable to the "liability" of the pregnant driver.

• UPS routinely permits employees to take long leaves of absence, rather than losing them altogether,
since it wants to retain employees (rather than hire and retrain their replacements); and yet when
Peggy Young tried to return to work, the OHM, rather than simply encouraging her to take leave,
told her that she needed to "think about [her] job with UPS", *i.e.,* that she should quit her job.

**The CBA as an excuse.**  UPS contends (Mem. 5, n.6) that the accommodations it makes are required by the CBA, and that it does not accommodate pregnancy because the CBA does not require it (UPS Dep. (Brien) 93-97, 115-120, 126-130).  However, the CBA was negotiated by UPS, and it refused to agree with the Union's proposals that the CBA provide to all pregnant employees temporarily disabled by pregnancy alternate work in the same manner that employees temporarily disabled by other conditions were provided alternate work.  (Carolyn Robinson Stmt. ¶¶4-5.)  UPS cannot hide behind the discriminatory terms of the CBA that it voluntarily entered into, any more than a racially discriminatory employer would be immunized by a CBA that requires racial discrimination.[45]

**Avoiding "preferential treatment".**  UPS contends that it refusES to accommodate pregnant employees because it must not give preferential treatment to pregnant women and thereby discriminate against the non-pregnant (male) employee whose sports injury or non-work-related illness prevents him from performing his regular job.  (UPS Dep. (Brien) 97, 116-117.)  This contention is flawed.  Many of the sports-related injuries would also cause the afflicted driver to fail to meet DOT standards, thereby bringing them into the protection of the alternative work provision of the CBA (Martin Dep. 63-64).  But more important, the contention fundamentally misunderstands the PDA and disregards binding precedent. The Supreme Court held, in *California Federal Savings v. Guerra*, 479 U.S. 272, 285-86 (1987), that--

> Congress intended the PDA to be a floor beneath which pregnancy disability benefits may not drop, not a ceiling above which they may not rise.  The legislative history is devoid of any discussion of

---

[45]Also, under the ADA, "It is unlawful for a covered entity to participate in a contractual or other arrangement or relationship that has the effect of subjecting the covered entity's own qualified ... employee with a disability to the discrimination prohibited...  The phrase 'contractual or other arrangement or relationship' includes ... labor union, including collective bargaining agreements."  29 CFR §1630.6.  *See also Burwell v. Eastern Air Lines, Inc.*, 633 F.2d 361, 365 (4th Cir. 1980) (where CBA provision was open to multiple interpretations, employer's reliance on the CBA was misplaced where "It was only [employer's] unilateral interpretation that effected this grossly discriminatory result").  The facts here are equivalent to those in *Burwell*.  *See* PX9, CBA at 39; Robinson Stmt. ¶¶ 4-5; UPS Dep. (Gordanier) 16-18.

preferential treatment of pregnancy, beyond acknowledgments of the existence of state statutes providing for such preferential treatment.

As to the petitioner's "argument that the PDA prohibits employment practices that favor pregnant women," *id*. at 286, the Supreme Court stated:

> On the contrary, if Congress had intended to prohibit preferential treatment, it would have been the height of understatement to say only that the legislation would not require such conduct.  It is hardly conceivable that Congress would have extensively discussed only its intent not to require preferential treatment if in fact it had intended to prohibit such treatment.  [*Id.* at 287.]

Thus, under the PDA an employer may offer to pregnant workers an increased level of protection over, but not a decreased level of protection under, what it offers to other temporarily disabled workers.[46]

**3.** **UPS violated the PDA by failing to provide disability benefits for medical conditions in early pregnancy and by requiring that a pregnant employee have a doctor's note stating that she cannot work at all in order to qualify for benefits.[47]**

UPS's short-term disability (STD) plan is a self-insured plan.  UPS is the ultimate decisionmaker regarding an employee's qualifications for benefits.  OHM Carol Martin "manages the disability process" (Martin Dep. 15) and was the person to whom employees with questions about the plan were referred.  She told Ms. Young (1) that she would not qualify for STD benefits unless her doctor stated in writing

---

[46]That many women work out of financial necessity was a consideration in the passage of the PDA.  *See* 123 Cong. Rec. 29663-64 (1977).   Pregnancy is recognized by the Supreme Court as a unique and inherently female physiological experience.  *See Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833, 860-61 (1992). The Supreme Court has found failure to accommodate for inherent physiological differences between men and women to be sex discrimination, particularly when such accommodations would celebrate those differences while helping advance a historically disadvantaged class.  *See United States v. Virginia*, 518 U.S. 515, 550-551 (1996).  It follows that an employer's providing accommodations for pregnancy-related limitations would not be found to be unlawful discrimination against the non-pregnant.

[47]Plaintiff's position is that the matters discussed in Parts I.C.3 and I.C.4 in this argument are adequately stated in her First Amended Complaint, but the Court previously ruled otherwise and held that Plaintiff could not amend her complaint to include them.  (*See* Order of March 30, 2010 (Doc. 44).)  Consequently, Plaintiff was not permitted to conduct discovery on these matters.  Had she been permitted such discovery, she would now be presenting additional factual support for her position on these issues.  These issues are included in this discussion as offers of proof to preserve the issues for appeal.

that she could not work at all, and (2) that benefits would not be provided to her in the early stages of pregnancy (before 20 weeks).  These unwritten, discriminatory terms for pregnancy are superimposed on the plan by UPS who is the administrator of the plan and the ultimate decider of its terms.

