UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PEGGY YOUNG | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: DKC 08 CV 2586 |
| | ) |
| UNITED PARCEL SERVICE, INC., | ) |
| | ) |
| Defendants. | ) |

**APPENDIX:**
**PLAINTIFF'S ANNOTATION OF DEFENDANT UPS's**
**"STATEMENT OF UNDISPUTED FACTS"**

## II. STATEMENT OF UNDISPUTED FACTS

From previous briefing in this case, the Court is familiar with the essential facts. Indeed, the Court's March 30, 2010 Memorandum Opinion (Document 43) summarizes most of the basic undisputed facts. Although the Court may already be familiar with the undisputed facts, they are repeated below for the convenience of the Court.

**A.    Carol Martin -- Policy And Practice Of Dealing With Employees With Medical Restrictions**

    **1.  Carol Martin.**

Carolyn ("Carol") Martin was the Occupational Health Manager for UPS's Metro D.C. District, which covered Maryland, the District of Columbia, and northern Virginia, and included the Landover,

Maryland building[1] where Young worked. (Martin depo. 9-12.)[2] Carol Martin is a registered nurse and had been employed in UPS's Human Resources department in occupational health roles for more than sixteen years. (Martin depo. 5-8, 17.)

Carol Martin worked in the Burtonsville, Maryland District headquarters, but she had District-wide responsibilities. As the Occupational Health Manager for the Metro D.C. District, she was the Human Resources official responsible for most issues relating to employee health and ability to work, including approving leaves of absence under the Family and Medical Leave Act ("FMLA"), the administration of UPS's program for compliance with the ADA, federal Department of Transportation ("DOT") medical examinations and qualification requirements applicable to UPS drivers, and injury prevention programs. (Martin depo. 4-5, 13-17; Martin Decl. ¶ 2.[3]) Carol Martin also was the official in the Metro D.C. District who made decisions about whether employees are able to perform their jobs based on restrictions imposed by the employees' physicians. (Martin depo. 169-170; Martin Decl. ¶ 2; *See also* Blunt depo. 77-79, 94[4]; Brien depo. 14-15, 19-21, 45.[5])

*But see P. Mem. 9, 25-26.* [handwritten annotation]

---

[1] Although located in Landover, Maryland, the building where Young worked is referred to as the "D.C. Building." (Young depo. 65-66.) Young's deposition testimony is cited as "(Young depo. ___)," and cited pages from Young's deposition transcript are attached as Appendix 1. Although some aspects of Young's deposition testimony are disputed, for the limited purpose of this motion for summary judgment, Young's deposition testimony is assumed to be true.

[2] Carol Martin's deposition testimony is cited as "(Martin depo. ___)," and cited pages from Carol Martin's deposition transcript are attached as Appendix 2.

[3] The Declaration of Carolyn Martin is attached as Appendix 3, and that Declaration is cited as "(Martin Decl. ¶ ___.)"

[4] Ursula Blunt's deposition testimony is cited as "(Blunt depo. ___)", and cited pages from the deposition transcript of Ursula Blunt are attached as Appendix 4.

[5] Health and Safety Manager Mark Brien's deposition testimony is cited as "(Brien depo. ___)," and cited pages from the deposition transcript of Mark Brien are attached as Appendix 5.

**2. On-The-Job Injuries.**

Under Article 14, Section 2 of the governing collective bargaining agreement, UPS is required to assign temporary alternate work ("TAW") to bargaining unit employees who are unable to perform their regular job because of an on-the-job injury covered by the workers' compensation laws. (Martin depo. 60; Martin Decl. ¶ 3.) *See* excerpts from the collective bargaining agreement, attached to Declaration of Robert Cowie, which is attached hereto as Appendix 6. TAW is only temporary, generally limited to 30 days, and it is part of a "work-hardening" program that is designed to help employees return to their regular jobs as soon as possible. (Martin depo. 88-89. *See also* Brien depo. 12-14; 74-75; Martin Decl. ¶ 3.)

[Handwritten margin note: *But see* P. Mem. 10 n.10.]

Other than TAW for on-the-job injuries under Article 14, Section 2 of the collective bargaining agreement, the only other situation in which a bargaining-unit employee may be granted a light-duty accommodation is if the employee has a "disability" within the meaning of the ADA. (Martin Decl. ¶ 4.) If an employee has a qualifying "disability" within the meaning of the ADA which prevents him/her from being able to perform some aspect of his/her job, the employee may request an accommodation pursuant to UPS's ADA compliance procedure. (Martin depo. 54-55; Martin Decl. ¶ 5.) Depending on the circumstances, a disabled employee might be entitled to an alternative work assignment under the ADA. (Martin Decl. ¶ 5.)[6]

[Handwritten margin notes: *Contra* P. Mem. 7-11, 39-40. *But see* P. Mem. 18 + n.20, 58-59.]

