IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PEGGY YOUNG

     v.                            :    Civil Action No. DKC 08-2586

UNITED PARCEL SERVICE, INC.

**MEMORANDUM OPINION**

Peggy Young, employed as a part-time morning driver by United Parcel Service, Inc. ("UPS"), sued the company in 2008 for allegedly discriminating against her because of her gender, race, and perceived disability. UPS has moved for summary judgment. (ECF No. 60). A number of other motions are also pending, including a motion to dismiss in part (ECF No. 69) filed by Young; two motions to seal (ECF Nos. 77, 93); a motion to compel (ECF No. 78) filed by Young; and a motion to continue (ECF No. 80) filed by Young. The issues have been fully briefed and no hearing is necessary. *See* Local Rule 105.6. For the reasons that follow, the motion to dismiss in part will be denied, the motion to compel will be denied, and the motion to continue will be denied. The motion for summary judgment will be granted, as will the two motions to seal.

## I. Background

### A. Factual Background

The following facts are undisputed unless otherwise stated.

### 1. The Plaintiff: Peggy Young

UPS hired Young in 1999. In January 2002, Young started driving a delivery truck for the company. (Young Dep., 40, 65; ECF No. 76-16 ¶ 1). During the time relevant to this case – primarily the years 2006 and 2007 – Young worked as a part-time, early-morning "air driver." (Young Dep., at 65, 114-15; ECF No. 76-16 ¶ 3).[1] As an air driver, Young often carried lighter letters and packs, as opposed to heavier packages. "Air delivery is more expensive by weight than ground delivery. Therefore, heavier packages tend to be sent by ground delivery, and lighter packages tend to be sent by air delivery." (ECF No. 76-4 ¶ 1; *see also* ECF Nos. 76-11, at 3; 76-18, at 8). At least on some infrequent occasions, however, Young's deliveries would also include heavier boxes.[2] (Young Dep., at 67; ECF Nos. 76-16 ¶ 3; 76-18, at 8).

Because they were sometimes called upon to deliver heavier packages, air drivers like Young were required by UPS to be able to "lift, lower, push, pull, leverage and manipulate" items

---

[1] Young worked out of a facility in Landover, Maryland known as the "D.C. Building." (Young Dep., at 66; ECF No. 76-16 ¶ 2).

[2] Young submitted records showing that between November 2008 and June 2009, for instance, she made 76 deliveries weighing more than 20 pounds. (ECF No. 76-7 ¶ 6). At least 12 deliveries were greater than 50 pounds. (*Id.* ¶ 9).

"weighing up to 70 pounds." Air drivers also needed to be able to "[a]ssist in moving packages weighing up to 150 pounds." (ECF No. 76-26, at 23; *see also, e.g.*, ECF Nos. 60-5 ¶ 10; 60-9 ¶ 2; 60-4, at 47; 60-10, at 4-5). Young recognized that UPS "require[d] [her] to lift 70 pounds." (Young Dep., at 45, 52-53). She argues that the 70-pound lifting requirement was "illusory" because packages heavier than 20 pounds were infrequent (ECF No. 76-11 ¶ 11), she was able to use a hand truck (Young Dep., at 572), and other employees could and sometimes did take heavy packages for her (*e.g.*, ECF No. 76-15 ¶ 5). She observes that several other UPS jobs have similar 70-pound "lifting" requirements, even though the jobs did not in actuality require heavy lifting - at least in her view. (*See* ECF No. 76-27, at 19 (operations clerk), 21 (loader/unloader), 23 (auto painter)).

In 2006, early-morning air drivers like Young would begin their workday at 6:30 a.m. (Young Dep., at 74). After arriving at the D.C. Building and clocking in, Young would inspect her delivery van. (Young Dep., at 74-75). Once finished with the inspection, Young would gather with other early-morning drivers to meet a shuttle that arrived from the airport bearing packages. (Young Dep., at 75). Together, the delivery drivers, including Young, "jumped up and unloaded" the packages from the

shuttle van into their individual delivery vans.[3] (Young Dep., at 78-80). Young would load her own van and was expected to load and deliver - on her own - any packages under 70 pounds that were not oddly shaped. (Young Dep., 81-82). Young was ultimately responsible for delivering any packages of any weights that the customers sent. (Young Dep., at 85-86; ECF Nos. 76-17, at 4; 60-10, at 2). She had no control over which packages she was given to deliver on her route. (Young Dep., 75, 80, 85-86).

After the van was loaded, Young would begin making her deliveries. (Young Dep., at 82). Young ordinarily drove a route covering Annapolis, Davidsonville, and Calvert County (Young Dep., at 68; ECF No. 76-16 ¶ 3), delivering generally lighter letters and packs by 8:30 a.m.. (Young Dep., at 67; ECF No. 76-16 ¶¶ 3, 66). Sometimes, particularly on Saturdays, she would also make deliveries in Washington. (Young Dep., at 68). She would usually make five to twenty deliveries each day. (ECF No. 76-16 ¶ 66).

After finishing her deliveries, Young would meet a full-time driver to take additional "air" packages off his vehicle

---

[3]    In a later statement, however, Young says that loading and unloading vans was not "part of [her] regular job" in 2005 and 2006. (ECF No. 76-16 ¶ 66).

and deliver them by the 8:30 a.m. deadline. (Young Dep., at 69, 73, 85). She would then return with her van to the D.C. Building. (Young Dep., at 86). Young's day at UPS would end around 9:45 a.m. (Young Dep., at 86), after which she would punch out and go to her second job at a flower delivery company. (Young Dep., at 87).

### 2.    The Defendant: United Parcel Service, Inc.

UPS is a package delivery service that employs 318 drivers at the D.C. Building, 14 of whom are part-time female drivers like Young. (Brien Dep., Ex. 1). Many of these employees, including Young (Young Dep., at 105), were covered by a Collective Bargaining Agreement ("CBA"). Young's arguments implicate many provisions of the CBA, in addition to certain other policies and procedures at UPS.[4]

Under Article 14, Section 2 of the CBA, UPS must give temporary work assignments to CBA-covered employees who are unable to perform their regular jobs because of on-the-job injuries. (ECF Nos. 60-5 ¶ 3; 60-7, at 2-3). These temporary assignments are generally limited to 30 days and are meant to help return the employee to regular work as soon as possible.

─────────────────────

[4]    Young makes several "factual" allegations regarding UPS's supposed unwillingness to assume voluntary obligations in the CBA concerning its pregnant employees. (ECF No. 76-1, at 20-21). Even taken as true, such facts need not be considered.

(ECF Nos. 60-5 ¶ 3; 60-7, at 2-4). Unless an employee suffers an on-the-job injury, the stated policy of UPS is to permit light-duty accommodations only where "an employee has a qualifying disability within the meaning of the ADA which prevents him/her from being able to perform some aspect of his/her job." (ECF No. 60-5 ¶¶ 4-5; *see also* ECF No. 60-7, at 4). Thus, UPS's policy is that an employee who is unable to perform an essential function of the job would be required to take a leave of absence (if the inability stemmed from something off-the-job). (ECF No. 60-5 ¶ 6).

UPS's general policy is to treat pregnancy just like any other off-the-job injury or condition. (*See, e.g.*, No. 60-4, at 51 ("UPS does not offer light duty to any employee, male or female, who has any medical condition not related to work, pregnancy included."); *cf.* 85-3 ¶ 3). Thus, "[p]regnant employees were permitted to continue working as long as they wanted to during their pregnancies, unless and until the employee presented a doctor's note or other medical certification that she had a restriction that rendered her unable to perform the essential functions of the job." (ECF No. 60-5 ¶ 7). Many delivery drivers, for instance, do in fact continue to work throughout their pregnancy. (ECF No. 60-5 ¶ 7). Pregnant employees who are unable to perform essential

functions of their job are granted a leave of absence, but are ineligible for temporary work assignments or other light-duty work. (ECF No. 60-5 ¶ 7).

Young argues that UPS made exceptions to its stated policy of refusing to provide accommodations to employees who were injured off-duty. For instance, she believed one employee with cancer was given "light duty" while undergoing treatment. (ECF Nos. 76-4 ¶ 23; 76-11 ¶ 2). Young provides evidence of several other instances of accommodation for drivers and other employees dealing with injuries or other job impediments. (*See, e.g.*, ECF Nos. 76-4 ¶¶ 22-30; 76-5 ¶¶ 3-4; 76-6 ¶¶ 4-7; 76-8 ¶¶ 4-5; Pl.'s Ex. 32; 76-16 ¶¶ 33-36). Young also notes instances where other pregnant employees enjoyed accommodations. (*See, e.g.*, ECF Nos. 76-11 ¶¶ 5-7, 9; 76-16 ¶ 32).