The regulations interpreting and implementing the PDA state:

Written or unwritten employment policies and practices involving matters such as the commencement and duration of leave..., and payment under any health or disability insurance or sick leave plan, formal or informal, shall be applied to disability due to pregnancy, childbirth or related medical conditions on the same terms and conditions as they are applied to other disabilities.  [29 C.F.R. § 1604.10(b).]

A woman unable to work for pregnancy-related reasons is entitled to disability benefits ... on the same basis as employees unable to work for other medical reasons.  [29 C.F. R. part 1604, Appendix, third para.]

UPS set higher qualifications for its STD plan in the case of pregnant employees, thus violating the PDA.

**4.**     **UPS's policy of providing accommodations only for employees with on-the-job injuries or with other non-pregnancy-related medical conditions has a disparate impact on pregnant women.**

UPS contends (Mem. 28) that the Court should summarily hold that UPS is not liable for pregnancy discrimination because it is not pregnancy but the "lifting restrictions associated with pregnancy ... that UPS does not accommodate" and because, it says, UPS treats employees with pregnancy limitations the same as employees with other non-work-related conditions.  Assuming *arguendo* that these contentions were true, UPS's facially neutral, no-light-duty-for-off-duty-lifting-restrictions policy would nonetheless

have a disparate impact on women,[48] because women and men alike suffer injuries and illnesses but only

women bear the impact of the "lifting restrictions associated with pregnancy" (UPS Mem. 28).

Lifting restrictions are common in pregnancy (Martin Dep. 66-67), and lifting restrictions arise at

UPS disproportionately among pregnant women (Arline-Young Dep. 83-84) .  UPS cannot legally single

out the dubious "essential function" of lifting up to 70 pounds and refuse to accommodate the employee

who is temporarily impaired in the performance of it, while accommodating the employee temporarily

impaired in his ability to meet the DOT requirements, the first and primary "essential function".  To

single out the lifting restriction is, in large part, to single out pregnancy as the condition that will not be

accommodated.  If permitted, Ms. Young would show that UPS's alleged facially neutral policy of not

accommodating employees with lifting restrictions falls more harshly on pregnant women than on other

groups and cannot be justified by business necessity.

**II.**      **UPS violated the Americans with Disabilities Act.**

    **A.**      **UPS violated the ADA by requiring Peggy Young to obtain a medical examination and a doctor's note with "restrictions."**

The first of the ADA issues in this case is very simple:  The ADA prohibits an employer from

selectively subjecting employees to medical evaluations in order to obtain documentation of an

employee's medical restrictions.  The ADA permits an employer to require a medical examination of an

employee only where it is required of all such employees, 42 U.S.C. § 12112 (d)(3), and only when "such

---

[48]"Disparate-impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003); *Int'l Broth. of Teamsters v. U.S.*, 431 U.S. 324, 335 n.15 (1977); *see also Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971); *Garcia v. Woman's Hospital of Texas*, 97 F.3d 810, 813 (5th Cir. 1996) (pregnant nurse should have been given the opportunity to present evidence that the lifting restriction had a discriminatory impact on pregnant women); *Lehmuller v. Incorporated Village of Sag Harbor*, 944 F.Supp. 1087 (E.D.N.Y. 1996).

examination or inquiry is shown to be job-related and consistent with business necessity."[49]   42 U.S.C.

§ 12112 (d)(4)(A).  The regulations limit such "inquiries into the ability of an employee to perform job-related functions" (29 CFR § 1630.14(c)), and the EEOC explains that "these questions should not be phrased in terms of disability" (EEOC ADA Guidance, *supra*, § 1630.13(a)).  UPS violated the ADA by selectively requiring Ms. Young to obtain a doctor's note with "restrictions".

**B.**   **UPS violated the ADA by failing to accommodate Peggy Young when it regarded her as having a disability.**

The second ADA issue in this case begins with the ADA's general rule:

It is unlawful for a covered entity not to make reasonable accommodation to the known physical ... limitations of an otherwise qualified ... employee with a disability ....  It is unlawful for a covered entity to deny employment opportunities to an otherwise qualified ... employee with a disability based on the need of such covered entity to make reasonable accommodation to such individual's physical ... impairments. [29 CFR § 1630.9(a)-(b).]

The ADA's protection is extended to "every qualified individual with a disability", which "means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  *Id*. § 12111(8).  An individual with a "disability" includes someone who is "regarded as having such an impairment" even where she has no impairment.  *Id.* § 12102(2)(c).

---

[49]This means employer must have "a reasonable belief based on objective evidence" that the employee's ability to perform an essential job function is being impaired by a medical condition.  Enforcement Guidance on Disability-Related Inquiries, available at eeoc.gov/docs/guidance-inquiries.  *See Conroy v. New York State Dep't of Corrections*, 333 F.3d 88, 95-96 (2nd Cir. 2003) (ADA was violated by policy requiring employee to provide general diagnosis of medical condition upon returning to work from sick leave, noting "general diagnoses may expose individuals ... to employer stereotypes"; *id*. at 96 ("the diagnosis may give rise to the *perception* of a disability").