---

[6] Article 20, Section 4 of the collective bargaining agreement addresses the situation where a delivery driver is legally prohibited from continuing to drive because he/she fails the DOT medical examination or otherwise is medically disqualified from driving. If a delivery driver is medically disqualified from driving but is physically fit and qualified to perform heavy duty "inside" work, UPS is required to provide the disqualified driver with non-driving, "inside" work. (Martin depo. 38-39.) *See* excerpts from collective bargaining agreement attached as Appendix 6. Such "inside" work is not light-duty work; rather, it generally is heavy duty, physically demanding work inside the UPS distribution facility that involves loading, unloading, and sorting packages. (Martin depo. 40, 113-117.) In those cases where a UPS driver is medically disqualified from driving but able to perform "inside" work, Carol Martin generally informs the employee's manager and the UPS Labor Manager, and those

[Handwritten margin note: *But see* P. Mem. 10, 42.]

5

### 3. Injuries and Illness Not Caused on the Job.

Employees also are sometimes unable to perform their regular jobs as a result of an illness, medical condition, or injury that did not occur at work and, therefore, is not covered by the workers' compensation laws. (Martin depo. 62-64, 68; Martin Decl. ¶ 6.) UPS does not offer light duty in those situations, and if the employee has a lifting restriction or other restriction that renders him unable to perform the essential functions of his regular job, the employee must take a leave of absence until the restriction is removed. (Martin depo. 68-70, 112, 184. *See also*, Brien depo. 35, 40-41; Martin Decl. ¶ 6.) For example, if a male employee injures himself engaging in recreational activities or yard work at home and, as a result, has a twenty-pound lifting restriction that makes him unable to perform the essential functions of his regular job, the employee is not offered light duty or alternative work. Instead, the employee is required to take a leave of absence until the lifting restriction is removed and the employee once again is able to perform the essential functions of his regular job. (Martin Decl. ¶ 6; Martin depo. 68, 112, 184; Brien depo. 35, 40-41.) [Handwritten annotation: Contra P. Mem, 7-11, 39-40.]

As the District Occupational Health Manager, Carol Martin was responsible for deciding if a medical restriction renders an employee unable to perform the essential functions of his/her job. (Martin depo. 169-170; Martin Decl. ¶¶ 2, 6.) In making those decisions, Carol Martin relied on the Essential Job Functions list that UPS publishes for each job. If a physician has restricted the employee from lifting more than twenty pounds, but the Essential Job Functions list for the employee's job includes lifting more than twenty pounds, Carol Martin would conclude that the employee was not able to [Handwritten annotation: But see, P. Mem. 9, 25-26.]

---

managers, often in consultation with the Union, assign the "inside" work to the disqualified driver in accordance with the collective bargaining agreement. (Martin depo. 35-38, 40.) It is undisputed that Article 20, Section 4 had no application to Young while she was pregnant, because (1) while pregnant, Young remained able to perform the driving functions of her delivery job, and (2) as a result of the lifting restriction, she was not able to perform the essential functions of "inside" work. (Young depo. 614; Brien depo. 480-482.)

6

perform the essential job functions and, therefore, would require the employee to go out on a leave of absence. (Martin Decl. ¶ 6; *See also* Martin depo. 138-140.)[7]

### 4. Pregnancy.

Pregnancy is treated the same as any other off-the-job injury or medical condition. A pregnant employee is permitted to continue working as long as she wants to during the pregnancy, unless and until she presents a doctor's note or other medical certification that states she has a restriction that renders her unable to perform the essential functions of her job. (Martin Decl. ¶ 7; Martin depo. 112, 184-185. *See also*, Brien depo. 102-103, 480-481.) If a pregnant employee presents a doctor's note or other medical certification imposing a restriction that renders her unable to perform the essential functions of her regular job, the employee is granted a leave of absence until the restriction is lifted and the employee is able to perform the essential job functions. (Martin depo. 67-68; Martin Decl. ¶ 7.)[8] Just like the male employee with a lifting restriction from an off-the-job injury, the pregnant employee is not entitled to light-duty or alternative work. (Martin depo. 112; Martin Decl. ¶ 7.)

On the other hand, pregnant employees who do not present with restrictions inconsistent with the essential job functions can and do continue working as long as they want to work. (Martin Decl. ¶ 7;

[annotation: Contra P. Mem. 7-11, 39-40.]

---

[7] If an employee presents a doctor's note with a restriction on the employee's ability to work, the Occupational Health Manager is to be promptly informed. A supervisor or manager in the operation does not have the authority to determine whether the employee can perform the essential functions of his/her job notwithstanding the restriction, nor does an operations supervisor or manager have the authority to grant an accommodation for an off-the-job injury or illness. Only Human Resources is authorized to make those decisions. (Martin Decl. ¶ 8; Brien depo. 490. *See also* Martin depo. 70-71.)