Several of Young's cited "exceptions" involved drivers who failed a Department of Transportation ("DOT") medical exam. Drivers must pass such a medical exam every 24 months. *See* 49 C.F.R. § 391.45. Article 20, Section 4 of the CBA provides that, if a driver fails the exam and becomes legally prohibited from driving, but is still fit enough to perform "inside jobs,"[5] UPS must provide that employee with such a job. (ECF No. 76-27,

---

[5] "Inside jobs" are not light duty jobs. (ECF No. 60-4, at 52-56).

at 7; *see also* Brien Dep., at 17-18, 93-94, 103-05, 114-15; *see, e.g.*, ECF No. 76-21, at 3). Similar arrangements are provided for under the CBA for drivers who lose their driver's license or have been involved in a motor vehicle accident. (ECF Nos. 85-3 ¶ 3; 76-27, at 4-5, 6, 17).

Carolyn Martin, the District Occupational Health Manager for the Metro D.C. District at UPS, was the individual charged with applying the above policies in Young's region. (ECF Nos. 60-5 ¶ 1; 60-4, at 11-15; 60-6, at 15-17; Brien Dep., at 107-08). In particular, Martin was responsible for:

> . . . most issues relating to employee
> health and ability to work, including leaves
> of absence under the Family and Medical
> Leave Act . . ., the administration of UPS's
> Program for Compliance with the [ADA], the
> [DOT] medical examination and qualification
> requirements applicable to UPS drivers, and
> injury prevention. [She] also was the
> official in the Metro D.C. District who made
> decisions about whether employees were able
> to perform the essential functions of their
> jobs based on restrictions imposed by
> physicians.

(ECF No. 60-5 ¶ 1). In determining whether an employee could perform her job, Martin would rely on the Essential Job Functions list for each employee's job. (ECF No. 60-5 ¶ 6). Martin states that only she has the authority to grant accommodations. (ECF No. 60-5 ¶ 8; *see also* Brien Dep., at 57-60). According to her, she would only provide accommodations in

8

accordance with company policy and would put an end to any accommodation inappropriately granted by a manager or supervisor. (ECF No. 60-5 ¶ 8). Martin states that she makes accommodation decisions on her own. (ECF Nos. 60-4, at 64-65).

### 3. Young's Pregnancy and Problems with UPS

In 2005, Young started a first round of *in vitro* fertilization in an effort to get pregnant. (Young Dep., at 118). Because of that treatment, Young took a leave of absence from her job at UPS beginning in July 2005. (Young Dep., at 121-22). Young became pregnant, but suffered a miscarriage in September. (Young Dep., at 122). She returned to her former position at UPS roughly a month later, in October 2005. (Young Dep., at 122).

In February 2006, Young started a second round of *in vitro* fertilization. (Young Dep., at 123). She again requested time off, this time submitting a form titled, "Certification by Health Care Provider." (ECF No. 60-11, at 1). Young's physician certified on that form that she was unable to perform work on the day of surgery or the day after, and should not lift more than ten to fifteen pounds for two weeks after surgery. (ECF No. 60-11, at 1). Martin approved the leave request.[6] (ECF

_____

[6] Young had previously spoken with Martin about the proper procedure for requesting leave. (Young Dep., at 96-98;

No. 60-11, at 2).   Young then took leave beginning on February

21, 2006.  (ECF No. 60-11, at 2).

The second round of *in vitro* fertilization was unsuccessful

and Young returned to work in March 2006.  (Young Dep., at 125).

After her return, Carol Richardson – the other driver on Young's

route – insisted on taking all of the heavier packages from

Young.  (Young Dep., at 76; ECF Nos. 76-16 ¶ 3; 76-9 ¶ 4).

Richardson took the heavier packages because she was concerned

Young might not be able to get pregnant again if she handled

them herself.  (Young Dep., at 77, 435-36; ECF Nos. 60-10, at 6-

7; 76-9 ¶ 4; 76-4 ¶ 15).[7]

Young then began a third round of *in vitro* fertilization in

July 2006.  (Young Dep., at 45).  Once more, she asked for a

leave of absence because she could not lift more than ten

pounds.  (Young Dep., at 45).  In another letter from Martin,

UPS granted her requested leave.  (Young Dep., at 126).  The

---

ECF No. 76-16 ¶ 8).  She states that Martin told her she would
need to "bring in a doctor's note with [her] restrictions when
[she] returned to work."  (ECF No. 76-16 ¶ 8; *see also* Young
Dep., at 130 ("I believe Carol Martin said I had to bring in
doctors' notes.")).  Martin did not always require such a note
from people returning from leave; for example, she did not
require such a note from people who took "intermittent" medical
leave.  (ECF No. 76-20, at 15).

[7]    Young suggests this was part of an "informal
allocation" system.  (ECF Nos. 76-11 ¶ 11; 76-15 ¶ 6).

leave began at the end of July, with an anticipated return date around August 26. (Young Dep., at 127; ECF No. 76-16 ¶ 12). The third round of *in vitro* was successful, and Young became pregnant. (Young Dep., at 23, 127).

Because of the new pregnancy, Young sought to extend her leave. (Young Dep., at 137, 153, 258-59; ECF No. 76-16 ¶¶ 12, 13, 15). Consequently, she went to the D.C. Building sometime in September 2006 and dropped off a "letter with [her restrictions]" from her doctor, Dr. Thaddeus Mamlenski. (Young Dep., at 128, 136-37; ECF No. 76-16 ¶ 14). The letter recommended that Young "not be required to lift greater than 20 pounds for the first 20 weeks of pregnancy and no greater than 10 pounds thereafter." (ECF No. 60-12, at 1). She left the note with her supervisor, Urusla Blunt, or "someone else at UPS to give to her." (ECF No. 76-16 ¶ 14). When she delivered the note, Young was told to speak with Martin about her leave extension request. (Young Dep., at 139).

Young later called and left a voicemail message for Martin informing her of the doctor's note. (Young Dep., at 143-44). Sometime thereafter, Young finally reached Martin, told her about the doctor's note, and told her she "wasn't ready to come back to work quite yet." (Young Dep., at 148-49). According to Young, Martin responded that she "wasn't sure what to do with

[Young] at that point." (Young Dep., at 149). Martin also "gave [Young] the impression that UPS did not care when [she] returned to work." (ECF No. 76-16 ¶ 15). Martin reminded Young, however, that when she did return she "needed to bring in a doctor's note stating what [her] restrictions were." (ECF No. 76-16 ¶ 15).

Young had another checkup appointment on October 11, 2006 with nurse midwife Cynthia Shawl. (Young Dep., at 156). Following an "encouraging appointment" (Young Dep., at 157), Shawl released Young "without limitations" (ECF No. 76-12 ¶ 2). Nonetheless, Shawl wrote a note stating: "Due to her pregnancy it is recommended that she not lift more than 20 pounds." (ECF Nos. 76-12 ¶ 3; 60-13, at 1). Shawl did not normally write such notes, but "wrote this note only because Ms. Young told me she needed a letter for work stating her restrictions." (ECF No. 76-12 ¶ 4). Her letter did not include the word "restriction" because she felt she "was making only a recommendation." (ECF No. 76-12 ¶ 4).

A short time thereafter, Young contacted Blunt and asked to come back to work. (Young Dep., at 186). She also explained, however, that she had a "doctor's" note with a recommendation not to lift more than 20 pounds, and asked if there was any

light duty available.  (Young Dep., at 186-87).  Blunt referred her again to Martin.  (Young Dep., at 188).

At some point before Young reached out to Martin, Martin learned about Young's doctor's note through another UPS manager, Jim Harris.  (ECF No. 60-4, at 37-38).  Harris phoned Martin and told her that "Peggy Young had brought in a note regarding light duty because she had restrictions due to her pregnancy."  (ECF No. 60-4, at 37-38).  She told Harris that, "since [Young] ha[d] restrictions, that she [could] not be allowed to continue doing her regular job as a delivery driver or air driver or service provider."  (ECF No. 60-4, at 38).  She knew that the Essential Job Function list required air drivers to lift 70 pounds, and consequently "concluded that the lifting restriction rendered Peggy Young unable to perform the essential functions of her job."  (ECF No. 60-5 ¶ 10).  Martin also believed that Young was ineligible for light duty or an alternative work assignment because the restriction was not the result of an on-the-job injury.  (ECF No. 60-5 ¶ 10).  She told Harris that Young could not return to work while the restriction was in place.  (ECF Nos. 60-5 ¶ 10; 60-4, at 38).  She reached this decision entirely on her own.  (ECF No. 60-5 ¶ 11).