1.    <u>UPS regarded Peggy Young as disabled.</u>

Peggy Young was entitled to the protections of the ADA as a person with a disability because UPS

regarded her as having a disability.  Under the ADA, a person who has no impairment is "regarded as

having" an impairment that substantially limits the person's major life activities when an employer treats

that person as having such an impairment.  *See* 29 C.F.R. §1630.2(l)(3); EEOC ADA Guidance, *supra*,

§ 1630.2(*l*).  EEOC guidance explains that "an individual meets the 'regarded as' part of the definition of

disability if he or she can show that a covered entity made an employment decision because of a

perception of a disability based on 'myth, fear, or stereotype.'" *Id.*  As one court explained,[50]

> "The focus is on the impairment's effect on the attitudes of others.  [Citation omitted.]  This
> provision is intended to combat the effect of 'archaic attitudes,' erroneous perceptions, and myths
> that work to the disadvantage of persons with, or regarded as having, disabilities.  *See School Bd. of
> Nassau County v. Arline*, 480 U.S. 273, 279 & 285 (1987).

While Peggy Young never had or claimed to have any impairment or disability, UPS nonetheless

regarded her as having a disability when UPS took her midwife's recommendation that she not lift over 20

---

[50]*King v. Yellow Freight System, Inc.*, 2000 U.S. Dist. LEXIS 20062 (D. Miss. 2000) (medical records
said employee was unable to drive, but factual issue existed regarding the accuracy of essential functions
presented to employee's doctor and the right of employer to rely on his records; *id*. at *14; plaintiff set out
prima facie case of ADA discrimination (*id at *10)* where he raised genuine issues as to: (1) whether
employer regarded him as substantially limited in the ability to drive trucks (*id*. at *15-16), (2) whether the
employer had inflated the actual essential functions of his position (*id.* at *20), (3) whether the employer
properly relied on a particular physician's evaluation (*id.* at *23-24), and (4) whether the employer had
discriminatory animus and its actions were pretext for discrimination (*id.* at *24)); *see also Sutton v. United
Airlines, Inc.*, 527 U.S. 471, 489 (1999) (employer regards an employee as disabled when it misperceives
employee has a substantially limiting impairment that he does not have); *McKenzie v. Dovala*, 242 F.3d 967
(10th Cir. 2001) (where employer "was worried about liability" but did not order tests to determine
applicant's qualifications factual question as to whether employee was "regarded as" disabled); *Wilson v.
Phoenix Specialty Mfg. Co, Inc.*, 513 F.3d 378, 385 (4th Cir. 2008) (employer's "myths and fears"); *LeVelle
v. Penske Logistics*, 197 Fed. Appx. 729 (10 Cir. 2006) (upholding jury verdict for driver who was
terminated after employer learned he had doctor-recommended lifting restrictions even though employee
contended he could do the job; employer argued it acted only upon the doctor's recommended restrictions,
but court noted "the evidence ... permits the conclusion that Penske's actions were based upon myths, fears,
or stereotypes about LeVelle's perceived disability, not upon his actual ability to work").

pounds during her pregnancy, inflated it to mean that she was unable to lift (*see Wilson*, 513 F.3d at 387,

n2 ("perceptions of ... limitations were exaggerated")), and then treated her as if she were disabled in the

major life activities of lifting and of working.[51]   UPS latched on this statement--despite Ms. Young's pleas

to the contrary--as a reason to treat Ms. Young as unable to lift or to work, thereby forcing her into 6-1/2

months of unpaid leave.  "Under the 'regarded as' prong of the ADA, membership in the protected class

becomes a question of intent.  And ... 'the employer's motive is ... rarely susceptible to resolution at the

summary judgment stage.'"  *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2000). UPS's motive

can be inferred from what it said and did to Ms. Young:

    a.    **The Division Manager's statement that Ms. Young was "too much of a liability" shows that UPS regarded her as disabled.**

The Division Director told Ms. Young not that she was unqualified to do her job but that she was

"too much of a liability"--an obvious expression of fear that Ms. Young's pregnancy might subject UPS to

tort liability or increased workers' compensation costs, and a classic indicium of regarding an employee as

disabled.[52]  However, the ADA prohibits an employer from taking an action against an employee because

---

[51]*See Calef v. FedEx Ground Packaging Sys.*, 343 Fed. Appx. 891, 898 (4th Cir. 2009) (finding of "regarded as" disabled upheld for employee with 20-pound lifting restriction where employer made no sincere effort to evaluate ability to work before ordering plaintiff home); *see also Henderson v. Ardco, Inc.*, 247 F.3d 645, 650-652 (6th Cir. 2000) (employee with 25-pound lifting restriction raised genuine issue whether employer "perceived her as unable to perform anything but 'light duty' work" and therefore disabled in the major life activities of lifting and working); EEOC ADA Guidance, *supra*, § 1630.2(i) Appendix ("[O]ther major life activities include, but are not limited to, sitting, standing, lifting, reaching"), *citing* congressional reports in n.54, *infra*; EEOC Compliance Manual, *Section 902 Definition of the Term Disability* (hereinafter, "EEOC Disability Manual"), § 902.8(e), Example 4 ("the major life activity of lifting"), available at archive.eeoc.gov/policy/docs/902cm.html .