If Carol Martin became aware that a supervisor accommodated a male employee who was unable to perform the essential functions of his job without an accommodation, Carol Martin immediately ended the accommodation and insisted that the employee be placed on leave. (Martin depo. 70-72; Martin Decl. ¶ 8.)

[annotation: Contra P. Mem. 13-14, 25 + n.28.]

[8] Supervisors are not covered by the collective bargaining agreement, and pregnant supervisors, therefore, are treated differently than pregnant bargaining unit employees. Job modifications or alternative work assignments are provided to pregnant supervisors. (Martin depo. 150-152.)

7

Some EAM delivery drivers started the morning by going to the BWI airport, unloading packages off of the airplanes, and bringing those packages back to the D.C. Building, where Young and other EAM delivery drivers were waiting. (Young depo. 73-79, 100-102.) Young and the other EAM delivery drivers unloaded the packages from the shuttles arriving from the airport, and then loaded the packages onto their delivery vehicles, which in most cases were vans. (Young depo. 79-82.) Once her van was loaded, Young left the D.C. Building and delivered the packages to the homes and businesses to which they were addressed.[10] (Young depo. 82.)

Young and co-worker Carol Richardson generally delivered packages to an area that consisted of Anne Arundel and Calvert counties. (Young depo. 80, 82.) Although Young generally was assigned to deliver to that area, she never had any "bid" route, and she, therefore, could be assigned to deliver to any area at management's discretion. (Young depo. 115-117.) Also, when Young worked on Saturdays, she sometimes delivered packages in the District of Columbia. (Young depo. 68-69.) [handwritten: But see P. Mem. 4 n.1.]

During the relevant time period, after completing her initial deliveries, Young then was required to meet a full-time package car driver on route, take "Air packages" off of his vehicle, and then deliver those transferred "Air packages." (Young depo. 83-86.)

Young generally started work at UPS around 6:30 a.m. and finished around 9:45 a.m. (Young depo. 74.) Once Young finished her work at UPS, she went to a second part-time job, delivering flowers for a company called Floral Express. (Young depo. 41, 87, 222.)

Although Young claims that most of the packages that she delivered were light, it is undisputed that customers can and do ship packages of all sizes and weights for early morning delivery, and Young

---

[10] Young's job as an EAM delivery driver sometimes included going to the airport and unloading and loading packages coming off the airplanes. (Young depo. 79, 100.) [handwritten: Contra P. Mem. 4 n.1.]

After being told that she needed to contact Carol Martin, Young claims that she telephoned Carol Martin and left her a voice message stating that she had a doctor's note imposing lifting restrictions and that she was scheduled for another doctor's appointment on October 11, 2006. (Young depo. 143-145.) Young tried to telephone Carol Martin because she knew that at that point her FMLA leave had expired. (Young depo. 130-134, 145, 147.) When Young finally reached Carol Martin, she told Carol Martin that she was not ready to come back to work and that she had a doctor's note stating a lifting restriction. (Young depo. 143-145, 148-149, 153, 599.) Carol Martin told Young that she had used up all available FMLA leave, which Young already knew. (Young depo. 150.) Although Young had already exhausted all FMLA leave, she was granted an additional leave of absence. (Martin Decl. ¶ 12.)

[handwritten annotation: But see P. Mem. 15; 42. + n. 17]

### D. Carol Martin's Handling Of Plaintiff's Medical Restrictions

On October 11, 2006, Young had another doctor's appointment. (Young depo. 155-156.) Young's doctor recommended that Young not lift more than twenty pounds, and she gave Young another note stating: "Due to her pregnancy it is recommended that she not lift more than 20 pounds." (Young depo. 157-158, 330; *See* October 11, 2006 note attached hereto as Appendix 11 and referred to in Young's deposition transcript at Young depo. 373.)

Young did not contact anyone at UPS expressing an interest in returning to work until some time after her October 11, 2006 doctor's appointment. (Young depo. 127-128, 155.) A few days after October 11, 2006, Young claims that she went to the D. C Building and spoke with a supervisor, Ursula Blunt. (Young depo. 186-188.) Young believes that she gave Ursula Blunt the doctor's note imposing the twenty-pound lifting restriction, said that she wanted to come back to work, and asked for a light duty work assignment. (Young depo. 187-188.) Ursula Blunt initially told Young that she would look

[handwritten annotation: But see Young Stmt. ¶ 18.]

13

into the situation, but she later telephoned Young and told her that she would have to contact District Occupational Health Manager Carol Martin to discuss the matter. (Young depo. 188, 542-543.)