At the end of October 2006, Young called and left a phone message with Martin.  (Young Dep., at 162-63).  Young explained

13

that "she got a note with her restrictions and that, you know,
[she] felt good about [her] pregnancy and that [she] wanted to
come back to work and [she] needed to know what [she] had to
do." (Young Dep., at 163). Martin returned her call the same
day. (Young Dep., at 164). They again discussed the lifting
recommendation and Young's health. (Young Dep., at 164).
Martin then told Young that (a) UPS did not "offer light duty
for pregnancy, only for on-the-job injuries"; (b) Young didn't
"qualify for short-term disability because [her] doctor didn't
give [her] a note saying that [she] couldn't work, that [she]
just had a lifting restriction"; and (c) that she had used up
all of her medical leave. (Young Dep., at 164-65; ECF No. 60-5
¶ 11). Martin also informed Young: "Based on company policy,
I, unfortunately, could not allow her to continue working with
her 20-pound lifting restriction." (ECF No. 60-4, at 41).
Young told her she "wanted to work" and Martin felt that,
although she "would have loved to help her" (ECF No. 60-4, at
44), she "needed to treat [Young] like [she] would treat anybody
who had a note for lifting and couldn't do their regular job."
(ECF No. 60-4, at 42).

Martin explains that she would have allowed Young to return
to work if Young had "presented another medical certification
indicating that the lifting restriction had been removed and

14

that she was able to perform the essential functions of her job." (ECF No. 60-5, at 7). Young, however, says Martin provided her with only two options: provide a note stating that she could not work at all – rendering her eligible for disability – or "think about [her] job with UPS because [she] was pregnant and had used up [her medical] leave." (Young Dep., at 317, 559-60; ECF No. 30-3 ¶¶ 20-21).

In early November 2006, Young spoke with "the top person at [her] jobsite," Myron Williams, about the possibility of returning to work. (ECF No. 76-16 ¶ 26). Williams, who is the Capital Division Manager,[8] "did not have the authority to determine whether [an] employee was able to perform the essential functions of his/her job notwithstanding [a] restriction/recommendation." (ECF No. 85-4 ¶ 5; *see also* ECF No. 85-5 ¶¶ 5-6).[9] Young maintains that Williams told her "not to come back in the building until [she] was no longer pregnant

---

[8] Contrary to Young's characterization, the record reflects that Williams led a small division encompassing one building, not the entire Metro D.C. District. (Brien Dep., at 65, 240-41; ECF Nos. 85-4 ¶¶ 2-3; 85-5 ¶¶ 4-5).

[9] Young cites the testimony of another UPS employee as evidence that Williams *did* have the authority to make leave determinations. (ECF No. 76-4 ¶ 11). The employee states that "nobody would have stopped" a manager from placing an employee on light duty, as "[t]hat is just how it works." (ECF No. 76-4 ¶ 11).

because [she] was too much of a liability." (ECF No. 76-16 ¶ 26; *see also* Young Dep., at 563-64). Williams denies making any such statement. (ECF No. 85-4 ¶ 4).

By this point in time, Young had exhausted her medical leave, but her leave of absence was extended. (ECF No. 60-5 ¶ 12). UPS "coded" Young's absence under the code for "disability" on her attendance chart. (ECF Nos. 76-26, at 4; 76-16 ¶¶ 45; Young Dep., at 166-170).[10] During her leave, Young received no pay and lost her medical coverage at the end of 2006. (ECF No. 76-16 ¶ 38; ECF No. 76-26, at 1).

Young gave birth to her child on April 29, 2007. (Young Dep., at 204). She did not immediately return to UPS because she "felt as though [she] should have the maternity leave like every other pregnant woman to spend time with their child and bond with their child before they have to return to work." (Young Dep., at 227). She also felt that she would not have been able physically or emotionally to perform her regular job for the first two months after the birth. (Young Dep., at 606-607). As soon as Young wished to return to work, she did so.

---

[10] Martin states, however, that she did not believe Young had a disability within the meaning of the ADA. (ECF NO. 60-5 ¶¶ 14-16). If she had, she "would have discussed the ADA procedure . . . and suggested that [Young] apply for an accommodation under the ADA policy." (ECF NO. 60-5 ¶ 15).

(Young Dep., at 210-11). She returned to work on June 26, 2007 and resumed the same position she held before. (Young Dep., at 208, 211).

### B. Procedural Background

On July 23, 2007, Young filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on race, sex, and pregnancy. The EEOC issued Young a right to sue letter on September 2, 2008. Young filed this action on October 3, 2008 against the United Parcel Service of America, Inc., United Parcel Service, Inc., UPS Health Program, Aetna Life Insurance, and Aetna Disability and Absence Management. That complaint alleged violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et. seq.*, and 42 U.S.C. § 1981. (ECF No. 1).

On October 29, 2008, Young filed an amended complaint against only United Parcel Service of America, Inc. and United Parcel Service, Inc.; the amended complaint dropped the ERISA claim, and seeks damages and equitable relief for alleged violations of Title VII, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), and Section 1981. (ECF No. 4). Defendants filed an answer on December 8, 2008 (ECF No. 7), and

17

a scheduling order was entered the same day.  (ECF No. 8).  That scheduling order required that all motions to amend be submitted by January 22, 2009.  (ECF No. 8, at 2).  By stipulation of the parties, Defendant UPS of America, Inc. was dismissed from the case on December 17, 2008.  (ECF No. 14).

UPS filed a motion for summary judgment on July 30, 2010.  (ECF No. 60).  Young responded in opposition on September 16, 2010.  (ECF No. 76).[11]  In addition, Young filed a motion to compel certain discovery concerning comparator evidence and "delivery weight" evidence.  (ECF No. 78).  In conjunction with the motion to compel, Young moved for a continuance pursuant to (former) Federal Rule of Civil Procedure 56(f)[12] in the event that the court finds such evidence materially lacking in determining the summary judgment motion.  (ECF No. 80).  On August 31, 2010, Young moved to dismiss her racial discrimination claim.  (ECF No. 69).

## II.  Motion for Voluntary Dismissal

Young has moved to dismiss her racial discrimination claim voluntarily pursuant to Rule 41(a)(2) of the Federal Rules of

---

[11]    Two motions to seal were also filed in connection with the summary judgment briefing.  (ECF Nos. 77, 93).

[12]    Following a recent amendment, the relevant rule has been moved to Rule 56(d) of the Federal Rules of Civil Procedure.

18

Civil Procedure.  (ECF No. 69).  Young concedes that the information revealed during discovery "does not disclose a pattern of discrimination that would support a race discrimination claim in this case." (*Id.* at 5).  UPS argues that the dismissal should be with prejudice.

Although both parties treat this as an issue falling under Rule 41(a)(2), the relevant rule is Rule 15.  Rule 41(a), which addresses voluntary dismissals, applies only when a party seeks to dismiss an entire action, not merely one claim or count. *Iraheta v. United of Omaha Life Ins. Co.*, 353 F.Supp.2d 592, 595 (D.Md. 2005); *see also* Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 2362 (3$^d$ ed. 2008).  "This conclusion is based on the fact that both Rules 41(a)(1) and (a)(2) only apply their terms to dismissal of an 'action,' while Rule 41(b) provides that 'a defendant may move to dismiss the action or any claim against it.'" *In re Amp'd Mobile, Inc.*, 395 B.R. 582, 585 (Bankr.D.Del. 2008).  Consequently, a plaintiff wishing to dismiss one count of a multi-count suit should ordinarily look to Rule 15, which governs amendments to pleadings.

Because Young in effect seeks to amend her pleading almost two years after the pleadings deadline set forth in the scheduling order, the matter may not be resolved by simply

applying Rule 15. Instead, Rule 16(b) also applies - and the standards for satisfying Rules 15 and 16 are sometimes at odds. Rule 15(a)(2) states in pertinent part that leave shall be freely given "when justice so requires," while Rule 16(b)(4) states that "[a] schedule may be modified only for good cause and with the judge's consent." The Fourth Circuit resolved this tension in *Nourison Rug Corp. v. Parvisian*, 535 F.3d 295, 298 (4th Cir. 2008), when it conclusively held that "the good cause standard must be satisfied to justify leave to amend the pleadings" after scheduling order deadlines have passed.

Rule 16(b)'s "good cause" standard was analyzed in a previous opinion in this case, *Young v. UPS*, No. DKC 08-2586, 2010 WL 1346423, at *5-6 (D.Md. Mar. 30, 2010), so only the briefest review is necessary here. Rule 16(b) "focuses on the timeliness of the amendment and the reasons for its tardy submission." *Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D.Md. 2002). The primary consideration for Rule 16(b)'s "good cause" standard is the movant's diligence. Lack of diligence and carelessness are the "hallmarks of failure to meet the good cause standard." *W. Va. Hous. Dev. Fund v. Ocwen Tech. Xchange, Inc.*, 200 F.R.D. 564, 567 (S.D.W.Va. 2001). "If [the movant] was not diligent, the inquiry should end." *Marcum v. Zimmer*, 163 F.R.D. 250, 254 (S.D.W.Va. 1995).