[52]*See EEOC v. Heartway Corp.*, 466 F.3d 1156, 1166 (10th Cir. 2006); *Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1133-1134 (10th Cir. 2003 ("[R]ecord reveals that ... supervisors also expressed concern with productivity, attendance and insurance, all recognized indicators of discrimination based on myth, fears, and stereotypes"); *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 960 (10th Cir. 2002) (where employer "withdrew the job offer because of unsubstantiated speculation about future risks from a perceived disability"); *Shrader v. OMC Aluminum Boat Group, Inc.*, 128 F.3d 1218, 1221

of "fear or speculation that a disability may indicate a greater risk of future injury ... or may cause future

workers' compensation or insurance costs,"[53] or from taking action because of unfounded fear that the

employee is a danger to self or others is likewise impermissible; rather, an employer must determine a

"direct threat" to safety on the basis of "an individualized assessment of the individual's present ability to

safely perform the essential functions of the job", 29 CFR §§ 1630.29 (r); and that assessment must be

"based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the

best available objective evidence," 29 CFR § 1630.15[54]--neither of which was complied with in this case.

_____

(8th Cir. 1997) (where employer "concerned about liability for future injury" discharged employee, jury determined employer's decision was "based on its perception of her as disabled"); *Fox v. BNSF R.Co.*, 2006 WL 3791323, at *7 (D.Kan. Dec. 22, 2006) (finding genuine issues as to whether employer's treatment of plaintiff "was 'based on myth, fear, or stereotype ...' where employer "stated concerns" that "stemmed from [employer's] desire to protect itself from what it perceived a inevitable workers' compensation claims"(citations omitted)); *Kelly v. Metallics West, Inc.*, 2004 WL 3760972, at *6-7 (D.Colo. Jan. 12, 2004), aff'd, 410 F.3d 670 (10th Cir. 2005) ("plaintiff has established a prima facie case that the defendant violated the ADA by regarding her as disabled and terminating her employment because ...  Mr. Mola ... admitted that he did not want the plaintiff back to work because the company did not want the liability"); *Kresge v. Circuitek*, 958 F.Supp. 223, 226 (E.D. Pa. 1997) (evidence that employer refused to hire individual because of workers' compensation history and concern about effect on insurance rates creates fact issue as to whether he was "regarded as" disabled).

[53]*See* EEOC's *Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act* (hereinafter, "EEOC T.A.M."),§ 6.4 ("The results of a medical inquiry or examination may not be used to disqualify persons who are currently able to perform the essential functions of a job, either with or without an accommodation, because of fear or speculation that a disability may indicate a greater risk of future injury ... or may cause future workers' compensation or insurance costs....  For Example: An individual who has an abnormal back X-ray may not be disqualified from a job that requires heavy lifting because of fear that she will be more likely to injure her back or cause high workers' compensation or health insurance costs"), available at www.jan.wvu.edu/links/ADAtaml.html.

[54]In such a case the employer is obliged to determine "whether a reasonable accommodation would either eliminate the risk or reduce it to an acceptable level....  An employer, however, is not permitted to deny an employment opportunity to an individual with a disability merely because of a slightly increased risk.... Such consideration must rely on objective, factual evidence – not on subjective perceptions, irrational fears, patronizing attitudes, or stereotypes."  EEOC ADA Guidance, *supra*, § 1630.2(r) (legislative history and case citations omitted). "The assessment ... of substantial harm ... must be strictly based on valid medical analyses and/or on other objective evidence ... individualized factual data ... rather than on stereotypic or patronizing assumptions....  Generalized fears about risks  ... cannot be used by an employer to disqualify an individual

50

It is evident that UPS, in the absence of any real assessment of threat or danger, simply made its decision on the basis of "myths, fears, and stereotypes"[55] that are themselves evidence that an employer regards an employee as disabled--an inference warranted by the fact that UPS (1) held to its 70-pound requirement without any "individualized assessment" of Ms. Young's job, (2) inflated the significance midwife's 20-pound recommendation without any confirmation that it had been based on "the best available objective evidence,"[56] and (3) irrevocably bound Ms. Young to them both.  In making the unexamined assumption that Ms. Young was "too much of a liability", UPS evidently held to the stereotype that pregnant women have problems lifting weights and are prone to injury, or that their permitting them to continue doing their jobs could pose some risk to their unborn children.   The ADA was enacted to protect workers from such reflexive stereotyping.

---

with a disability."  *Id*. (*citing* S. Rep. No. 116, 101st Cong., 1st Sess. 21 (1989), at 56; H.R. Rep. No. 485 part 2, 101st Cong., 2d Sess. 50-51 (1990), at 73-74; H.R. Rep. No. 485 part 3, 101st Cong., 2d Sess. 26-27 (1990) at 45).  UPS had no such evidence about Ms. Young.

[55]EEOC ADA Guidance*, supra*, § 1630.2(*l*) ("'Congress acknowledged that society's accumulated myths and fears about disability ... are as handicapping as are the physical limitations that flow from actual impairment.' [*School Board of Nassau County v. Arline*,] 480 U.S. [273 (1987)] at 284.  An individual rejected from a job because of the 'myths, fears and stereotypes' associated with disabilities would be covered under this part of the definition of disability .... [C]ommon attitudinal barriers that frequently result in employers excluding individuals with disabilities ... include concerns regarding ... safety, insurance, liability ...[and] worker's compensation costs....  Therefore, if an individual can show that an employer ... made an employment decision because of a perception of disability based on "myth, fear or stereotype," the individual will satisfy the 'regarded as' part of the definition of disability.  If the employer cannot articulate a non-discriminatory reason for the employment action, an inference that the employer is acting on the basis of 'myth, fear or stereotype' can be drawn").