Before Young contacted Carol Martin, Carol Martin was informed by a manager, Jim Harris, that Young had presented a doctor's note stating that she could not lift more than twenty pounds. (Martin depo. 75-76, 180-181; Martin Decl. ¶ 10.) Carol Martin concluded that, based on the twenty-pound lifting restriction imposed by Young's physician, Young was not able to perform the essential functions of her job, because the Essential Job Functions list required Air Drivers to lift up to seventy pounds. (Martin Decl. ¶ 10; Martin depo. 75-76.) Concluding that the lifting restriction rendered Young unable to perform the essential functions of her job, Carol Martin informed the manager, Jim Harris, that Young, therefore, could not resume working as a delivery driver. (Martin depo. 75-77, 81-82; Martin Decl. ¶ 10.)

[handwritten margin note: See also P. Mem. 17 (note was read to her).]

Later in October 2006, Young telephoned Carol Martin to discuss her situation. (Young depo. 162-163, 192-193; Martin depo. 75-77.) According to Young, that telephone conversation occurred in mid or late October 2006. (Young depo. 162-163.) Young told Carol Martin that she had a twenty-pound lifting restriction and requested a light-duty work assignment. (Young depo. 164; Martin Decl. ¶ 11.) In response, Carol Martin told Young that light-duty work assignments were only available for on-the-job injuries, and light duty was not given to pregnant employees. (Young depo. 164-165; Martin depo. 74, 77-80; Martin Decl. ¶ 11.) As Carol Martin explained at her deposition: "I needed to treat her [Young] like I would treat anybody who had a note for lifting and couldn't do their regular job. That I could only offer light duty in work-related [injury] situations." (Martin depo. 80. See also Martin depo. 184-185.) Young claims that Carol Martin also told her that she could not return to work in her regular delivery driver position because she had a twenty-pound lifting restriction. Carol Martin made all these

[handwritten margin note: But see P. Mem. 19.]

14

decisions related to Young on her own; in making those decisions, <u>Carol Martin did not seek or receive any input from anyone else.</u> (Martin depo. 163, 169-170; Martin Decl. ¶ 11.) At this point, Young had already exhausted all FMLA leave for which she was eligible. (Young depo. 205-206.) She, nonetheless, was granted additional leave. (Young depo. 605.)[15]

*[handwritten margin note: But see P. Mem. 9, 25-26.]*

If, after Young presented with a twenty-pound lifting restriction, she had presented another medical certification indicating that the lifting restriction had been removed and that she was able to perform the essential functions of her job, Young promptly would have been permitted to return to her job. (Martin depo. 67-68; Martin Decl. ¶ 13.) Young, however, admits that during her pregnancy she never sought to have the lifting restriction removed, and she never sought, or presented to UPS, any medical certification that she was able to return to work and perform the essential functions of her job. (Young depo. 259-260; *see also* Martin Decl. ¶ 13.)

*[handwritten margin note: Contra P. Mem. 19 n. 24.]*

E.   **Young Returned To Work As Soon As She Wanted To After The Birth Of Her Child**

Young gave birth on April 29, 2007. (Young depo. 204.) After her child was born, Young wanted to remain out on leave to bond with her baby. (Young depo. 227.) Young also claims that for two months after the birth of her child she was not able to perform the essential functions of her Air Driver job. (Young depo. 606-607.)[16]

---

[15] Young believes that after the telephone conversation with Carol Martin she may have faxed Carol Martin a copy of the October 11, 2006 doctor's note stating the twenty-pound lifting restriction. (Young depo. 173.)

[16] "I don't think that I could have done my regular job at UPS. ... I don't think at that point in time that I could have lifted, you know, 70 pounds or anything over 20 pounds." (Young depo. 606-607.)

15

Young did not contact anyone at UPS to express an interest in returning to work until some time in June 2007. (Young depo. 209-210.) As soon as Young wanted to return to work, UPS allowed her to return to work. (Young depo. 210-211.) Although Young previously had exhausted all FMLA leave, UPS permitted Young to return to her regular job as soon as she wanted to. She returned to work on or about June 26, 2007. (Young depo. 208.) She returned to work in her same job, as an EAM delivery driver. (Young depo. 211.) After she returned to work in 2007, Young told Carol Richardson that "you don't need to baby me anymore" by taking Young's heavier packages, because Young was now able to handle the heavier packages. (Young depo. 435-436.)[17]

*But see P. Mem. 6 n.5.*

### III. SUMMARY JUDGMENT STANDARD

"Recent cases of the Supreme Court have made increasingly clear . . . the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses from proceeding to trial.'" *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). As the Supreme Court stated in *Celotex*:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action" . . . . One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose.

*Celotex*, 477 U.S. at 323-24.

---

[17] Young continued to work for UPS as a part-time EAM delivery driver until June, 2009, when she resigned in anticipation of her husband's retirement from the military and their relocation to Texas. (Young depo. 429-430.)