A plaintiff's request to amend may be denied for unreasonable delay when the plaintiff previously failed to correct a pleading problem though given the opportunity to do so. In addition, a plaintiff's request to amend a complaint may be unreasonable and prejudicial if it is brought only after defendant has moved for summary judgment, particularly if it appears to be an effort to avoid the preclusive effect of summary judgment. *See, e.g.*, *Kleinhans v. Lincoln Sav. Profit Sharing Trust*, 810 F.2d 618, 625 (7th Cir. 1987) (affirming denial of motion to amend where motion represented "an apparent attempt to avoid the effect of summary judgment"); *see also Burton v. Youth Servs. Int'l, Inc.*, 176 F.R.D. 517, 521 (D.Md. 1997). Such is the case here. The parties have engaged in substantial discovery and briefed multiple motions. A motion for summary judgment is fully briefed and pending. And now, in the midst of that major dispositive motion, Young seeks to dismiss her race discrimination claim without prejudice before a final determination can be made.[13]

Under the circumstances, the motion to dismiss will be denied and the claim will be addressed on the merits. Young initially dropped the race discrimination claim from a proposed

---

[13] Plaintiff acknowledges that a dismissal at this time would effectively be with prejudice because the statute of limitations has run. (ECF No. 84).

amended complaint filed in June 2009 (ECF No. 30), but left the claim intact after the court denied her attempt to add certain other claims (ECF No. 44). Because Young apparently understood that the claim should have been dropped more than a year before filing this motion to "dismiss," it is hard to see how she could argue that she had good cause for her delay. Young's motion to dismiss, construed as a motion to amend, will be denied.

In addition, UPS also argues in its response to Young's motion for voluntary dismissal that it is due attorneys' fees if the race discrimination claim is dismissed. UPS contends that Young has pursued – at least until now - what she knew to be a "completely meritless" claim. (ECF No. 81, at 1). A "district court has authority to shift attorneys fees, but . . . only in the extraordinary circumstances where bad faith or abuse can form a basis for doing so." *Hensley v. Alcon Labs., Inc.*, 277 F.3d 535, 543 (4th Cir. 2002). UPS has not yet proven the requisite degree of bad faith or unreasonableness. *Miller v. Downes*, 935 F.2d 660, 664 (4th Cir. 1991) ("[C]ounsel do not have to be right on their legal position to avoid sanctions, only reasonable."). Consequently, UPS's request for attorneys' fees will be denied.

## III. Motion for Summary Judgment

### A.    Standard of Review

UPS has moved for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.    A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.    *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).    Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party."    *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"    *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)).    "A mere scintilla of proof . . . will not suffice to prevent summary judgment."    *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).    "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."    *Liberty Lobby*, 477 U.S. at

249-50.  (citations omitted).  At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

### B.  Analysis

Young's complaint alleges three forms of employment discrimination:  gender-based discrimination, race-based discrimination, and disability-based discrimination.  In the end, none of these three claims succeeds.

### 1.  Gender-Based Discrimination[14]

The Pregnancy Discrimination Act ("PDA"), which amends Title VII, states that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work."  42 U.S.C. § 2000e(k).  Under the PDA, a pregnancy discrimination claim is "analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII."  *Jordan v.*

---

[14]  In her opposition to summary judgment, Young again raises two claims that were considered and rejected in an earlier opinion.  *See Young v. United Parcel Serv. of Am., Inc.*, No. DKC-08-2586, 2010 WL 1346423, at *6-7 (D.Md. Mar. 30, 2010). Because Young raises the issues "as offers of proof to preserve [them] for appeal" (ECF No. 76-1, at 50), there is no need to discuss them again in this opinion.

*Radiology Imaging Assocs.*, 577 F.Supp.2d 771, 779 (D.Md. 2008) (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 297 (4th Cir. 1998)). As such, Young may avoid summary judgment via the two alternative avenues of proof available to all discrimination plaintiffs. First, she may show "through direct or circumstantial evidence" that her pregnancy "motivated the employer's adverse employment decision." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). Alternatively, she may "proceed under a 'pretext' framework" – commonly referred to as the *McDonnell Douglas* approach – "under which the employee, after establishing a *prima facie* case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually pretext for discrimination." *Hill*, 354 F.3d at 285.

Young attempts to prove her case via both methods of proof.

### a. Direct Evidence

Young first attempts to establish her case using three items of purported "direct evidence." Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (quotation marks omitted).

25

If believed, direct evidence "would prove the existence of a fact . . . without any inference or presumptions." *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548 (4th Cir. 1995) (quotation marks omitted), *rev'd on other grounds by* 517 U.S. 308 (1996). To defeat a motion for summary judgment, the evidence must show that the employer announced, admitted, or "otherwise unmistakably indicated" that an impermissible consideration was a determining factor, or that discrimination can properly be assumed from the circumstances. *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982).

Young contends that one piece of direct evidence is Williams' alleged statement that she was "too much of a liability" to remain at work. She is right that "[d]erogatory remarks may in some instances constitute direct evidence of discrimination." *Eruanga v. Grafton Sch., Inc.*, 181 F.Supp.2d 514, 521 (D.Md. 2002) (quoting *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999)). But "the derogatory remark cannot be stray or isolated." *Id.* "[A]nd unless the remarks upon which [the] plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination." *Id.* (quotation marks omitted).

A simple comment that an employee is a "liability" could very well be insufficient to tie discrimination to the adverse

action. *See, e.g.*, *Allen v. Commercial Pest Control, Inc.*, 78 F.Supp.2d 1371, 1375 (M.D.Ga. 1999) (finding employer's comment that employee was a liability to the company was not direct evidence of discrimination). Yet even if one assumes a sufficient causal link in such a statement, Young must produce sufficient evidence to establish that Williams "was the one principally responsible for, or the actual decisionmaker maker behind, the [adverse] action." *Hill*, 354 F.3d at 288-89. Williams was not the decisionmaker here, Martin was.[15] It is not enough that Williams was "in communications with [Martin] regarding employees and their work limitations." (ECF No. 76-1, at 32). Although Williams was a manager, the evidence indicates that his responsibilities were limited to a single building. There is no suggestion that he "outranked" Martin or had any power to make decisions about employee leave or accommodations. Whenever an issue arose concerning leave or accommodations, Young was directed to speak with Martin. And although another employee speculated that managers were involved in granting

---

[15] Young argues that Martin was not really a decisionmaker either, as she was merely implementing a pre-existing discriminatory policy at UPS. "A decisionmaker is the person responsible for the contested decision." *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) (quotation marks omitted). Because Martin decided that Young would not be allowed to return to work and would not be granted accommodations, she was the decisionmaker.

27

light duty, there can be no genuine dispute that Martin was the relevant decisionmaker in Young's case and in most every other case. Even if Williams had some minor influence on the decision to refuse Young light duty, that is not enough. "[A]n employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision." *Hill*, 354 F.3d at 291.

Young also asserts that Williams's statement placed Martin's decisions in a "less neutral context." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 301 (4th Cir. 2010). In *Merritt*, the Fourth Circuit agreed that the decisions of non-decisionmakers colored the choices of the decisionmaker. *Id.* But the Fourth Circuit did so only after finding that the defendant's "corporate culture evinced a very specific yet pervasive aversion" to female drivers, which was evidenced by multiple statements from "employees[] of all ranks." *Id.* at 300-301. Williams's remark in this case largely stands by itself; there is no evidence indicating a corporate culture permeated with discrimination at UPS.

Young suggests a second piece of direct evidence is the fact that UPS required Young to provide a doctor's note stating her restrictions – and later suggested that she get a doctor's note indicating she could not work at all. The requests for

28

doctor's notes are not direct evidence, as a number of inferences would be required to conclude that they reflect discrimination. One would have to infer, for instance, that the doctor's notes were the first step in a plan by UPS to exclude Young from work. One would have to infer that Young was asked to provide a note because she was pregnant, even though the evidence indicates that many employees – pregnant and non-pregnant alike – were asked to submit notes. One would have to infer that Martin and UPS were acting in bad faith when they read the note's lifting recommendations narrowly and did not pursue further follow-up with Young's medical providers. The note requests are too distant from discrimination to constitute direct evidence. *See, e.g.*, *Elam v. Regions Fin. Corp.*, 606 F.Supp.2d 999, 1010 (S.D.Iowa 2009).