[56]*See Rodriguez v. ConAgra Grocery Products Co*., 436 F.3d 468, 472, 481 (5th Cir. 2006) (granting partial summary judgment to employee whose employer accepted one doctor's statement--over the employee's objection--that the employee was not medically qualified due to uncontrolled diabetes as grounds for terminating him and stating, "Employers cannot rely on 'perceptions of [a] disability based on myth, fear or stereotype' ... an employer must focus on whether the particular applicant ... is actually capable of performing the essential functions of the job at issue").

### b.   The OHM's instruction to get a doctor's note that Ms. Young could not work at all shows that UPS regarded her as disabled.

Faced with a midwife's "recommendation" about lifting and Ms. Young's insistence that she was fully able to do her job, UPS's procedures called for it to solicit from Ms. Young or her doctor a fitness-for-duty statement. Instead, UPS bizarrely gave her the maddening instruction to get a doctor's note saying that she could not work at all. There was no reason for UPS to tell Ms. Young to get such a note other than UPS's regarding her as being unable to work at all.[57] A reasonable jury could well conclude from this instruction that UPS regarded Ms. Young as disabled and intended to treat her as such.

### c.   Coding Ms. Young 's status as "disability" shows that UPS regarded her as disabled.

There is no dispute that, after it sent her home pregnant, UPS coded Ms. Young as being out due to "disability." If UPS could escape the consequences of this classification by proving that it was an error made by a low-level clerical employee, the attempt would fail since so far UPS's position is that it does not know who ordered this code. (*See* UPS Dep. (Brien) 214.) If it matters what individual ordered the "disability" code, then for purposes of summary judgment, when every inference is drawn in Ms. Young's favor, the evidence suggests--and the Court must assume--that OHM Carol Martin gave the order for this code. (PX6-7, Young Dep. 166-170). There could be no more vivid and concrete way to document an employer's regarding an employee as disabled than to show--as Plaintiff has shown--that on its business records UPS explicitly recorded that Ms. Young had a "disability".

---

[57]*See Moorer v. Baptist Mem. Health Care*, 398 F.3d 469, 481 (6th Cir. 2005) (holding that "evidence that the company created a pretextual reason for [the plaintiff's] firing may tend to prove that it regarded [the plaintiff] as a disabled employee", citations omitted).

### d.    UPS's other contentions are beside the point.

The evidence discussed so far is adequate by itself to show that UPS regarded Ms. Young as disabled, apart from any merit in two other contentions that UPS makes.  However, it is not difficult to rebut those other two contentions as well.

### i.    UPS regarded Peggy Young as unable to do a broad range of jobs.

UPS contends that Ms. Young's ADA claim fails because Ms. Young cannot show that UPS regarded her as disabled in the major life activity of working.  However, whether Ms. Young was regarded as disabled from "working" is a question addressed after considering whether an employer regarded an employee as disabled with respect to another "major life activity"; and the evidence shows that UPS regarded her as disabled in the major life activity of lifting.  Ms. Young need not also show that UPS regarded her as disabled in the major life activity of working.[58]  Nonetheless, that showing can be made:

OHM Martin, whom UPS contends is the decisionmaker, never considered whether Ms. Young could do other work (Martin Dep. 167); and UPS cannot now contend that UPS considered Ms. Young as able to do a broad range of other jobs.  It is beyond dispute that UPS regarded Ms. Young as incapable of performing any job that required her to lift over 20 pounds and incapable of performing any job in the bargaining unit (UPS Dep. (Brien) 509, 520).  Thus she was considered incapable of performing all

---

[58]*See* EEOC Technical Assistance Manual, *supra*, at § 2.1(a)(iii) ("It is not necessary to consider if a person is substantially limited in the major life activity of "working" if the person is substantially limited in any other major life activity"); EEOC ADA Guidance, *supra*, § 1630.2(j) ("If an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered. If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working"); *Wilson,* 513 F.3d at 386-87 (where employer's reasons for termination were pretextual and employer believed employee could not use a computer effectively and write, factfinder could properly determine employee was regarded as disabled, without any discussion of a broad class of jobs he could not perform).

delivery jobs, all heavy labor jobs,[59] and all manual labor jobs requiring lifting over 20 pounds.  Ms.

Young has a high school education and no special training or skills.  When UPS regarded her as unable to

perform any job in its bargaining unit, it regarded her as "significantly restricted in the ability to perform

either a class of jobs or a broad range of jobs in various classes as compared to the average person having

comparable training, skills and abilities."  *EEOC v. Heartway Corp.* 466 F.3d 1156 (10th Cir. 1006).  This

is a sufficient showing that UPS regarded Ms. Young as unable to do a broad range of other jobs.[60]

### ii.    A temporary impairment can be an ADA disability.

UPS contends that Martin could not have regarded Ms. Young as disabled because her weight-lifting

"impairment" was "temporary", since it was associated with pregnancy, and because (UPS incorrectly

states) "courts have also universally have found that such temporary limitations are not disabilities within

the meaning of the ADA."  (UPS Mem. 36.)  On the contrary, courts have found temporary limitations to

---

[59]"Heavy labor jobs" is a class of jobs.  *See* EEOC Disability Manual, *supra*, § 902.8(f); EEOC ADA Guidance, *supra*, § 1630.2(j); EEOC T.A.M., *supra*, § 2.1(a)(iii).