Citing *Merritt* once more, Young nonetheless insists that the requests for notes showed UPS's "assumption that a pregnant woman should have restrictions." It is true that the Fourth Circuit concluded that a company's use of a physical ability test for women (but not men) "could be seen by a jury to embrace beliefs that women are unsuited for some of the more remunerative forms of manual labor and, once injured, are less resilient in their ability to recover." 601 F.3d at 300. In contrast to *Merritt*, however, there is no evidence in this case

that doctor's notes "with restrictions" were only requested from pregnant women. Although Martin admitted she did not ask for notes from those returning from short, intermittent leave, there is no indication that doctor's notes were otherwise selectively used or used in a manner distinguishing between pregnant and non-pregnant employees.

Finally, Young argues that UPS has a "no-light-duty-for-pregnancy" policy. (ECF No. 76-1, at 35). *See* 29 C.F.R. 1604.10(a) ("A written or unwritten employment policy or practice which excludes from employment applicants or employees because of pregnancy, childbirth or related medical conditions is in prima facie violation of Title VII."). Certainly, liability will attach in a disparate treatment case when the employer "relied upon a formal, facially discriminatory policy requiring adverse treatment of employees with [a protected] trait." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).[16] But any suggestion that UPS had such a policy is belied by the record. Young appears to be misstating UPS's actual policy of accommodating only drivers (1) who suffered on-the-job injuries; (2) who were disabled under the Americans with Disabilities Act;

---

[16] Although *Hazen* is case concerning the Age Discrimination in Employment Act ("ADEA"), the principle applies in this context as well.

or (3) lost their DOT certification to drive. As Martin herself explained, "UPS does not offer light duty to any employee, male or female, who has any medical condition not related to work, pregnancy included." (ECF No. 60-4, at 51). Because UPS determines whether accommodations will be offered on these gender-neutral criteria, it at least on its face a "neutral and legitimate business practice." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 297 (4th Cir. 2010). What the Sixth Circuit said in an analogous case applies with equal force here:

> [The] employer's] light-duty policy is indisputably pregnancy-blind. It simply does not grant or deny light work on the basis of pregnancy, childbirth, or related medical conditions. It makes this determination on the nonpregnancy-related basis of whether there has been a work-related injury or condition. Pregnancy-blind policies of course can be tools of discrimination. But challenging them as tools of discrimination requires evidence and inference beyond such policies' express terms.
>
> [The] pregnancy-blind policy, therefore, cannot serve as direct evidence of . . . alleged discrimination.

*Reeves v. Swift Transp. Co., Inc.*, 446 F.3d 637, 641 (6th Cir. 2006).

In sum, Young has not presented any direct evidence of gender-based discrimination.

**b.    The *McDonnell Douglas* Framework**

Lacking direct evidence, Young needs to proceed using the burden-shifting framework found in *McDonnell Douglas*.    Under this approach, Young first must establish a *prima facie* case of discrimination.    *McDonnell Douglas*, 411 U.S. at 802.    UPS is then required to offer a non-discriminatory justification for the adverse employment action.    *Id.*    If it does so, the burden shifts back to Young to demonstrate that UPS's justification is pretextual.    *Id.* at 803-05.

At this point, an employee's "prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000).    On the other hand, "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.*[17]    UPS would still be entitled to summary

_____

[17]    In a similar vein, "courts must resist the temptation to become so entwined in the intricacies of the *McDonnell Douglas* proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non.*"    *Merritt*, 601 F.3d at 295 (quotation marks, brackets, and ellipses omitted).

judgment, for example, if Young is able to create only "a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.*

### 1) Prima Facie Case

To make a prima facie case, Young must show that (1) she is a member of a protected class; (2) she was qualified for the job and performed it satisfactorily; (3) she suffered an adverse employment action; and (4) she was treated differently than similarly situated employees outside of the protected class. *Popo v. Giant Foods LLC*, 675 F.Supp.2d 583, 589 (D.Md. 2009); *see also Taylor v. Virginia Union Univ.*, 193 F.3d 219, 233 (4th Cir. 1999). UPS has conceded on this motion that Young has satisfied the first and third elements of her prima facie because she was pregnant and denied light duty. (ECF No. 60-1, at 24); *see also Miles v. Dell, Inc.*, 429 F.3d 480, 490 (4th Cir. 2005) ("[F]or purposes of establishing a prima facie case of pregnancy discrimination, the protected class is pregnant women, not all women."). Thus, only the second and fourth elements are really at issue.

UPS argues that Young has not established the fourth element of the prima facie case because she has not presented a "comparator," *i.e.*, a similarly situated employee who was

treated differently.[18]  Time and again, Young argues that that

UPS accommodates employees "affected by such things as high

blood pressure, diabetes, vision problems, and drunk driving

convictions," while it denies accommodations for pregnant women.

(ECF No. 76-1, at 42).  She suggests all of these individuals

were similar to her in their inability to work and represent

valid comparators.

UPS correctly notes that each of Young's examples is an

employee who was accommodated (a) under the ADA or (b) under the

provisions of the CBA governing drivers who lose their DOT

certification for various reasons.  (ECF No. 85, at 21-24).  It

concludes that Young's examples are not appropriate comparators

because Young was ineligible for ADA accommodation and did not

lose her DOT certification.  Young responds that drivers losing

their DOT certification *are* valid comparators.  (*See* ECF No. 76-

1, at 45 ("When UPS gives an alternative job to the driver who

fails to meet the DOT requirement and send home the driver who,

because of pregnancy, fails to meet the lifting requirement, UPS

violates the PDA.")).

_____

[18]    Young is not required to point to a similarly situated
comparator as a matter of law; she could succeed on her claim if
other circumstantial evidence suggests discrimination.  *Bryant
v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir.
2003).  She has not presented such circumstantial evidence here.

"The similarity between comparators . . . must be clearly established in order to be meaningful." *Lightner v. City of Wilmington, NC*, 545 F.3d 260, 265 (4th Cir. 2008). In the pregnancy discrimination context, a plaintiff needs to show that her proposed comparators are "similar in their ability or inability to work" to the plaintiff. 42 U.S.C. § 2000e(k). There has been no clear showing here. As the court has already indicated on more than one occasion, drivers who lose their DOT certification are not similar in their inability to work to Young. (*See, e.g.*, ECF No. 43, at 18 ("[I]nformation regarding employees assigned to 'inside jobs' because they lost their certification from the [DOT] and were unable to drive [is] irrelevant."), 21-22 ("Plaintiff is prohibited from asking about matters that are not related to claims in her amended complaint, such as . . . UPS's assignment of alternative work to employees who lost their driver's licenses or failed the DOT exam.")). Such drivers suffer from a legal obstacle to their operation of a vehicle; Young possessed a physical impairment that stymied her ability to lift. Those inabilities are dissimilar. *See, e.g.*, *Walker v. Fred Nesbit Distrib. Co.*, 156 F.App'x 880, 884 (8th Cir. 2005) ("[A pregnant driver's] inability to work stemmed from her inability to meet the fifty-pound lifting requirement of her job, not the loss of her CDL. Given the difference

35

between a male driver who . . . [lost] his license and a female driver given eighteen months of unpaid leave due to an inability to meet the lifting requirement, we hold the district court did not abuse its discretion in concluding that a reasonable jury could have found that [the pregnant driver] was not similarly situated to male drivers . . . [who lost] their CDLs."). Moreover, those with DOT certification maintained the ability to perform any number of demanding physical tasks, while Young labored under an apparent inability to perform tasks involving lifting.

Young complains that by excluding drivers who lost their DOT certification, UPS is effectively "find[ing] a (selective) group that it arguably treated as badly as it treated pregnant employees." (ECF No. 76-1, at 42). She argues that "[t]he PDA does not codify a lowest common denominator, a least-favored nation rule." (*Id.*). The law is different, however. "Employers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994); *accord Daugherty v. Genesis Health Ventures of Salisbury, Inc.*, 316 F.Supp.2d 262, 265 (D.Md. 2004) (Davis, J.) ("[T]he rule seems to be that disability arising from pregnancy cannot be singled out for less favorable treatment."). It is important here to

recall the objective of this element of the *prima facie* case: to discern whether a reasonable inference can be drawn that the employer has animus directed *specifically* at pregnant women. When an employer grants pregnant employees and some class of non-pregnant employees equally harsh terms, it undermines such an inference. In such circumstances, an employer might have some form of animus that is not to be applauded, but the animus is not directed towards a protected trait and, consequently, is not actionable.

Lacking any similarly situated comparator – or any other circumstantial evidence – Young's disparate treatment claim fails.