[60]*See Cline v. Wal-Mart Stores, Inc*., 144 F.3d 294, 304 (4th Cir. 1998) (employer "regarded Cline as being substantially limited in his ability to perform a class of supervisory jobs"); *McKenzie v. Dovala*, 242 F.3d 967, 972 (10th Cir. 2001) (employer's "refusal to consider employing her in a less sensitive post within the Office ... suggests that he regarded her as substantially limited in her ability to work in an entire class of jobs"); *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2000) (jury question whether employer "regarded [employee with 25-pound lifting restriction] as significantly limited in his ability to lift or in his ability to work in a broad class of jobs); *Henderson v. Ardco, Inc.*, 247 F.3d 645, 654 (6th Cir. 2000) ("evidence that defendant perceived there was no job for her at the Ardco plant ... gives an indication of the employer's perception about her suitability for a class of relevantly similar employment"); *EEOC v. E.I. DuPont De Nemours & Co.*, 480 F.3d 724, 730 (5th Cir. 2007) ("DuPont regarded Barrios as restricted from all jobs at the plant....  Therefore for ADA purposes, DuPont regarded Barrios as substantially limited in the major life activity of walking"); *Moorer v. Baptist Mem. Health Care*, 398 F.3d 469, 483 (6th Cir. 2005) (upholding trial court's "regarded as" determination where employer perceived employee as unable to perform any job at that hospital); *A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 368 (4th Cir. 2008) ("regarded as disabled" question properly for jury where reasonable jury could reach either answer).

be disabilities under the ADA,[61] and the EEOC's guidance agrees that longer-term temporary impairments "last[ing] for more than several months" can constitute ADA disabilities.[62]

The Fourth Circuit case cited by UPS, *Pollard v. High's of Baltimore, Inc*., 281 F.3d 462 (4th Cir. 2002), is inapposite to the present case, in which UPS foresaw an impairment for the 7 months remaining in Ms. Young's pregnancy.[63]  In *Pollard*, by contrast, only one month was really at issue:  The plaintiff in *Pollard* was out of work for a total of five months, but at the beginning of that absence, she was by choice out of work and receiving workers' compensation benefits.  There is no indication that she desired to return to work until <u>one month</u> before her actual return date.  *Pollard* was therefore a much more temporary situation than the nearly seven months of forced leave to which Ms. Young was subjected by UPS.  Research has yielded no Supreme Court or Fourth Circuit case requiring that an impairment last longer than seven months in order to be regarded as a disability.

---

[61]*See EEOC v. Chevron Phillips Chemical Co.*, 570 F.3d 606 (5th Cir. June 5, 2009) (7 months of chronic fatigue symptoms held to be of sufficient severity and duration to constitute an ADA disability); *Leicht v. Hawaiian Airlines, Inc*., 77 F.Supp. 2d 1134, 1148 (D. Haw. 2001) (whether cancer that was life-threatening for only four months before treatment and remission was too "temporary" to constitute "disability" held to be a fact issue), *rev'd on other grounds*, 15 Fed. Appx. 552 (9th Cir. 2001).

[62]*See* EEOC Disability Manual, *supra*, § 902.4(d) ("An impairment is substantially limiting if it lasts for more than several months").  EEOC counsel observed in June 2009: "Requiring that an impairment last for six months or more to be considered substantially limiting would in fact impose a stricter standard than the Commission has ever applied."  Statement of Christopher J. Kuczynski, EEOC Assistant Legal Counsel, Meeting of June 17, 2009, on Proposed Rulemaking Implementing the ADA Amendments Act of 2008, available at eeoc.gov/eeoc/meetings/6-17-09/transcript.cfm.  *See also Navarro v. Pfizer Corp.*, 261 F.3d 90, 97 (1st Cir. 2001) ("While pregnancy itself may not be an impairment, the decided ADA cases tend to classify complications resulting from pregnancy as impairments"); *Spees v. James Marine Inc.*, ___ F.3d ___, 2010 WL 3119969 at *14 (6th Cir. 2010) (same).

[63]Peggy Young's weight-lifting recommendation was made, and she attempted to return to work, on October 11, 2006, nearly 7 months before her May 2007 due date.  The forced leave was followed by childbirth and a period when both Ms. Young and Ms. Martin agree that she would have been unable to work.  (Young Dep. 566; Martin Dep. 65-66 (women typically unable to return to work for six weeks or so after giving birth).)  Therefore, at the time Ms. Young requested an accommodation, she was 7 months from giving birth and approximately 8 or 9 months from being able to return to work after giving birth.

### 2.   Peggy Young was qualified.

UPS argues under both the PDA and the ADA that Young was not qualified for a position at UPS.

The analysis for whether Ms. Young was qualified under the ADA is in large part the same as whether she

was qualified under the PDA, as is discussed above.  However, we note that under the ADA's regulations,

> job criteria that even unintentionally screen out, or tend to screen out, an individual with a disability
> ... because of their disability may not be used unless the employer demonstrates that those criteria, as
> used by the employer, are job-related to the position to which they are being applied and are
> consistent with business necessity....  This provision is applicable to all types of selection criteria,
> including ... lifting requirements.

EEOC ADA Guidance, *supra*, § 1630.10.  Therefore, under the ADA, Ms. Young need not show that she

was able to lift 70 pounds; rather, to show herself qualified she need show only that she was able to lift the

weight actually required by her air driver job.  Ms. Young's testimony, corroborated by that of other UPS

employees, is that she could have performed her regular job without an accommodation.  Her job rarely

(less than 3% of the time) required her to handle packages over 20 pounds, and she could have handled

them when it was required.  She had lifted her 35-pound son throughout her prior pregnancy with no ill

effects.  She was permitted to use a hand truck whenever she wanted to do so.