### 2) **Pretext**

Even if Young had presented a prima facie case, she has not shown that UPS's non-discriminatory explanation was pretextual. The record reflects that Martin earnestly believed that Young's doctor's note rendered her unable to perform her job. She then applied the standard policy applicable to off-duty injuries not otherwise dealt with in the CBA.

Young lists a number of factual points that she says show that UPS is "illogical, inconsistent, and dishonest." Her evidence, however, does not support such a harsh characterization. She argues, for instance, that UPS obviously

37

contrived the lifting requirement because heavy lifting is not truly necessary for all UPS drivers. But Martin relied on a written job description containing the lifting requirement, and there is nothing in the record to indicate that she applied that job description despite knowledge that heavy lifting was not a genuine requirement in an effort to target pregnant women. Thus, at best, all Young has shown is that Martin erroneously relied on an inaccurate job description in barring Young from her job. *See Price v. Thompson*, 380 F.3d 209, 215 n.1 (4th Cir. 2004) ("[M]ere mistakes of fact are not evidence of unlawful discrimination."); *see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) ("[I]t is not [the court]'s province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's [adverse action]." (quotation marks omitted)).

Young quibbles with certain other factual statements made by UPS. These extraneous points do not even require discussion. "Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a 'genuine' dispute, the latter would fail to be

'material.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 216 (4th Cir. 2007).[19]  There is no evidence of pretext.

## 2.  Race-Based Discrimination

UPS moved for summary judgment on the race discrimination claim, arguing that Young has not established that she was treated less favorably than those outside her protected class. (ECF No. 60-1, at 44).  Again, to establish a *prima facie* case of discrimination, Young would need to show that (1) she is a member of a protected class;[20] (2) she suffered an adverse employment action; (3) she was performing satisfactorily at the time of the adverse employment action; and (4) there were circumstances or different treatment giving rise to an inference of discrimination.  *Coleman v. Maryland Court of Appeals*, 626

---

[19]  Young also says that UPS's explanation must be pretextual because "is counter to its own explanations of business interests in personnel matters."  Even if Young is correct, other opposing business interests are served by UPS's policy.  Many if not most business decisions involve a balancing of such interests – and it is inappropriate to declare an explanation for an adverse action "pretextual" merely because an employer chose to sacrifice certain business interests for the sake of other interests.  "Title VII is not a vehicle for substituting the judgment of a court for that of the employer." *DeJarnette*, 133 F.3d at 298-99 (quotation marks omitted).

[20]  Although Young is white, "[i]t is established that 'reverse racism' (race-based discrimination that targets white employees), as alleged here, is actionable under Title VII." *Reed v. Airtran Airways*, 531 F.Supp.2d 660, 668 n.11 (D.Md. 2008).

F.3d 187, 190 (4th Cir. 2010).  UPS's argument goes to the fourth element of the *prima facie* case.

Judging from the amended complaint, Young intended to establish the fourth element by relying – at least in part – on a pattern or practice of racial discrimination at UPS.  (*See, e.g.*, ECF No. ¶¶ 29 ("UPS maintains a pattern of discrimination in employment on the basis of sex and race."); 39 ("UPS maintains a pattern of discrimination on the basis of race."); *see also* ECF No. 69, at 3 (stating Young wished to "determine the presence or absence of a pattern of racially discriminatory allowance and disallowance of accommodations for pregnant employees")).  As the United States Court of Appeals for the Fourth Circuit has recognized, "[e]vidence of a pattern or practice of discrimination may very well be useful and relevant to prove the fourth element of a *prima facie* case . . . or that the employer's articulated reasons for the adverse action was merely pretext."  *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999).

Unfortunately for Young, she has failed to muster any such evidence in this case, as she herself now admits.  (ECF No. 69, at 4).  In fact, the record is devoid of *any* circumstances giving rise to an inference of race-based discrimination, short

of one fleeting instance where an African-American employee was purportedly provided light duty during pregnancy. Based on an examination of the entire summary judgment record, one instance of disparate treatment, standing alone, does not a discrimination claim make. *See Cook v. CSX Transp. Corp.*, 988 F.2d 507, 512 (4th Cir. 1993). In *Cook*, the Fourth Circuit explained:

> We believe, however, that to focus on one piece of the record without considering the whole would distort the permissible inferences to be drawn. The scheme of proof originally articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and adapted in *Moore* to cases of employee discipline, for establishing a prima facie case by circumstantial evidence is not a precise, mechanically-imposed formulation. In each set of circumstances, the burden is on the plaintiff to prove a set of circumstantial facts, which in the absence of a legitimate non-discriminatory explanation, leads one to conclude with reasonable probability that the action taken against him was the product of discrimination. *See Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1418 (4th Cir.), cert. denied, 502 U.S. 963, 112 S.Ct. 429, 116 L.Ed.2d 449 (1991). The question confronting a judge faced with determining whether a prima facie case under Title VII has been made is whether the record as a whole gives rise to a reasonable inference of racially discriminatory conduct by the employer. A plaintiff seeking to establish a prima facie case by relying on a broad history of disciplinary enforcement cannot fairly claim that an inference of racial discrimination should be drawn from one factual circumstance taken out of the context of the

41

disciplinary treatment generally afforded by the employer for conduct similar to that of the plaintiff. We find that the district court was correct to look to the entire record before it in making its decision, rather than seizing upon a particular piece of evidence contained within it.

Accordingly, summary judgment will be entered for UPS on Young's race discrimination claim.

### 3.   Disability-Based Discrimination

The ADA prohibits discrimination against "a qualified individual on the basis of disability." 42 U.S.C. 12112(a). Young asserts two claims under the Act. Both fall short.

### a.   Medical Inquiry

First, Young advances a "very simple" claim that UPS violated the ADA by "selectively" requiring her to submit a doctor's note. (ECF No. 76-1, at 53). One problem with this simple claim is that it is nowhere to be found in Young's amended complaint. Even if this claim was validly pled, it would not succeed because UPS was permitted to ask for such a note in these circumstances.

"The ADA limits the scope of information that employers may seek and disclose about their employees' medical conditions." *Wiggins v. DaVita Tidewater, LLC*, 451 F.Supp.2d 789, 801 (E.D.Va. 2006). Among other things, the ADA prohibits an employer from making inquiries of an employee as to whether he

42

is an "individual with a disability or as to the nature or severity of the disability unless such . . . inquiry is shown to be job-related and consistent with business necessity."[21]    42 U.S.C. § 12112(d)(4)(A); *see also* 42 U.S.C. § 12112(d)(4)(B) ("A covered entity may make inquiries into the ability of an employee to perform job-related functions.").[22]  EEOC regulations provide that that "[t]his provision permits employers to make inquiries or require medical examinations (fitness for duty exams) where there is a need to determine whether an employee is still able to perform the essential functions of his or her job."    29 C.F.R. pt. 1630, App'x § 1630.14(c), *cited with approval in Porter v. U.S. Alumoweld Co., Inc.*, 125 F.3d 243, 246 (4th Cir. 1997).  At least some courts have held that the provision applies to all employees, "regardless of whether the employee has an actual disability."  *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007).

---

[21]    Determining whether an inquiry or examination is "job-related and consistent with business necessity" is an objective inquiry.  *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001).

[22]    Young cites 42 U.S.C. § 12112(d)(3) for the proposition that a medical examination can only be required of a particular employee "where it is required of all such employees."  (ECF No. 76-1, at 52).  That provision applies only to employment entrance examinations.

Assuming that UPS's request for a doctor's note was an "inquiry" under Section 12112(d)(4)(A), it was "job-related and consistent with business necessity." Young delivered letters and packages. It is undisputed that customers had the ability to send heavier packages and that Young would be required to deliver them. The evidence indicates that Young did in fact deliver such packages on prior occasions.[23] *See Porter*, 125 F.3d at 246 ("[T]he facts that [the employee]'s job required lifting and pulling, . . . indicate that the requested fitness for duty exam was indeed job-related and necessary to determine if he could carry out his duties."). When she took a leave of absence for her *in vitro* fertilization treatments, she did so because she was no longer able to lift. She had previously taken several such leaves of absence. As the United States Court of Appeals for the Second Circuit has explained:

---

[23] Indeed, the fact that Young requested light duty in the first place could be seen as a tacit acknowledgment that her job involved lifting heavier items.

> [C]ourts will readily find a business
> necessity if an employer can demonstrate
> that a medical . . . inquiry is necessary to
> determine . . . whether the employee can
> perform job-related duties when the employer
> can identify legitimate, non-discriminatory
> reasons to doubt the employee's capacity to
> perform his or her duties (such as frequent
> absences or a known disability that had
> previously affected the employee's work).

*Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 98 (2[d] Cir. 2003). Because UPS possessed objective facts suggesting Young might have lost the ability to perform central job functions, it had a legitimate reason to seek some verification that Young had recovered her ability to perform those duties. *See, e.g.*, *Porter*, 125 F.3d at 247 (holding employer's medical inquiry was job-related and consistent with business necessity when employee returned to job involving lifting after back surgery); *accord Thomas*, 483 F.3d at 527 (holding employer had a legitimate reason to evaluate employee's fitness for duty where employee had previously exhibited signs of work-place stress).

**b. Failure to Accommodate**

Young also contends that Young wrongfully failed to offer her an accommodation, even though it regarded her as disabled. UPS maintains that it did not regard Young's temporary lifting limitation as a disability under the ADA. Even if it had, UPS suggests that it has no duty to accommodate employees who are "regarded as" disabled but are not disabled in fact.

45

To establish a prima facie case for failure to accommodate, Young must show: "(1) that [s]he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [s]he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations." *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001); *see also EEOC v. Rite Aid Corp.*, --- F.Supp.2d ---, No. CCB-08-2576, 2010 WL 459842, at *5 (D.Md. Nov. 10, 2010). The parties' arguments here primarily concern the first element – whether Young in fact had a disability. The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Young relies on subsection (C), which covers circumstances when the employer "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999), *superseded on other grounds by* ADA Amendments Act of 2008, Pub.L. 110-325, 122 Stat. 3553 (2008). Put differently, this "regarded as" coverage arises when the employer "believe[s] . . . that [an individual] has a

46

substantially limiting impairment when, in fact, the impairment is not so limiting." *Id.* There is some emphasis on substantial in this analysis; an employer's mistaken belief that an employee is mildly impaired is not enough. Rather:

> [a]n employer regards a person as substantially limited in her ability to work if the employer perceived her to be significantly restricted in her ability to perform either a class of jobs or a broad range of jobs in various classes. One must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs.

*Rohan v. Networks Presentations LLC*, 375 F.3d 266, 277 (4th Cir. 2004) (quotation marks, citations, and brackets omitted).

A person is not substantially limited in a major life activity merely because she is (a) limited to lifting a few pounds or (b) pregnant. *See Stewart v. West*, 228 F.Supp.2d 660, 662-63 (D.Md. 2002) ("[A] person is not substantially limited in a major life activity because she is limited to lifting ten to fifteen pounds."); *Wenzlaff v. NationsBank*, 940 F.Supp. 889, 890 (D.Md. 1996) ("With near unanimity, federal courts have held that pregnancy is not a 'disability' under the ADA."); *see also Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 349 (4th Cir. 1996) ("[W]e hold, as a matter of law, that a twenty-five pound lifting limitation – particularly when

compared to an average person's abilities – does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity."). Nor would a temporary impairment typically constitute a disability. *See Pollard v. High's of Baltimore*, 281 F.3d 462, 468 (4th Cir. 2002) ("[T]emporary impairments usually do not fall within the ADA's definition of 'disability.'"). Consequently, Young would need to show that UPS regarded her as having more than a temporary lifting restriction and pregnancy. "Unless UPS mistakenly believed [Young] was substantially limited in a major life activity, it was free to decide that [her] lifting restrictions (real or perceived) prevented [her] from returning to [her] job as a . . . driver." *Jones v. UPS, Inc.*, 502 F.3d 1176, 1191 (10th Cir. 2007).

The evidence Young presents probably does not indicate that UPS believed her to be anything other than a pregnant individual with a temporary lifting restriction. For instance, the most persuasive evidence is UPS's decision to "code" her as disabled. But, as UPS observes, there is little to indicate that any relevant decisionmaker was involved in assigning Young that code. "[W]hen an employee asserts . . . that he was regarded as disabled, the analysis focuses on the reactions and perceptions of the [employer's] decisionmakers who worked with the

48

employee." *Wilson v. Phoenix Specialty Mfg. Co., Inc.*, 513 F.3d 378, 385 (4th Cir. 2008) (quotation marks omitted). Martin specifically disclaims any belief that Young was disabled.

Ultimately, it is not necessary to reach any definite conclusion on the factual question, because an employer is under no obligation to accommodate an employee who is simply regarded as disabled. Concededly, the circuit courts have been split on this question for some time. The Fifth, Sixth, Eighth, and Ninth Circuits have held that "regarded as" disabled employees are not entitled to accommodation. *See, e.g.*, *Duello v. Buchannan Cnty. Bd. of Supervisors*, 628 F.3d 968, 972 (8th Cir. 2010) ("Under long-held circuit precedent, 'regarded as' plaintiffs are not entitled to reasonable accommodations because the ADA was not intended to grant reasonable accommodations to those who are not actually disabled."); *Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1232-33 (9th Cir. 2003) (same); *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999) (same); *Newberry v. E. Texas State Univ.*, 161 F.3d 276, 280 (5th Cir. 1998). The First, Third, Tenth, and Eleventh Circuits disagree, finding that the ADA's accommodation provision reaches "regarded as" disabled employees in addition to the actually disabled. *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1240 (11th Cir. 2005) (concluding employers do have duty to accommodate

49

individuals regarded as having a disability); *Kelly v. Metallics W., Inc.*, 410 F.3d 670, 675-76 (10th Cir. 2005) (same); *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 772-76 (3[d] Cir. 2004); *Katz v. City Metal Co., Inc.*, 87 F.3d 26, 32-33 (1st Cir. 1996). The United States Court of Appeals for the Fourth Circuit has not yet decided this issue. *Shin v. Univ. of Maryland Med. Sys. Corp.*, 369 F.App'x 472, 480 n.15 (4th Cir. Mar. 11, 2010). Nevertheless, several district courts in this circuit have concluded that "the better reasoned view appears to be that an employer has no duty under the ADA to accommodate a plaintiff alleging regarded as liability." *Blackburn v. Trs. Of Guilford Tech. Cmty. Coll.*, No. 1:09cv00497, 2010 WL 3310247, at *2 (M.D.N.C. Aug. 17, 2010) (quotation marks and citations omitted); *accord Bateman v. American Airlines, Inc.*, 614 F.Supp.2d 660, 672 (E.D.Va. 2009) ("Although this issue remains an open question in the Fourth Circuit, the majority view is that employers have no duty to offer a reasonable accommodation to employees who are merely regarded as disabled."); *Green v. CSX Hotels, Inc.*, 650 F.Supp.2d 512, 519 (S.D.W.Va. 2009) ("There is no dispute between the parties that employers are under no duty to offer reasonable accommodations to 'regarded as' plaintiffs."); *Betts v. Rector & Visitors of Univ. of Virginia*, 198 F.Supp.2d 787, 799 n.10 (W.D.Va. 2002) (finding

employer had no duty to provide accommodation to "regarded as" plaintiff); *but see Dean v. Philip Morris USA Inc.*, No. 1:02CV149, 2003 WL 21754998, at *4 (M.D.N.C. July 29, 2003) (quoting *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 196 (3[d] Cir. 1999) for the proposition that the ADA "does not appear to distinguish between disabled and 'regarded as' individuals in requiring accommodation").

That consensus is grounded in sound logic or, as one court has put it, "common sense." *Powers v. Tweco Prods., Inc.*, 206 F.Supp.2d 1097, 1114 (D.Kan. 2002). Although the ADA rightfully intends to restore the damages "regarded as" disabled employees suffer because of disability discrimination, it is an entirely different proposition to suggest that these employees deserve additional *benefits* despite their lack of any actual disability. Courts requiring accommodations for "regarded as" disabled employees seem to ignore this distinction. *See, e.g.*, *Kelly Metallics*, 410 F.3d at 676. "The central purpose of [the ADA and the ADEA] is to make the plaintiff 'whole.'" *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1338 (11th Cir. 1999). When a "regarded as" plaintiff is awarded damages for discrimination, he has presumably suffered real damages from real discrimination, even if the basis for the discrimination is illusory. In the accommodation context, however, he has not

51

suffered any legally cognizable harm and there is nothing to make whole.

Forcing employers to accommodate "regarded as" employees in such a manner would "create a windfall for . . . employees who, after disabusing their employers of their misconceptions, would nonetheless be entitled to accommodations that their similarly situated co-workers are not, for admittedly non-disabling conditions." *Weber*, 186 F.3d at 917. Indeed, one might conclude that is happening in this case, where Young continually denied being disabled but claims a present entitlement to benefits that would only inure to her because of the fortuity of UPS's alleged mistake. In addition, providing damages for only illusory benefits would undermine the statutory purpose of the ADA "to provide *clear*, strong, *consistent*, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2) (emphasis added). If accommodations were offered to those "regarded as" disabled, employers would be compelled to offer accommodations to an ever-changing class of individuals based on the employer's individual conceptions. That might simply lead the employer to offer accommodations and other resources to anyone even remotely impaired, which in turn "would potentially require employers to divert resources away from those truly disabled under the Act,

thereby running the risk that employers might inadequately accommodate those who are actually disabled." *Bateman*, 614 F.Supp.2d at 673. Finally, as the Ninth Circuit has noted, mandating accommodation in "regarded as" circumstances would provide a strange incentive for impaired - but not disabled - employees actually to encourage their employers' misconceptions so as to qualify for accommodation. *See Kaplan*, 323 F.3d at 1232.