Plaintiff's evidence on this point is sufficient for a reasonable jury to conclude that Ms. Young was

indeed able to perform the job--particularly since there is no evidence (and certainly <u>not</u> any evidence from

her midwife) tending to show that she could not perform the job.  Even if her midwife's 20-pound lifting

recommendation had the inflated content and status that UPS supposes, a jury could still consider other

evidence to decide that the employer should not have relied on that "restriction".  In *Chalfant v. Titan*

*Distribution, Inc.*, 475 F.3d 982, 990 (8th Cir. 2007), the employer cited a doctor's opinion that the

employee "could not ... walk more than one-half mile in one day" to argue that the employee was not

qualified for a position that required walking.  The employee testified that he walked over five miles each

56

day.  The court held that "that evidence was sufficient for a reasonable jury to determine that [the

employee] was able to perform the essential functions of the ... position".

      **3.**     **<u>UPS had a duty to accommodate Peggy Young once it regarded her as disabled</u>.**

     UPS contends that, even if UPS did regard her as disabled, it had no duty to accommodate

Ms. Young.  Defendant cites no Supreme Court or Fourth Circuit precedent for this proposition because

there is none.  Although some circuits have held otherwise, the statute is clear:  Employees are entitled to a

reasonable accommodation for both actual disabilities and "regarded as" disabilities.

     "[T]he ADA bars employment discrimination "against a qualified individual with a disability".

42 U.S.C. § 12112(a).  A "disability" under the ADA is either--

     (A)   a physical or mental impairment that substantially limits one or more major life
activities of such individual;
     (B)   a record of such an impairment; <u>or</u>
     (C)   being regarded as having such an impairment.

*Id*. § 12102(2) (as in effect in 2006; emphasis added).  UPS ignores the truism that one <u>has a "disability"</u>

under the ADA if she has an impairment or <u>if she is regarded</u> as having an impairment. Therefore, the

ADA bars discrimination against a qualified individual with an actual impairment <u>and</u> bars discrimination

against a qualified individual who is regarded as having an impairment".  "Discrimination" under the

ADA includes "not making reasonable accommodations to the known ... limitations of an otherwise

qualified individual with a <u>disability</u>", *id.* § 12112(b), which by definition includes a qualified individual

who is "regarded as" disabled no less than an individual who is actually impaired.  The ADA thus

prohibits denial of reasonable accommodations to a qualified individual who is only regarded as impaired.

     This is the reasoning in *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1235-1236 (11th Cir.

2005), which relied, in part, on the Supreme Court's interpretation of the ADA's predecessor, the Rehabil-

itation Act of 1973, as set forth in S*chool Board of Nassau County v. Arline*, 480 U.S. 273 (1987).  In

*Arline*, the Court considered the claim of a school teacher afflicted with tuberculosis who argued that she

had been fired because her employer regarded her as handicapped, in violation of the Rehabilitation Act.

The Act's definition of "handicapped individual" (like the ADA's definition of "disability"), then codified

at 29 U.S.C. § 706(7)(B), included "any person who (i) has a physical ... impairment which substantially

limits one or more of such person's major life activities, and [any person who] (iii) is regarded as having

such an impairment."  Finding the teacher to be a handicapped individual within the Act's "regarded as"

definition, the Court remanded for the district court to determine "whether the school board could have

reasonably accommodated her," since "[e]mployers have an affirmative obligation to make a reasonable

accommodation for a handicapped employee."  *Arline*, 480 U.S. at 288-89 & n. 19.[64]

The duty to accommodate begins with the employer's duty to engage in a "flexible, interactive

process" with an employee who requests an accommodation.[65]  The interactive process should commence

once the employer knows of the employee's possible disability and her request for an accommodation.[66]

---

[64]*See also Sutton v. United Airlines*, 527 U.S. 471 (1999); *Cigan v. Chippewa Falls School District*, 388
F.3d 331 (7th Cir. 2004); *Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751, 753
(3d Cir. 2004);  *Wilson*, 513 F.3d at 388 (noting circuit split on question but not deciding it).

[65]*See* EEOC ADA Guidance, *supra*, § 1630.9 ("[T]he employer must make a reasonable effort to
determine the appropriate accommodation.  The appropriate reasonable accommodation is best determined
through a flexible, interactive process that involves both the employer and the [employee] with a
disability"); *see also id.* § 1630, "Background" ("When an individual's disability creates a barrier to
employment opportunities, the ADA requires employers to consider whether reasonable accommodation
could remove the barrier.... [A]n accommodation must be tailored to match the needs of the disabled
individual with the needs of the job's essential functions.  This case-by-case approach is essential"); 29 CFR
§ 1630.2(o)(3) ("informal, interactive process ... [to] identify the precise limitations resulting from the
disability and potential reasonable accommodations that could overcome those limitations").

[66]*See Haneke v. Mid-Atlantic Capital Mgmt.*, 131 Fed. Appx. 399 (4th Cir. 2005).  Many other circuits
have also determined that an employer must engage in the interactive process with an employee who
requests an accommodation.  *See Leicht v. Hawaiian Airlines, Inc*., 15 Fed. Appx. 552 (9th Cir. 2001);
Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1114 (9th Cir. 2000), *vacated on other grounds*, 535 U.S. 391

The guidelines for the interactive process (stated in section §1630.9 of the EEOC'S ADA Guidance in 29 CFR part 1630, Appendix) state that once an employee requests an accommodation, the employer must:

(1)     Analyze the particular job involved and determine its purpose and essential functions;

(2)     Consult with the [employee] to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;

(3)     In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and

(4)     Consider the preferences of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

If UPS had engaged in any interactive process with Ms. Young, Ms. Young would have been permitted to work, with or without an accommodation.  UPS's only reaction to Ms. Young's "request" for an accommodation or her alternative request that she be permitted to perform her regular job was to force her onto nearly 7 months of unpaid leave.  A jury could conclude this to be a violation of the ADA.  *Jones v. United Parcel Service,* 214 F.3d 402, 407 (3d Cir. 2000); *Taylor v. Phoenixville School District*, 184 F.3d 296, 313 (3d Cir. 1999); *Deane v. Pocono Medical Center*, 142 F.3d 138, 149 (3d Cir. 1998).

Ms. Young has made out a prima facie case under the ADA by demonstrating that (1) she was disabled within the meaning of the ADA, in that UPS regarded her as being disabled, (2) she was qualified to perform the essential functions of her job with or without a reasonable accommodation, and (3) she suffered an adverse employment action because of disability.

---

(2002); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 804-806 (7th Cir. 2005); *Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d at 772-774 (3d Cir. 2004); *Fjellestad v. Pizza Hut of America*, 188 F.3d 944, 952 (8th Cir. 1999); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999); *Taylor v. Principal Financial Group Inc.*, 93 F.3d 155, 165 (5th Cir. 1996).

III.   **UPS's motion is moot insofar as it seeks judgment on Plaintiff's claim of race discrimination, since she has moved to dismiss that claim.**

Plaintiff has moved to dismiss voluntarily her race discrimination claim, because discovery showed that UPS discriminated against pregnant women without regard to race.  UPS's motion is therefore moot as to race discrimination.

IV.   **Ms. Young suffered damages as a result of UPS's unlawful discrimination.**

Ms. Young seeks several kinds of damages--*i.e.*, lost wages, health benefits, disability benefits, and pension benefits, and emotional pain and suffering--as well as injunctive relief.  UPS contends that Ms. Young failed to mitigate her damages.  This contention could apply only to one form of relief she seeks; and even as to her lost wages, mitigation was not practical, reasonable,[67] or legally necessary.  UPS employees who have pregnancy-related limitations that keep them from performing their regular jobs are not required to obtain other jobs.  They are supposed to be able to collect disability benefits that continue their health insurance benefits and pay them a portion of their wages.  Ms. Young's lack of mitigation was reasonable.  Her employment was not terminated, and she did return to her job after giving birth. Her testimony was that, by the time Myron Williams had definitively told her that she would not be able to work while pregnant, she was already visibly pregnant--a fact that would have made futile any efforts to locate a new job, especially a job that she would not return to after she gave birth.  Moreover, she worked at UPS from approximately 5:00 to 10:00 a.m., hours for which it would have been very difficult to find other work.  She worked at UPS in large part for the health insurance benefits which, from her experience,

---

[67]*See Ford v. Rigidply Rafters, Inc.*, 984 F. Supp. 386, 389 (D. Md. 1997) ("Title VII is a broad remedial statute designed to 'make whole' victims of discrimination, and the Supreme Court has emphasized that the district courts have broad equitable discretion to award back pay ... and interest to effectuate the statute's remedial intentions....  A Title VII plaintiff who is unable to find comparable work is entitled to back pay 'as a matter of course' unless the defendant produces evidence that plaintiff did not use <u>reasonable</u> efforts to mitigate damages"; citations omitted; emphasis added).

is almost unheard of in other part-time jobs.  She also testified that she had a period of depression after her

forced lay-off that made it difficult for her to do much of anything.[68]  By the time these issues had

resolved, she was soon to give birth.  A couple of months after giving birth, she returned to her position at

UPS.

Even if UPS were correct that Ms. Young had a duty to mitigate her damages on these facts, that

mitigation argument would not affect her right to recover her lost disability, health,[69] and pension benefits,

her emotional pain and suffering damages, or the punitive damages and injunctive relief she seeks.  Thus,

any failure to mitigate would by no means bar all recovery and cannot support UPS's motion for summary

judgment.

## CONCLUSION

The Court should deny UPS's motion for summary judgment.

Respectfully submitted,

September 16, 2010

_/s/_____

Sharon Fast Gustafson
4041 N. 21st Street
Arlington, Virginia  22207
(703) 527-0147 telephone
(703) 527-0582 telefacsimile
Federal Bar No. 16485
sf.gustafson@verizon.net

*Attorney for Plaintiff*

---

[68]*See Tobin v. Liberty Mutual Insurance Co.*, 553 F.3d 121, 141 (1st Cir. 2009) (employee entitled to backpay where employer's discriminatory conduct caused inability to mitigate); *Latham v. Dep't of Children & Youth Svcs.*, 172 F.3d 786, 794 (11th Cir. 1999) (same); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 157 (3d Cir. 1999) (same).

[69]Ms. Young testified that she could not afford to pay the $992.70 per month Cobra payment that was required for her to mitigate the loss of her private health insurance.