The 2008 Amendments to the ADA also adopt the view that accommodations need not be given to "regarded as" employees. *See* 42 U.S.C. § 12201(h) ("A covered entity . . . need not provide a reasonable accommodation . . . to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of such section."; *see also* Allison Ara*, The ADA Amendments Act of 2008: Do the Amendments Cure the Interpretation Problems of Perceived Disabilities?*, 50 Santa Clara L. Rev. 255, 276-77 (2010) ("Congress apparently agreed with the Fifth, Sixth, Eighth, and Ninth Circuits' determination that allowing reasonable accommodation for those who were 'regarded as' disabled would be bizarre."). Although those amendments do not apply to this case, the amendments further buttress the notion that Congress never intended the accommodation provision to protect "regarded as" disabled

employees.  *See Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004) ("[C]ourts regularly view a conflict in the courts with regard to the proper interpretation of a statute . . . as an indication that Congress passed a subsequent amendment to clarify rather than change existing law.").

Because Young was not entitled to accommodation even if UPS regarded her as disabled, her remaining ADA claim must be dismissed.

## IV.  Motions to Continue and Compel

Young alternatively moves for a continuance under former-Rule 56(f) of the Federal Rules of Civil Procedure.  She argues that, before the court can grant summary judgment, she should be permitted to take additional discovery concerning (1) "information about additional comparators," and (2) the typical weights of the packages she delivered.  (ECF No. 80, at 5, 6-7). She requests this discovery – and several other discovery items – in her third motion to compel.  (ECF No. 78).

Pursuant to Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion."  "The purpose of the affidavit is to ensure that the nonmoving party is invoking the protections of Rule 56[(d)] in good faith and to afford the

trial court the showing necessary to assess the merit of a party's opposition." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quotation marks omitted). Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery. Rather, the plaintiff must provide an affidavit that:

> . . . particularly specifies legitimate needs for further discovery and identifies which aspects of discovery required more time to complete. Indeed, the Fourth Circuit places great weight on the Rule 56[(d)] affidavit and, to that end, a party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment when it failed to comply with the requirement of Rule 56[(d)] to set out reasons for the need for discovery in an affidavit.

*Amirmokri v. Abraham*, 437 F.Supp.2d 414, 420 (D.Md. 2006) (quotation marks, citations, and brackets removed). A court also may deny a Rule 56(d) motion "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs.*, 55 F.3d 943, 954 (4th Cir. 1995).

UPS takes issue with the technical sufficiency of Young's 56(d) submission, which consisted of a declaration signed by counsel attesting to the truthfulness of the facts in her motion and asking for additional discovery. Such a declaration seems sufficient. Even if it did lack some formal requirement, it

would nevertheless be appropriate to consider Young's motion because, at the very least, it "serve[s] as the functional equivalent" of a Rule 56(d) affidavit, and Young was "not lax in pursuing discovery." *Harrods*, 302 F.3d at 244-45.

Nevertheless, Young's technically sufficient motion must be denied, as the additional requested discovery would not create a genuine dispute of fact sufficient to defeat summary judgment. First, Young seeks additional evidence concerning relevant comparators. Although such information might be useful in establishing the fourth element of her prima facie PDA case, it would not correct the fact that Young has failed to demonstrate pretext. Moreover, the record reflects that UPS has in fact produced a substantial number of materials concerning employees whom UPS accommodated.

Second, Young requests additional discovery concerning the package weights that Young delivered, complaining that UPS has only provided package weights for a period *after* Young's pregnancy. She contends that she needs such evidence to establish that lifting heavier packages was not a business necessity. Once again, additional discovery would not serve any fruitful purpose because Young's own admissions effectively establish that lifting packages was a business necessity. She admitted that, at least on some occasions, she did in fact

deliver packages.  She also admitted that she had no control over the packages that she was given, and that UPS customers were free to send heavier packages.  And her request for light duty when she initially sought to return to work is effectively a tacit admission that her work as a driver at least sometimes entailed making heavier deliveries.  Although she characterizes this lifting as a "tiny sliver" of her work, there can be no reasonable dispute that an essential element of working as a UPS delivery driver involves transporting and carrying packages of varying sizes from one location to another.  As such, it would be inappropriate to force UPS to assume the burdensome task of parsing through complex billing records that might provide additional – but incomplete – information concerning package weights.  In addition, Young admits that other employees had offered to carry her heavier packages around the time of her pregnancy.  Thus, packages weights from around that time (which are primarily the weights that Young wishes to discover) are not especially useful in determining what package weights an ordinary UPS air driver would typically be expected to deliver.

As a more general matter, there is no reason to doubt that Young has had the opportunity to engage in sufficient discovery.  For over two years now, following more than one extension, Young has had the chance to engage in comprehensive discovery, which

has included several depositions covering a variety of subjects. *Cf. Pardo-Kronemann v. Donovan*, 601 F.3d 599, 612 (D.C. Cir. 2010) (refusing to reverse denial of motion to continue and stating, "After ten months of discovery, including multiple extensions, this decision hardly amounted to an abuse of discretion."). The court has twice granted motions to compel filed by Young. She may hope that additional discovery would produce more useful evidence, but "the mere hope that something might turn up in further discovery does not satisfy the standard" of Rule 56(d). *Goodell v. Rehrig Int'l, Inc.*, 683 F.Supp. 1051, 1054 (E.D.Va. 1988).

Because the court finds no need to delay disposition of the summary judgment motion for unnecessary further discovery, the motion to compel and the motion for a continuance will both be denied.

## V. Motions to Seal

Both parties have also submitted motions to seal. A motion to seal must comply with Local Rule 105.11, which provides:

> Any motion seeking the sealing of pleadings, motions, exhibits or other papers to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protections. The Court will not rule upon the motion until at least 14 days after it is entered on the public docket to

> permit the filing of objections by
> interested parties. Materials that are the
> subject of the motion shall remain
> temporarily sealed pending a ruling by the
> Court. If the motion is denied, the party
> making the filing will be given an
> opportunity to withdraw the materials.

This rule endeavors to protect the common law right to inspect and copy judicial records and documents, *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), while recognizing that competing interests sometimes outweigh the public's right of access, *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984).

Before sealing any documents, the court must provide the non-moving party with notice of the request to seal and an opportunity to object. *Id.* This notice requirement may be satisfied by either notifying the persons present in the courtroom or by docketing the motion "reasonably in advance of deciding the issue." *Id.* at 234. Finally, the court should consider less drastic alternatives to sealing, such as filing redacted versions of the documents. If the court decides that sealing is appropriate, it should also provide reasons, supported by specific factual findings, for its decision to seal and for rejecting alternatives. *Id.* at 235.

Both parties seek to seal certain exhibits in connection with the motion for summary judgment; both motions currently

stand unopposed after having been on the docket for several
weeks.  Young moves to seal certain exhibits produced by UPS
under a "confidential" designation, which contain both personal
employee information and certain sensitive corporate data.
Under the terms of a consent protective order entered May 27,
2009, such information was provided to the court under seal.
(*See* ECF No. 22 ¶ 2).  In a similar vein, UPS moves to seal
certain exhibits that contain sensitive medical information
about some of its employees.  This type of information may be
appropriately sealed.  *See Pittson Co. v. United States*, 368
F.3d 385, 406 (4th Cir. 2004) (affirming decision to seal certain
"confidential, proprietary, commercial, or financial data" that
was produced under a protective order); *Briggs v. Marriott
Int'l, Inc.*, 368 F.Supp.2d 461, 463 n.1 (D.Md. 2005) (sealing
sensitive medical records).  Moreover, both parties have moved
to seal only a narrow class of exhibits – not all exhibits to
the motion or the accompanying memoranda.  Given the lack of
objection, the sensitive nature of the information contained in
the sealed documents, the indication that less-severe
alternatives would prove unwieldy, and the small number of
documents to be sealed, the court will grant both motions to
seal.

## VI.  Conclusion

For the foregoing reasons, the motion to dismiss in part, the motion to compel, and the motion "to continue" will all be denied.   The motion for summary judgment and both motions to seal will be granted.   A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge